CAMPBELL & WILLIAMS
J. COLBY WILLIAMS, (5549)
710 South Seventh Street, Suite A
Las Vegas, Nevada 89101
Telephone: 702/382-5222
702/382-0540 (fax)
jcw@cwlawlv.com

Local Counsel for Lead Plaintiff
International Trading Group, Inc.

ROBBINS GELLER RUDMAN
& DOWD LLP
RYAN A. LLORENS
JEFFREY J. STEIN
JOHN M. KELLEY
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
ryanl@rgrdlaw.com
jstein@rgrdlaw.com
jkelly@rgrdlaw.com

Lead Counsel for Lead Plaintiff
International Trading Group, Inc.

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| JOSE CHUNG LUO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SPECTRUM PHARMACEUTICALS, INC., JOSEPH W. TURGEON, KURT A. GUSTAFSON, FRANCOIS J. LEBEL, M.D., THOMAS J. RIGA,<br><br>Defendants. | No. 2:21-cv-01612-CDS-BNW<br><br><u>CLASS ACTION</u><br><br>AMENDED CONSOLIDATED CLASS ACTION COMPLAINT |

## TABLE OF CONTENTS

Page

SUMMARY OF THE ACTION ....................1
JURISDICTION AND VENUE ....................4
THE PARTIES....................4
A. Plaintiff ....................4
B. Defendants ....................4
FACTUAL ALLEGATIONS ....................5
A. Spectrum and Its Two Products ....................5
B. Defendants Mislead Investors About the Efficacy of and Market Need for Poziotinib ....................6
1. The Design of Poziotinib Trials ....................6
2. Defendants Misleadingly Use MD Anderson Trial Results ....................8
3. The FDA Rejects Poziotinib as a Potential Breakthrough Therapy ....................10
4. The ZENITH20 Clinical Trial with the FDA ....................11
a. Cohort 1 Falls Well Short of Investor Expectations ....................12
b. Cohort 3 Also Falls Well Short of Expectations....................13
C. Defendants Mislead Investors About the Condition of the Manufacturing Facility for Rolontis ....................14
1. The Rolontis BLA....................14
2. Spectrum Withdraws the Rolontis BLA and Defendants Falsely and Misleadingly Assure Investors that the Implications Are Minor ....................16
3. Spectrum Resubmits the BLA and Defendants Falsely and Misleadingly Say They Are Prepared for the FDA Inspection....................17
D. Turgeon and Gustafson Abruptly Depart from the Company ....................18
MATERIALLY FALSE AND MISLEADING STATEMENTS....................19
A. False Statements Regarding Poziotinib ....................19
1. Statements During the MD Anderson Trial....................19
2. Statements During Cohort 1 of the ZENITH20 Trial ....................23
3. Statements During Cohort 3 of the ZENITH20 Trial ....................27



4883-3848-5041.v2

**Page**


B. False Statements Regarding Rolontis ....29

1. Statements Regarding the First BLA Submission ....29

2. Statements Regarding the Second BLA Submission ....31

ADDITIONAL EVIDENCE OF SCIENTER ....36

A. Defendants Repeatedly Expressed Their Knowledge of Material Information ....36

B. Defendants Engaged in Insider Trading ....37

C. The Fraud Implicated Spectrum's Core Products and Operations....39

D. Turgeon and Gustafson Abruptly Left After the Class Period ....40

E. Defendants Signed Sarbanes-Oxley Certifications Attesting that They Personally Supervised Spectrum's Controls and Procedures ....41

F. Spectrum's Intra-Class Period Financing Incentivized Fraud ....41

SCHEME LIABILITY....42

LOSS CAUSATION....42

NO SAFE HARBOR ....44

SPECTRUM SECURITIES TRADED IN AN EFFICIENT MARKET....45

CLASS ACTION ALLEGATIONS ....46

COUNT I ....47

COUNT II ....50

COUNT III....51

PRAYER FOR RELIEF ....52

DEMAND FOR TRIAL BY JURY ....53

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired Spectrum Pharmaceuticals, Inc. ("Spectrum" or the "Company") common stock between March 7, 2018 and August 5, 2021, inclusive (the "Class Period"), and were damaged thereby (the "Class"), against: (i) Spectrum; (ii) former Chief Executive Officer ("CEO") Joseph W. Turgeon ("Turgeon"); (iii) former Chief Financial Officer ("CFO") Kurt A. Gustafson ("Gustafson"); (iv) Chief Medical Officer ("CMO") Francois J. Lebel, M.D. ("Lebel"); and (v) Chief Operating Officer ("COO") Thomas J. Riga ("Riga") (collectively "Defendants"), under the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. Lead Plaintiff International Trading Group, Inc. ("Plaintiff"), on behalf of itself and the Class, by and through its counsel Robbins Geller Rudman & Dowd LLP ("Counsel"), alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Plaintiff's information and belief are based on, among other things, the independent investigation of Counsel. This investigation includes, but is not limited to, a review and analysis of: (i) public filings by Spectrum with the U.S. Securities and Exchange Commission ("SEC"); (ii) public filings and materials concerning Spectrum and its products with the U.S. Food and Drug Administration ("FDA"); (iii) transcripts of Spectrum senior management's conferences with investors and analysts; (iv) press releases and media reports issued about and disseminated by the Company; (v) analyst reports issued about Spectrum; and (vi) other public information and data regarding the Company.

## SUMMARY OF THE ACTION

3. Spectrum is a small pharmaceutical company that makes money by purchasing the rights to late-stage developmental drugs with an aim to bring them to market and profit off of them. Spectrum's two primary developmental drugs during the Class Period – and the focus of this pleading – were poziotinib, a drug that purports to treat specific lung cancers, and Rolontis, a drug that purports to treat neutropenia, a side effect of chemotherapy.

4. Turgeon took over as CEO of Spectrum in December 2017. His first earnings call as CEO, concerning financial results from Q4 2017, took place after market close on the day before the

Class Period began, March 6, 2018.[1] On that call, he promised to be "concise, transparent and focused around the key drivers of our progress" on his future calls with investors. He claimed that in addition to his commitment to transparency, he would also bring a "different style" than past CEOs, because in his words: "I'm very data-driven, and I expect the company to make decisions based on science and data, and that's the way we will do it."

5. Contrary to these representations, however, Turgeon and his colleagues were not transparent, and consistently made statements and took actions contrary to the data underlying their clinical trials. During Turgeon's brief and tumultuous tenure as CEO, Defendants undertook a scheme under which they consistently materially misrepresented the status and progress of poziotinib and Rolontis, and withheld negative data and other information from investors about these developmental products.

6. Regarding poziotinib, Defendants chose to conduct poziotinib's clinical trial on an "unmasked" basis, meaning they had ready access to the trial data – which was far below market expectations – as it came in. Rather than share this bad data with investors, Defendants instead concealed it and misleadingly claimed they were "absolutely confident" the drug trials would succeed. Defendants also touted the drug as addressing a "huge unmet need" among lung cancer patients, but misrepresented the then-existing standard of care, falsely claiming existing products only produced responses in 6-8% of patients, when in reality the best existing products produced responses in 22.9% of patients. Accordingly, investors regarded poziotinib's anticipated 20-30% effectiveness as a substantial improvement over existing therapies when in reality it was not an improvement at all.

7. Regarding Rolontis, Defendants insisted they had taken extreme measures at their South Korean manufacturing facility to ensure they would pass an FDA inspection critical to the drug's approval. They claimed Spectrum was "absolutely ready" for the inspection because they had routinely interacted with the FDA to understand the requirements and had retained experts to examine the facility to make sure it met those requirements. In reality, however, Spectrum was so

[1] As used herein, "Q" means the Company's fiscal quarter (*e.g.*, Q4 2017 means the fourth fiscal quarter of 2017).

unprepared for the inspection that the FDA found a laundry list of deficiencies, including fundamental mistakes such as failing to properly clean equipment and follow their own protocols.

8. Defendants' scheme and misrepresentations ultimately took their toll on Plaintiff and other investors. By the end of the Class Period, the failed drugs were still not approved by the FDA and the price of Spectrum common stock had plummeted from $21.23 per share to $2.55 per share, a small fraction of its original price. The stock price has never recovered from this dramatic decline, remaining under $1.00 per share at the time of this filing.




9. As everyday investors suffered from Defendants' scheme, both Turgeon and Gustafson became millions of dollars richer from opportunistic and suspiciously timed insider trades, including trades contemporaneous with purchases from Plaintiff, who did not have the same inside information. For example, in the weeks leading up to the last alleged disclosure concerning poziotinib's failed clinical trial, Turgeon initiated the two biggest trades of his tenure, dumping nearly half of his shares and pocketing nearly $1.4 million in profit. Just six days after Turgeon completed the second sale, Spectrum disclosed the devastating results and Spectrum's stock price fell.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under §§10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a), and 78t-1, and SEC Rule 10b-5 promulgated thereunder by the 17 C.F.R. §240.10b-5.

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

12. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act, 15 U.S.C. §78aa, because Spectrum's headquarters were located within this Judicial District throughout the Class Period, and Defendants conducted substantial economic activity in the Judicial District. As such, substantial acts in furtherance of the alleged fraud have occurred in this Judicial District.

13. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

### A. Plaintiff

14. Lead Plaintiff is a Pennsylvania-based private company owned and operated by its president, John T. McGann, Jr. During the Class Period, Plaintiff made significant investments in Spectrum common stock on the NASDAQ and suffered damages as a result of the violations of the federal securities laws alleged herein, as detailed in the attached certification (Exhibit A). Plaintiff maintains its principal place of business at 151 W. Highland Avenue, Suite B, Philadelphia, PA 19118.

### B. Defendants

15. Defendant Spectrum is incorporated in Delaware and, during the entire Class Period, its corporate headquarters were in Henderson, Nevada. Spectrum common stock trades on the NASDAQ under the ticker symbol "SPPI."

16. Defendant Turgeon was Spectrum's President and CEO from December 2017 until December 2021. Prior to becoming CEO, Turgeon was President and COO from April 2014 until December 2017. Spectrum announced Turgeon's retirement on December 1, 2021.

17. Defendant Gustafson was Spectrum's Executive Vice President and CFO from June 2013 until February 2022. Spectrum announced Gustafson's resignation on February 23, 2022.

18. Defendant Lebel has been Spectrum's Executive Vice President and CMO since November 5, 2018.

19. Defendant Riga was Spectrum's Chief Commercial Officer from August 2014 to December 2017, then COO from December 2017 to December 2021. Spectrum announced Riga as President and CEO to succeed Turgeon in December 2021, a position Riga still holds.

20. Turgeon, Gustafson, Lebel, and Riga are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions at Spectrum, possessed the power and authority to control the contents of Spectrum's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.

21. Each of the Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions that were being made were then materially false and/or misleading.

## FACTUAL ALLEGATIONS

### A. Spectrum and Its Two Products

22. Spectrum is a relatively small pharmaceutical company, with under 250 total employees. Spectrum kept its corporate headquarters in Henderson, Nevada throughout the Class Period, and maintained a research facility in Irvine, California, but outsourced most of its manufacturing overseas, including to South Korea.

23. According to its website, Spectrum is "a biopharmaceutical company focused on acquiring, developing, and commercializing novel and targeted drug products." Spectrum does not create drugs, but rather purchases drugs in late-stage clinical trials with an aim to bring them to market and profit off of them. Spectrum focuses on hematologic (blood) and oncologic (cancer) drugs. During the Class Period, Spectrum focused on two developmental drugs, poziotinib and Rolontis.[2]

24. Poziotinib is an investigational drug that Spectrum claims limits tumor activity among people with Non-Small Cell Lung Cancer ("NSCLC"). Specifically, Spectrum claims that poziotinib limits tumor progression in patients with genetic mutations at exon 20 of either the epidermal growth factor receptor ("EGFR") or the human epidermal growth factor receptor 2 ("HER2"). Such mutations may lead to abnormal cell growth, causing tumor formation and progression. Poziotinib is designed to be a tyrosine kinase inhibitor ("TKI"), which according to Spectrum may block enzymes needed for cell growth and slow or stop tumor progression.

25. Rolontis, also an investigational drug, does not treat cancer, but purports to treat a chemotherapy-induced side effect called neutropenia. Neutropenia refers to an abnormally low concentration of white blood cells in a patient's blood, which leaves the patient susceptible to infection. According to Spectrum, Rolontis promotes the production of additional white blood cells in these patients. At all relevant times, other drugs existed in the marketplace that performed the same function as Rolontis, albeit through a different molecule.

### B. Defendants Mislead Investors About the Efficacy of and Market Need for Poziotinib

#### 1. The Design of Poziotinib Trials

26. Plaintiff's poziotinib allegations center around two clinical trials. The first, initiated with the FDA in February 2017, was sponsored by and solely conducted at the MD Anderson Cancer Center in Houston, Texas (the "MD Anderson Trial"). The second, called ZENITH20 and initiated

[2] On March 17, 2022, Spectrum announced that, due to a naming conflict identified by the FDA, it would no longer use the name "Rolontis," but would instead refer to the drug by its scientific name, "eflapegrastim." For clarity, and because Spectrum used the "Rolontis" name throughout the Class Period, Plaintiff will refer to the drug exclusively as Rolontis in this pleading.

in October 2017, included a much larger patient pool, was sponsored by Spectrum, and involved a variety of locations throughout America, Canada, Europe, and the Middle East (the "ZENITH20 Trial" or "ZENITH20"). The parameters of these trials are discussed in more detail below.

27. For both trials, the efficacy of poziotinib was measured in terms of objective response rate ("ORR"). ORR is a common metric for cancer treatment, and measures the proportion of patients whose tumor either disappears or reduces in size. Therefore, a higher ORR indicates a more effective drug.

28. Participants in the MD Anderson Trial and the relevant portions of the ZENITH20 Trial had confirmed NSCLC with EGFR mutations at exon 20. Before treatment, they received a preliminary radiological scan to assess baseline tumor size. Then, they took the drug once per day in 28-day cycles. After one full cycle (for the ZENITH20 Trial) or two full cycles (for the MD Anderson Trial), patients received the first treatment-related scan, which was evaluated to determine whether the tumor had responded to the medication. After these first scans, confirmatory scans were performed and analyzed four weeks later (ZENITH20) or eight weeks later (MD Anderson Trial). Thereafter, scans were performed every eight weeks to assess the durability of the treatment (*i.e.*, whether the tumor remained under control). In other words, after the initial scan at four or eight weeks, the decisive information about a patient's response to the drug (and the foundation of the study's overall ORR) was determinable. These results were then fully confirmed at the next scan, eight weeks after initiation of treatment for the ZENITH20 Trial and sixteen weeks after initiation of treatment for the MD Anderson Trial.

29. According to the FDA, at the time of the poziotinib trials the best existing therapy for patients with EGFR exon 20 mutations was chemotherapy combined with an EGFR inhibitor, which achieved an ORR of 22.9%. TKIs like poziotinib had proven much less effective at treating the disease, producing ORRs in the single digits. Nevertheless, in accordance with guidance from the FDA, poziotinib would be compared to the best available treatment in its clinical trials to determine whether it produced a clinically meaningful benefit to patients. Accordingly, as the FDA made clear to Defendants, it would not consider any drug with an ORR less than 30% as clinically meaningful.

30. Clinical trials can be conducted on either a blind basis, which means that the Company does not have access to the data and results until the trial is complete, or an unmasked basis, which means the data is available throughout the trial. According to *Guidance for Industry* from the FDA, conducting a blind trial is one of "[t]he most important design techniques for avoiding bias in clinical trials." The *Guidance for Industry* explains that blinding a trial prevents intentional or unintentional manipulation of data, specifically:

> Blinding or masking is intended to limit the occurrence of conscious and unconscious bias in the conduct and interpretation of a clinical trial arising from the influence that the knowledge of treatment may have on the recruitment and allocation of subjects, their subsequent care, the attitudes of subjects to the treatments, the assessment of end-points, the handling of withdrawals, the exclusion of data from analysis, and so on. The essential aim is to prevent identification of the treatments until all such opportunities for bias have passed.

31. Contrary to this guidance, the poziotinib trials were conducted on an unmasked basis, which means that Spectrum could access the data and results as they came in.

**2. Defendants Misleadingly Use MD Anderson Trial Results**

32. In March 2017, MD Anderson launched a Phase 2 clinical trial of poziotinib with the assistance of Spectrum. The trial included 80 participants, and participants were evaluated in eight-week intervals. Every participant received treatment at the MD Anderson Cancer Center in Houston, Texas. MD Anderson has long been rated by *US News* as the best hospital for cancer care in the nation, ranking as one of the top two hospitals for cancer care every year since the survey began in 1990.

33. Since the MD Anderson Trial occurred at one location, it is referred to as a single-center trial, as opposed to a multicenter trial. According to *Guidance for Industry* from the FDA, multicenter trials lead to more translatable results:

> [A] trial may be designed as a multicenter (and multi-investigator) trial primarily to provide a better basis for the subsequent generalization of its findings. This arises from the possibility of recruiting the subjects from a wider population and of administering the medication in a broader range of clinical settings, thus presenting an experimental situation that is more typical of future use.

In other words, since multicenter trials by definition involve a more diverse and representative pool of treatment centers across the country and the world, results from multicenter trials are less impressive but more reliable in predicting how a drug will perform in real life.

34. The results from the MD Anderson Trial were especially skewed because every patient was treated at the world-class MD Anderson Center. Therefore, the drop-off from the level of care at MD Anderson to the average cancer care center was particularly dramatic.

35. Data from the MD Anderson Trial began to become available no later than May 2017 (eight weeks after initiation of the trial). Indeed, at the World Conference on Lung Cancer in Japan in October 2017, MD Anderson presented "unconfirmed" data from the first 11 patients with EGFR exon 20 mutations. Ultimately, on September 24, 2018, Defendants released the full MD Anderson Trial data that they had had access to for months, which revealed that poziotinib had an ORR of 43% in the single-center study.

36. Prior to the announcement of the MD Anderson results, while Defendants had access to the final data, they were covertly conditioning the market to incorrectly believe that a 40% ORR from that prestigious single-center trial would be considered a "home run" by the FDA. For example, on August 9, 2018, Riga said Spectrum was "very much aligned with the agency [FDA]" about "the statistics that are expected" for poziotinib approval. Using these misconceptions, Turgeon led investors to believe that, with respect to poziotinib, "if I can get a 20% to 30% response rate, I can get a drug approved" and "if you get a 40% or more response rate, that's a home run." Investors believed these misrepresentations. On September 6, 2018, an analyst from H.C. Wainwright adopted Turgeon's conclusions, referencing "the range of 20-30% [ORR] that we would consider necessary for FDA approval."

37. Defendants supported these misrepresentations by repeatedly understating the best available treatment on the market. For example, on May 16, 2018, Turgeon claimed poziotinib addressed a "huge unmet need" because "current TKIs and other therapies only have a 6% to 8% response rate." But Turgeon failed to disclose that existing TKIs were not the comparator that the FDA would use against poziotinib, and therefore was not the correct comparator for investors to consider. Rather, as Defendants understood at the time, the FDA would compare poziotinib to the

best current therapy, chemotherapy with an EGFR inhibitor, which achieved a 22.9% ORR. Accordingly, as Defendants would later admit, the FDA would not consider poziotinib as a meaningful improvement over existing therapies unless a ***multicenter*** trial demonstrated an ORR of ***at least 30%***.

### 3. The FDA Rejects Poziotinib as a Potential Breakthrough Therapy

38. Spectrum used data from the MD Anderson Trial to apply to the FDA for breakthrough therapy designation ("BTD") for poziotinib. BTD status expedites the FDA's development and review of drugs, but to qualify the drug must: (1) be intended to treat a serious condition; and (2) represent a "substantial improvement" over existing therapies, which is a significantly higher bar than the "clinically meaningful" result required for FDA approval.

39. Defendants claimed they regularly engaged with the FDA about the agency's expectations and requirements for BTD status. For example, on May 3, 2018, Riga said Spectrum was "in regular discussions with the FDA." And on August 9, 2018, while discussing the upcoming ZENITH20 trials for FDA approval, Riga said: "***[O]ur conversations with the agency, obviously, do go into the statistics that are expected, and we're very much aligned with the agency***." And since Defendants knew that the FDA required at least 30% ORR from a multicenter trial for a drug to be clinically meaningful, Defendants knew or recklessly disregarded that a 43% ORR from a single-center study would not be sufficient to satisfy the FDA's "substantial improvement" requirement for BTD status.

40. Despite this knowledge, Defendants repeatedly stated that the results demonstrated in the MD Anderson Trial would entitle poziotinib to BTD status. On August 9, 2018, Riga assured investors that "[w]e have alignment with the agency on our Phase II trial, and we have a clear shot at BTD." And on November 8, 2018, Riga reiterated "we remain very steadfast in our belief that there is an unmet need, and poziotinib is showing indications of being substantially better than currently available treatments. That's ultimately the criteria."

41. But Defendants' feigned confidence and claims of inside knowledge proved unfounded. On December 19, 2018, Spectrum announced that the FDA rejected their bid for BTD

status. At the time, Turgeon admitted for the first time that TKIs with single-digit ORRs were not the appropriate comparators for poziotinib, noting "***as required by the FDA's guidance on BTD***, in the absence of target specific control, the efficacy of poziotinib in patients with mutations had to be compared to non-mutation specific non-small cell lung cancer patients." In other words, Spectrum's repeated and reckless comparisons to the low ORRs of TKIs without acknowledgement of the much higher ORRs of the best existing therapy had been unfounded, inappropriate, and materially misleading.

**4. The ZENITH20 Clinical Trial with the FDA**

42. After the BTD application failed, Defendants immediately attempted to assuage investor concern about the implications of the failed application on the drug's ultimate approval with the FDA. On December 19, 2018, the day the BTD rejection was announced, Turgeon said: "First of all, I want to be clear, ***our enthusiasm for pozi is as high as it's ever been*** because the time line should not change here just because you don't get BTD." As a result of that and other assurances, investors remained overly optimistic as Defendants shifted their focus away from the BTD application and instead toward Spectrum's upcoming multicenter FDA approval trial, ZENITH20.

43. Spectrum initiated ZENITH20 in the third quarter of 2018. Defendants planned to use data from the ZENITH20 Trial to get FDA approval for the drug to treat patients with an EGFR exon 20 mutation. ZENITH20 included 603 participants, approximately half of which had the EGFR mutation. Participants were evaluated sooner than participants in the MD Anderson Trial, receiving initial scans at four weeks instead of eight, and confirmatory scans at eight weeks instead of sixteen. As a result, the data necessary to determine the ORR for any particular cohort was available just four weeks after that cohort was fully enrolled, and those results were confirmed by a second scan four weeks after that.

44. As originally submitted to the FDA in October 2017, the ZENITH20 Trial was split into two cohorts of different patients. Both cohorts focused on patients who had been previously treated with other cancer drugs: Cohort 1 focused on patients with an EGFR mutation, and Cohort 2 focused on patients with a HER2 mutation. In September 2018, Spectrum expanded the study to add Cohort 3 and Cohort 4. Both new cohorts included treatment naïve patients, meaning patients who

had never received any cancer treatment. Cohort 3 focused on EGFR patients and Cohort 4 focused on HER2 patients. On July 22, 2019, Spectrum announced an expansion of the ZENITH20 Trial, adding three additional cohorts to the study. Among these three new cohorts was Cohort 5, which Defendants described to the public as an overflow cohort to treat "[p]atients who meet the criteria for enrollment in Cohort 1 to 4, but the enrollment in the respective cohort has been closed." Defendants acknowledged that the additional patients "will give us additional data that is always useful for any drug. When you go to market, the more data you have, the better it is."

**a. Cohort 1 Falls Well Short of Investor Expectations**

45. In January 2019, Spectrum announced that Cohort 1 – which focused on previously treated patients with EGFR mutations – was fully enrolled. Therefore, the initial scans and the data underlying the final ORR for Cohort 1 were available to Defendants in February 2019, and confirmed in March 2019.

46. Unlike the MD Anderson Trial, the ZENITH20 Trial was conducted at 64 different medical centers within and outside the United States, including locations in Europe, Canada, and the Middle East. As such, the multicenter study more closely mimicked real-life treatment than the MD Anderson Trial, which was exclusively conducted at the best cancer center in the United States.

47. At the end of 2019, Defendants disclosed the data they had had access to since early in the year. On December 26, 2019, Defendants announced that Cohort 1 had missed its primary endpoint by a substantial margin, returning an abysmal ORR of just 14.8%, far worse than existing treatments. This disclosure came 11 months after Cohort 1 was fully enrolled, 10 months after every patient in Cohort 1 had been scanned, and 5 months after every patient had completed his or her six-month course of treatment in the ***unmasked*** clinical trial. Defendants knew or had ready access to all of this data as it came in, and simply withheld the information from investors.

48. Before this disclosure, and in furtherance of the scheme, on May 16, 2019 and June 6, 2019, with multiple scans and months of data from every participant in Cohort 1 of the ZENITH20 Trial available to him, Turgeon made two outsized sales of stock. Taken together, he sold over 40,000 shares – his largest sale since becoming CEO, totaling approximately 9% of his available holdings – for nearly $340,000 in profit.

49. Also before disclosing the ZENITH20 Trial results, Defendants made materially false and misleading statements concerning the data from the trial and poziotinib's ability to gain FDA approval for treatment of EGFR patients. They continued to claim that poziotinib would address a "huge medical need" because it "has shown a response rate of 43," even though they had better data showing the actual ORR was far less.

50. Defendants also worked to allay any concerns investment analysts raised. For example, on October 2, 2019, when the Cohort 1 data had been fully compiled and analyzed for months, an analyst from Cantor Fitzgerald specifically questioned the applicability of the MD Anderson Trial data to ZENITH20, asking "do you think there's going to be a slippage or a variability as you go for a bigger study with more sites?" In response, Lebel conceded only that single-center studies could produce "a little better" results than multicenter studies. He went on to misleadingly emphasize other aspects of the ZENITH20 Trial, such as different dosing schedules and earlier scans, and claimed they "should play in our favor" and would portend a ***better*** result than the MD Anderson Trial. In Cantor Fitzgerald's next report, dated November 8, 2019, the analyst parroted Lebel's assurances about the positive effect of such differences and concluded "[w]e think that poziotinib is active even considering the single site."

51. When Defendants announced the failed Cohort on December 26, 2019, investors suffered tremendous financial losses as the Company's stock price lost over 60% of its value in one busy trading day.

**b. Cohort 3 Also Falls Well Short of Expectations**

52. Cohort 3 was fully enrolled as of April 28, 2020, and the responsiveness data from initial scans became available to Defendants four weeks later, in late May 2020, and was confirmed in late June 2020.

53. Defendants continued to mislead, insisting that investors should expect better results from Cohort 3 than Cohort 1. For example, on November 4, 2020, Turgeon said: "I'm really confident in our ability to meet our corporate objectives and advance our programs with the aspiration of bringing new treatments to the patients with cancer who need it."

54. Defendants knew or recklessly ignored that Cohort 3 stood no better chance than Cohort 1, and by mid-2020 had access to data confirming that it would also fail. Accordingly, just before the Cohort 3 results became public, Defendants capitalized on their scheme and unloaded substantial portions of their personal stock holdings. On November 18, 2020, two weeks after Turgeon told investors he was "really confident in our ability to meet our corporate objectives," Turgeon sold 162,473 shares of Spectrum common stock, 23.5% of his holdings, for $671,013. Shortly thereafter, on December 16, 2020, Turgeon sold 150,899 more shares, 28.54% of his remaining holdings, for proceeds of $709,225. In just two trading days, Spectrum's CEO had offloaded more than 45% of his Spectrum holdings, for proceeds of almost $1.4 million. Nearly simultaneously, Gustafson made his own large trade. On December 14, 2020, Gustafson sold 25,696 shares (7.1% of his holdings) for proceeds of $128,480.

55. On December 22, 2020, just days after Turgeon and Gustafson unloaded their shares, Spectrum announced what Defendants had known for months: Cohort 3 failed to meet its primary endpoint with a recorded ORR of 27.8%. This second poor performance acted as a death knell for the market's confidence in poziotinib's potential as a treatment for patients with EGFR exon 20 mutations. The following day, December 23, 2020, an analyst from Cantor Fitzgerald wrote "[w]e assign the poziotinib EGFR exon 20 insertion mutation opportunity a 0% POS [probability of success], ***given both cohorts have not met the primary endpoint***."

### C. Defendants Mislead Investors About the Condition of the Manufacturing Facility for Rolontis

#### 1. The Rolontis BLA

56. In February and June 2018, Spectrum announced that Rolontis had demonstrated non-inferiority to a comparator drug in its Phase 3 clinical trials. From the outset, Defendants set investors' expectations high about the near-term financial implications of the positive clinical results, claiming the drug would allow Spectrum to "compete in a multibillion-dollar market with a novel asset." And starting in February 2019, Defendants told investors that they planned to launch Rolontis sometime in 2020.

57. After clinical trials, the next step toward FDA approval is to submit a biologics license application ("BLA") with the agency, which includes clinical trial data and other information. BLAs are designed to provide documentation that demonstrates the safety and efficacy of the drug to show it is safe and ready for market. As part of the safety and efficacy data, the company provides information regarding the chemistry, manufacturing, and control ("CMC") of the drug. The format of BLAs is organized into five modules. Module 1 is country or region specific and contains the information that is unique to a region. Module 2 contains summary documents for Modules 3-5. Module 3 is called the Quality Module and contains all of the CMC information for the new product. Nonclinical data are found in Module 4, and clinical data are presented in Module 5.

58. Pursuant to the Prescription Drug User Fee Act ("PDUFA"), the FDA has 60 days to decide if the BLA is complete and acceptable for full review. If accepted, the FDA then has 10 months to respond with an approval or non-approval. This crucial deadline in the BLA process is commonly referred to as the "PDUFA date." During the process the applicant and the FDA can communicate with each other to set expectations and address concerns. This communication can come in the form of correspondence, meetings, and phone calls between the applicant and the agency.

59. In the event of a non-approval, the FDA issues a responsive document called a "Form 483" that details the manufacturing deficiencies observed by inspectors and then a complete response letter ("CRL") which acts as a formal denial of the BLA.

60. As an important part of Module 3 (the CMC module), the applicant must pass an on-site inspection of its manufacturing plant by the FDA. Spectrum manufactured Rolontis at a plant owned by Hanmi Pharmaceuticals in South Korea starting in the fourth quarter of 2018, so an FDA inspection of that site was necessary to gain approval.

61. Leading up to and following submission of the BLA, Defendants claimed to be in regular contact with the FDA regarding its expectations and requirements. In November 2018, Riga reported that a pre-BLA meeting had taken place and gone well, claiming "[i]n the third quarter, we

had a positive pre-BLA meeting with the FDA. Based on that meeting, our team has been diligently working on the BLA submission for ROLONTIS, and we expect to file by the end of the year."

62. On December 27, 2018, Spectrum announced its submission of the Rolontis BLA with the FDA. The FDA did not officially receive the application until January 28, 2019, which started the 60-day clock for the FDA to accept or reject the application.

**2. Spectrum Withdraws the Rolontis BLA and Defendants Falsely and Misleadingly Assure Investors that the Implications Are Minor**

63. On March 15, 2019, the Company abruptly withdrew the Rolontis BLA because of manufacturing-related information deficiencies. Defendants assured investors that the problems related to information only, were fixable in the near term, and did not reflect deficiencies with the manufacturing plant itself. Specifically, the Company said in a press release that "Spectrum's decision to withdraw the BLA was the result of the company needing more time to provide certain additional manufacturing-related information." In the same release, Turgeon assured investors that Spectrum was "continuing to have productive discussions with the FDA and will deliver the additional information needed to support the application[.] . . . We remain confident in the ROLONTIS program and look forward to a successful resubmission and its ultimate approval."

64. Investors accepted Defendants' assurances. As far as they could tell, despite a short delay, Rolontis was still on track for approval and the Company was aligned with the FDA about its expectations for the BLA. For example, on the day Spectrum announced it was withdrawing the BLA, an analyst at Guggenheim wrote: "[W]e believe most of the information requested is administrative" and that the withdrawal would simply "shift out our launch assumption to 2021 from 2020," which was a "silver lining" because it would allow the Company to focus on the "pivotal poziotinib readouts in [the second half of 2019] and 2020."

65. After the withdrawal, Defendants continued to insist that they knew exactly what the FDA expected with regard to the CMC module, and that they were working with the agency to ensure a smooth application. For example, on May 9, 2019, Turgeon said: "***[W]e're working diligently to prepare the CMC module. I'll remind you, they told us exactly what they want. They're working with us, being very helpful***. So I look forward to the next meeting. ***I'm really***

***pleased with the progress we're making on that part of the trial***." And on August 8, 2019, he again said: "we're being thorough. We're being deliberate," and Lebel insisted that the Company was fully aligned with the FDA, stating "we recently had a productive meeting with the FDA to further discuss their expectation around module 3, which is the module focused on manufacturing."

### 3. Spectrum Resubmits the BLA and Defendants Falsely and Misleadingly Say They Are Prepared for the FDA Inspection

66. On October 24, 2019, Spectrum announced that it had resubmitted the Rolontis BLA. The FDA eventually accepted the application for consideration in December, which set the PDUFA date for October 24, 2020. Because of the coronavirus pandemic, the FDA was unable to travel to South Korea to conduct an inspection of the manufacturing facility, so it deferred the action, giving Spectrum additional time to prepare. On March 16, 2021, Spectrum issued a press release announcing that the FDA had planned the inspection for May 2021.

67. During the pendency of the BLA, Defendants continued to stress their alignment with the FDA and their readiness for the inspection. On October 2, 2019, Turgeon said:

> [W]e did have a positive meeting with the agency where they walked us through. We wanted to make sure we knew exactly what they wanted in the CMC section. . . . ***I think we are going to have everything they want and then some***. And we're checking and rechecking to make sure, a lot of experts looking at us.

68. In an October 26, 2020 press release, Turgeon said: "'***The manufacturing facility is ready for inspection*** and we are eager to assist the FDA in completing their assessment as soon as possible.'" And on a November 4, 2020 conference call, he said: "***We are absolutely ready for this inspection. We've been ready for a long time. We welcome it***." During the same call, Lebel and Turgeon stressed all the extra effort they had put in to ensure the manufacturing facility was FDA-compliant, including "mock inspections," "Spectrum boots on [the] ground" in Korea to examine the facility, and the utilization of "outside experts" who "not only run these mock inspections, but . . . know exactly what people – what the FDA is looking for [in] an inspection."

69. Defendants continued to tout their readiness for the inspection and their own oversight of the preparation up until the date of the inspection in May 2021. On May 13, 2021, Turgeon again told investors "***[w]e're prepared for the inspection,*** we're looking forward to it."

70. The FDA's inspection of the South Korean manufacturing facility ultimately took place from May 25, 2021 through June 2, 2021. At the conclusion of this inspection, the FDA provided Spectrum with a Form 483 that revealed ***ten separate deficiencies with the facility.*** The details of this report reveal that Defendants had not prepared for the investigation as they had led investors to believe. Indeed, the report identified fundamental deficiencies such as "conformance to the submitted application is inadequate," "process performance protocol . . . was not followed," and "[d]ocumentation for cleaning procedures established for sanitation of product contact equipment are deficient." Spectrum's failure to ensure that its own protocols were followed or that machinery was properly sanitized demonstrates that the Company had not actually undertaken the extreme preparation they described to investors.

71. On August 6, 2021, before market open, Spectrum announced receipt of a CRL from the FDA regarding the Rolontis BLA. Specifically, the press release stated: "The CRL cited deficiencies related to manufacturing and indicated that a reinspection [of the Company's manufacturing facility] will be necessary." In other words, the Company would have to remedy each of the sweeping deficiencies and then restart the lengthy application process. With this news, investors understood that the Company's only prospect for imminent revenue would not be realized, and the Company would instead continue to burn cash without earning it.

### D. Turgeon and Gustafson Abruptly Depart from the Company

72. At the end of 2021, less than a year after Turgeon and Gustafson used inside information to sell stock just before Spectrum disclosed the poziotinib ZENITH20 Cohort 3 failure and just four months after the market learned about the Company's unpreparedness for the inspection of the Rolontis manufacturing plant, Turgeon abruptly left the Company, followed shortly thereafter by Gustafson. On December 1, 2021, less than four years into his tenure as CEO, Spectrum suddenly announced that Turgeon "retired." On February 23, 2022, Spectrum announced that Gustafson would follow Turgeon out the door. The Company did not provide any benign explanation for these departures, releasing opaque statements that said "we would like to thank [Turgeon] for his many contributions to the company," and that Gustafson had "provided notice of his resignation to pursue other professional opportunities."

## MATERIALLY FALSE AND MISLEADING STATEMENTS

### A. False Statements Regarding Poziotinib

#### 1. Statements During the MD Anderson Trial

73. After market close on March 6, 2018, Spectrum hosted an earnings call with investors and analysts to discuss the Company's Q4 2017 results (the "Q4 2017 Earnings Call"). During the call, Riga made the following materially false and misleading statements:

> First, let me start with poziotinib. In the fourth quarter of 2017, preliminary data from a Phase II study at MD Anderson Cancer Center was presented at the World Conference on Lung Cancer in Japan. ***Promising data was presented with an unconfirmed partial response rate of 73% in the first 11 patients. These data are encouraging for patients who have very few options, if any. . . .*** Current therapies are unsatisfactory, and there is ***significant unmet need*** in this population. It is hypothesized that poziotinib, due to its relatively small molecular size and flexibility, can circumvent steric hindrance related to exon 20 insertion mutations.
>
> * * *
>
> The enthusiasm for this study is high among our investigators, and the plan is to open between 40 and 50 sites this year with some of them being outside of the United States. ***The unmet need in this patient population is well recognized, and we are having ongoing dialogue with the FDA to find the most-expedient regulatory pathway***.

74. On May 3, 2018, Spectrum hosted an earnings call with investors and analysts to discuss the Company's Q1 2018 results (the "Q1 2018 Earnings Call"). On the call, Defendants made the following materially false and misleading statements:

> [Riga:] On the regulatory side, ***we are in regular discussions with the FDA to expedite the regulatory approval for poziotinib***. We've conducted a pre-submission meeting with the agency along with Dr. Heymach from MD Anderson. The tone of the meeting was very encouraging, and the understanding around ***the unmet medical need*** for patients with exon 20 insertion mutations was very clear.
>
> As we evaluate the criteria for breakthrough therapy designation, we believe that pozi meets the criteria if the early data continues. When we look at those criteria, there are 2: first, there needs to be a clear unmet medical need, and ***second, the potential for substantial improvement over existing therapies needs to be there. We think pozi qualifies for both***.
>
> * * *
>
> [Turgeon:] Patients, as you know, with this disease have a PFS of 1.8 months. So it's a terrible, terrible prognosis. ***Current therapies only have less than 10% – I think a***

> ***6% to 10% response rate***. So we have ***huge unmet need***, terrible prognosis. What we saw in those first 11 – well, with the ones that were confirmed, is we saw 6.6 months, but we didn't get – we didn't hit the median yet. So that means it's going to be somewhere north, on those patients, of 6.6 months.
>
> Again, going back to the first meeting we had with the thought leaders, I'll remind you of this, we've talked about this in the past. ***I thought I could get an approvable drug just by getting maybe – when you look at the prognosis, maybe we could – if we could get to 4 months, maybe we'll have a good shot at this, and the response rate may be around 30%, I think that's what was expected***. And I asked those thought leaders exactly this question, I said, "Guys, what's a home run? Help me understand." What they told us was 2 things. ***If you can get 4 to 6 months of response and you could get anywhere from 40% to 50% response in duration, that's a home run. So that's kind of a marker I'm looking at. And I'm feeling pretty good about the early data when you look at that. How can you not?***
>
> * * *
>
> As we've said in the past, we had a preliminary meeting with the agency. This was talking about breakthrough designation. ***We know what the requirements are. We feel we meet the criteria***. And I think in the not-too-distant future, we'll go to a second meeting with them. ***And our goal is to establish breakthrough designation. We feel we meet those criteria***.

75. At a May 16, 2018, Bank of America Merrill Lynch Healthcare Conference, Turgeon made the following materially false and misleading statements:

> I don't know if you know this, lung cancer is a leading cause of death of all the cancers because, not because of the prevalence but because the percent of the people who actually die. So it's ***very, very high unmet need, very important***. When you get to these exon 20 insertion mutations, talking about unmet need, you have a progression-free survival of only 1.8 months and ***current TKIs and other therapies only have a 6% to 8% response rate, huge unmet need***.
>
> * * *
>
> Now let me give you a perspective. Before we started this trial, right here in Las Vegas, I had 16 of the world thought leaders in lung, in a room in a hotel down the street. And I said, okay, tell me, what is a home run here, in your guys' eyes? You guys do this for a living. I know as a drug developer, ***if I can get a 20% to 30% response rate, I can get a drug approved***. But what's the home run that I really want to look forward and hope for? Here's what they told me 2 things, they said, ***if you get a 40% or more response rate, that's a home run***. The second thing, on duration. If you can get anything from 4 to 6 month, remember, I told you, you have a PFS of only 1.8 months. You've got a home run. ***What I'm pleased to tell on an early data, why there's so much excitement, that we have 64% confirm response rate***. And as far as duration, we haven't hit the median yet, and we know we're at 6.6 months in these initial patients. ***That's exciting and promising***.

76. On August 9, 2018, Spectrum hosted an earnings call with investors and analysts to discuss the Company's Q2 2018 results. On the call, Riga made the following materially false and misleading statements:

> Regarding BTD, ***our belief is steadfast that poziotinib meets the criteria for breakthrough therapy designation. There is a clear unmet medical need, and we believe that poziotinib demonstrates substantial improvement over existing therapies***.
>
> As we move forward with our conversations with the FDA, the MD Anderson data will be the backbone of our discussions. We fully expect to gain clarity on this pathway by the end of the year. So here's what we know about poziotinib today. ***We've seen very strong early data in an area of high unmet medical need. We have alignment with the agency on our Phase II trial, and we have a clear shot at BTD***.
>
> * * *
>
> [Adnan Shaukat Butt, Analyst, Guggenheim:] Okay. Last one, then I will get back in line, promise. Presumably, you did agree to a kind of – some kind of response rate in PFS hurdle. Can you say what is? Is that in line with your prior thinking?
>
> [Riga:] Yes. It's a great question. I think you start with memory lane of where we are and ***current available treatments is less than 10%***. So obviously this is a patient population that needs a solution because today's solutions simply aren't working. So ***our conversations with the agency, obviously, do go into the statistics that are expected, and we're very much aligned with the agency***. And I'll leave it there.

77. At a September 24, 2018, World Conference on Lung Cancer, Defendants presented data from the MD Anderson Trial. Speaking on behalf of Spectrum along with Turgeon was Dr. John Heymach, the lead investigator for the MD Anderson Trial. At the conference, Turgeon made the following materially false and misleading statements:

> [Turgeon:] Currently, available therapies for these patients are limited and there's a ***high unmet need***. Dr. Heymach's trial is the single largest dataset in this patient population. We're proudly working with him and with his team.
>
> * * *
>
> [Heymach:] The eGFR exon 20 mutant cohort was initially plan to be 30 but it was rapidly increasing to 50 because of the unexpectedly brisk enrollment that we face on the study where we actually had a waiting list at times. The HER2 exon 20 cohort is planned to be 30. The primary endpoint here is objective response rate ***and it was felt that at target objective response rate greater than 20% would be a***

> ***substantial improvement over other options and will represent a clinically meaningful advance***.

78. On November 8, 2018, Spectrum hosted an earnings call with investors and analysts to discuss the Company's Q3 2018 results (the "Q3 2018 Earnings Call"). On the call, Defendants made the following materially false and misleading statements:

> [Riga:] Let me provide some highlights from the data that Dr. Heymach presented at the conference. In the EGFR cohort, there was a 43% confirmed objective response rate in the evaluable population. ***This compares favorably to an overall response rate of less than 10% with available TKIs and a rate of less than 20% with the current standard of care second-line agents.***
>
> * * *
>
> [Adnan Shaukat Butt, Analyst, Guggenheim:] Great. And then on a related question. Maybe you can expand on this one a bit more. Do you expect responses in this particular arm to track those that we saw from the MD Anderson study? Or are there tweaks in the study that could lead to differences?
>
> * * *
>
> [Riga:] Yes, so Adnan, I guess we'll wait and see what the data reads out. But I think it's an – it's important to just point out the differences in design of these studies. So if you remember, the MD Anderson study needed 16 weeks to confirm. So the first scan was at 8 weeks, second scan was 8 weeks later. ***Our confirmation will occur at 8 weeks***. So there is a timing difference in confirmation. When you're dealing with a patient population with prior treatments that has – PFS is 1.9 months, I think time is of the essence, and we think by having ***that interim scan at 4 weeks could prove to be beneficial***, but we have to wait and see the data.
>
> [Turgeon:] And I'll add. Remember, Adnan, that there are dosing differences. Whereas in the MD Anderson study, it was 16 to 12 and down to 8, we're only going – we've only 16, 14, 12 and only down to 10 with monitor approval. So that's a learning, and that's one of the changes we made in our trial. The appointed patients are not included in our trial whereas they were included in the MD Anderson trial.
>
> * * *
>
> [Riga:] Sure, sure. David, we're thrilled to have submitted the application for BTD, and we remain very steadfast in our belief that there is an unmet need, and ***poziotinib is showing indications of being substantially better than currently available treatments. That's ultimately the criteria***. Now the FDA will decide ultimately and where that goes, but there are multiple regulatory pathways besides BTD, like you had mentioned in the fast track setting and others that exist, but we are thrilled to have applied for that application and ***believe that the drug qualifies***.

79. The statements in ¶¶73-78 were materially false and misleading when made. The statements and omissions regarding poziotinib and its approval were materially misleading because they misrepresented:

(a) the level of ORR necessary for poziotinib to achieve FDA approval. Although Defendants admitted that they were "very much aligned with the agency [FDA]" about the "statistics that are expected," Defendants incorrectly claimed that "current therapies only have less than 10%" ORR and that "if I can get a 20% to 30% response rate, I can get . . . approved." In reality, Defendants knew that the FDA compared poziotinib to even the best existing therapy, which had a 22.9% ORR, and that the FDA would not consider anything under 30% ORR as clinically meaningful;

(b) the difference in the results at a small single-center study at MD Anderson, a world-renowned cancer center with world-renowned oncologists, and results in a generalized and more representative multicenter study at a variety of centers across the United States, Canada, Europe, and the Middle East, would be material. Defendants failed to disclose that poziotinib would perform materially worse in the upcoming multicenter trial, and instead claimed that early scans and different dosing would lead to improved results in the ZENITH20 Trial relative to the MD Anderson Trial; and

(c) their ready access to data from the unmasked MD Anderson Trial. Defendants failed to disclose that data compiled and available to them throughout the trial demonstrated an ORR well below expectations.

**2. Statements During Cohort 1 of the ZENITH20 Trial**

80. On December 19, 2018, Spectrum held a special conference call to discuss the status of the poziotinib BTD application. On the call, Defendants made the following materially false and misleading statements:

> [Adnan Shaukat Butt, Analyst, Guggenheim:] Would you say that there is room for responses to go even lower and you could sort of secure approval? I'm just wondering how big – how wide that window is between what you agreed to with the FDA versus what this data set that you submitted to the FDA for BTD was?

> [Lebel:] Yes, so this is Francois, CMO. I don't think we have disclosed the exact term of the negotiation with the FDA, but I think ***we can reiterate here that on the basis of the performance of things in our recruitment of 202 and the basis of what we think will be the approval of this drug, we're on track for everything. And we are confident that the drug continues to perform the way it did during this subset that we have done for the FDA***.
>
> * * *
>
> [Turgeon:] First of all, I want to be clear***, our enthusiasm for pozi is as high as its ever been*** because the time line should not change here just because you don't get BTD. BTD is really a nice to have. What it gives you, it gives you the ability to interact with the – on a much easier basis with the Agency. In other words, you could call them and they'll take your call and you'll discuss it. Otherwise, without that, you have to go through the process of setting up a meeting and getting with them.
>
> Now that being said, our overall development plan hasn't changed because, again, I'll go back to – we've had several discussions with the Agency along the way, where we have minutes on that and we've come to conclusions that our trials are built right, our trial on the 4 cohorts are built for registration, and they're – and these are the data that the FDA will require. That hasn't changed one bit, and there is still other paths to go after on accelerated time lines here, not just BTD. What BTD – again, is a nice to have. It gives you that ability to work with the FDA, call them on a regular basis that's really what it gives you. But our trials are set up for registration and we're confident that, that's the data that the FDA would need in order to approve this drug. I don't know, Francois, if you want to add to that.
>
> [Lebel:] Sure. So all along, the ZENITH20 was the trial that would be used to secure an approval here for the first indication. The BTD request, and the data that was provided to the FDA, the FDA specifically requested a smaller subset of 30 patients and they wanted – as was stated by Joe earlier, they wanted to see whether or not these response were durable. So – and we have disclosed to you today that the response rate was 40%, they were durable. ***So that data gives us confidence even in that small subset that the trends that we expect and are observing are consistent, and therefore, we remain absolutely confident that the ZENITH20 study will allow us to file for a BLA in that indication***. The other thing, I think Joe has mentioned as well, we're also very confident about the fact that we're on track on the recruitment of that cohort. So obviously, it would've been nice to get the BTD. We took a shot at it, but that is in no way changing anything in our overall approach for this program.

81. On August 8, 2019, Spectrum held an earnings call to discuss Q2 2019 financial results (the "Q2 2019 Earnings Call"). On the call, Defendants made the following materially false and misleading statements:

> [Lebel:] ***So cohort 5 – the primary reason why we have cohort 5 is, as I've indicated, we have received numerous requests for compassionate use*** from investigators that have patients with exon 20 mutations, and they want to enroll them in cohort 1 and 2. And those studies or cohorts are closed. So we have to have a mechanism to provide access under controlled condition, and ***that is exactly the main reason why we're doing this. It will give us additional data that is always useful for any drug. When you go to market, the more data you have, the better it is***.
>
> * * *
>
> [Edward Patrick White, Analyst, H.C. Wainwright:] Okay. Great. And now a question post the TAK-788 data at ASCO, I just want to get your thoughts on what that data versus the pozi data. If both of them hold up, what this could mean for the market? So maybe this is for Tom. And also, what the market is going to look like? And then, any thoughts on the discontinuations of 788 due to adverse events, which was higher than poziotinib.
>
> [Riga:] Hey, Ed, it's Tom. We've, obviously, looked at that data in detail. I think it's pretty early. It looks like that study is starting. ***I think our position, we feel really strong about with the data readout in Q4 and is well ahead in the development life cycle with poziotinib***. So we'll have to see what that market looks like. I think what it really says is that ***there is real unmet need for this patient population***. As more and more compounds come into the full, I think it speaks to the solutions that patients need, and we're pleased to be at the forefront of that.

82. At the September 11, 2019, Morgan Stanley Healthcare Conference (the "2019 Morgan Stanley Conference"), Turgeon made the following materially false and misleading statements:

> We – MD Anderson did a Phase II, specifically in exon 20, both EGFR and HER2. ***And last year, at World Lung, showed a 43% overall response rate, which was much higher than anything. There's nothing that works. There's nothing indicated for these poor patients***. The prognosis is very poor. PFS is 1.8 months. They progress very quickly and die. And so this is what the – where the exciting data came from.

83. At the October 2, 2019, Cantor Fitzgerald Global Healthcare Conference, Lebel made the following materially false and misleading statements:

> ***So, lung cancer remains a major challenge***. But there is a special subset where we call them mutated lung cancer in a number of protein including EGFR and HER2. And there is a particular kind of mutation, a subset of EGFR, called Exon 20. And ***currently there is no drug approved at all***. So, physicians today, when they see those patients – and in general, by the way, those patients are usually young women who never smoked in their life. So, that's very odd compared to your usual lung cancer patient.

So, ***a huge medical need, no drug is approved***. And we are in a leading position [right] now in developing a tyrosine kinase inhibitor that has [a] unique ability to work against Exon 20 in vitro in collaboration with M.D. Anderson. As shown Dr. Heymach there, who is the Chief of Thoracic Oncology, showed in a substantial – in the largest series in the world of Exon 20 patients, ***has shown a response rate of 43% or so*** and a tolerable side effect profile in line with other tyrosine kinase inhibitors.

* * *

[Alethia Young, Analyst, Cantor Fitzgerald:] And I guess as you think about, obviously your first study was in one site, M.D. Anderson. I mean do you – I know Takeda had multiple sites, but do you think there's going to be a slippage or a variability as you go for a bigger study with more sites?

[Lebel:] Yes, so that's a good point. Whenever you have a single site study in general the data often is a little better than when you do a multi-centric study. ***But we made some slight change to the study that should help us*** (technical difficulty) could go against us. But so the original data done at M.D. Anderson, single site. The images, the scans were read locally and when they were would run into toxicity, the way in which they would reduce the amount of drug the patient received were by an increment of 4 mg.

So, currently dose on both studies, you start at 16 mg. And if you run into some toxicity Dr. Heymach would have dropped it by 4 and by 4. We've made some change where we don't drop the doses fast; so we drop the dose by 2 mg. ***So, that should allow us to keep patient on drug longer and that's the name of the game***. The longer the patient is on drug that is when you could derive the benefit.

The other thing that we have done, we have central imaging labs and we also introduced a first read – Dr. Heymach in the first study was reading the – looking for a response every eight weeks. We've introduced a first scan at four weeks. So, that should allow us to pick up response at an earlier time and potentially add time on duration of response. ***It should play in our favor***.

The other thing we've done as well is, other than a lower increment of when you drop the dose. Also additionally what we've done is we prophylax every patient for – against diarrhea. One of the very common side effects when you use a TKI, it's a problem with the class, and actually is an indication that the drug blocks the EGFR receptor. They get rash and they get diarrhea or it impacts the gut. So we are prophylaxing all the patients against diarrhea. Dr. Heymach was not doing that, so ***that should play in our favor***.

84. The statements in ¶¶80-83 were materially false and misleading when made. The statements and omissions regarding poziotinib and its approval were materially misleading because they misrepresented:

(a) the level of ORR necessary for poziotinib to achieve FDA approval. Although Defendants admitted that they "had several discussions with the Agency along the way" concerning "the data that the FDA would need in order to approve this drug," Defendants incorrectly claimed that "a 43% [ORR] . . . was much higher than anything" else on the market. In reality, Defendants knew that the FDA compared poziotinib to the best existing therapy, which had a 22.9% ORR, and that the FDA would not consider anything under 30% ORR as clinically meaningful;

(b) the difference in results at a small single-center study at MD Anderson, a world-renowned cancer center with world-renowned oncologists, and results in a generalized and more representative multicenter study at a variety of centers across the United States, Canada, Europe, and the Middle East, would be material. Defendants failed to disclose that poziotinib would perform materially worse in the upcoming multicenter trial, and instead claimed that early scans and different dosing would lead to improved results in the ZENITH20 Trial relative to the MD Anderson Trial; and

(c) their ready access to data from the unmasked ZENITH20 Trial. Defendants failed to disclose that the Cohort 1 data compiled and available to them throughout the trial demonstrated an ORR well below that required for FDA approval, and instead misleadingly expressed confidence in the drug's prospects.

**3. Statements During Cohort 3 of the ZENITH20 Trial**

85. On May 7, 2020, Spectrum hosted an earnings call with investors and analysts to discuss the Company's Q1 2020 results (the "Q1 2020 Earnings Call"). On the call, Lebel made the following materially false and misleading statements:

> We now believe that the 16-milligram once-daily dose might have been too wide to administer all at once and led to frequent dose interruptions and dose reductions. 88% of patients had some sort of dose interruption from therapy, ***which we believe prevented the drug from demonstrating its full potential***. . . . Typically, when you have a half-life of less than 12 hours, the drug is generally administered 2 to 3 times per day. As a result, ***we have amended the ZENITH20 protocol to include various new dosing schedule***. This amendment will impact cohorts 4 through 7.

* * *

> So I think you're right on here, patients who are treatment naive, like we have in cohort 3 and 4, are – one would expect that they would be able to – they're in much better condition. They have not – their bone marrow have not beaten up with rounds of chemotherapy or some other therapy like the checkpoint inhibitor, where they might have had pneumonitis or other complication. ***So one would expect that they would be more tolerant of adverse events, potentially***.
>
> * * *
>
> What really matters, as I'm sure you can appreciate, is what are going to be the result in the clinic. ***And we have results for cohort 1, we demonstrated activity there, undeniable activity. However, it was not as high as we wanted. But we have other cohorts, as you well know. And the cohort 1 are not necessarily predictive of the outcome of cohorts 2, 3, 4 and for that matter, in 5, when we're going to change the dosing and the – that one sitting versus BID***. So there's no question, Takeda looks like they have some interesting results. And we'll have to see as the data comes in and we'll see if it may end up that 2 drugs move forward here. It could happen.
>
> And the other thing you got to remember is that poziotinib right now, we have dosed more than 1,000 patients at different dose and schedule. Takeda is not as advanced that way. So over time here, we might uncover that there are different adverse events that are uncovered. ***And we're pretty confident right now***. We understand quite well the side effect profile of pozi. We understand and we believe on the basis of the data and modeling we've done that we could mitigate the amount of adverse events we see. And we're anxious to see the result of cohort 5 when we give the drug BID. So I guess the short answer is stay tuned. And we'll see with more data, which drug is – will come to market first and which one is more promising.

86. On November 4, 2020, Spectrum hosted an earnings call with investors and analysts to discuss the Company's Q3 2020 results (the "Q3 2020 Earnings Call"). On the call, Turgeon made the following materially false and misleading statements:

> ***I'm really confident in our ability to meet our corporate objectives and advance our programs with the aspiration of bringing new treatments to the patients with cancer who need it***.

87. The statements in ¶¶85-86 were materially false and misleading when made. The statements and omissions regarding poziotinib and its approval were materially misleading because they misrepresented:

(a) the level of ORR necessary for poziotinib to achieve FDA approval. Defendants incorrectly claimed that poziotinib was superior to other drugs coming to market, including by Takeda. In reality, Defendants knew that poziotinib was inferior to the best ***existing***

therapy, which had a 22.9% ORR, and that the FDA did not and would not regard it as a clinically meaningful treatment for patients with EGFR exon 20 mutations.

(b) the difference in the results at a small single-center study at MD Anderson, a world-renowned cancer center with world-renowned oncologists, and results in a generalized and more representative multicenter study at a variety of centers across the United States, Canada, Europe, and the Middle East, would be material. Defendants failed to disclose that poziotinib would perform materially worse in Cohort 3 of the ZENITH20 Trial than the MD Anderson Trial.

(c) their ready access to data from the unmasked ZENITH20 Trial. Defendants failed to disclose that Cohort 3 data compiled and available throughout the trial demonstrated an ORR well below that required for FDA approval, and instead misleadingly expressed confidence in the drug's prospects.

**B. False Statements Regarding Rolontis**

**1. Statements Regarding the First BLA Submission**

88. On February 28, 2019, Spectrum held an earnings call to discuss Q4 2018 financial results (the "Q4 2018 Earnings Call"). During the call, Gustafson made the following materially false and misleading statements:

> So I think as we take a look at our forecast, we feel good about the ROLONTIS data and the BLA filing. ***So our forecast does include a launch of ROLONTIS some time in 2020. So that is indeed included in that guidance***.

89. On May 9, 2019, Spectrum hosted an earnings call with investors and analysts to discuss the Company's Q1 2019 results (the "Q1 2019 Earnings Call"). During the call, Turgeon made the following materially false and misleading statements:

> ***I'll remind you of this: we're working diligently to prepare the CMC module. I'll remind you, they told us exactly what they want. They're working with us, being very helpful***. So I look forward to the next meeting. ***I'm really pleased with the progress we're making on that part of the trial***. And I'll remind you, as you well know that the clinical data was sound. It was both – hit both the primary and secondary endpoints, which is, you could argue, the harder – the hardest part of this thing. And in the near term, we plan on filing it as soon as it's ready.

90. On August 8, 2019, during the Q2 2019 Earnings Call, Defendants made the following materially false and misleading statements:

> [Lebel:] ***Regarding our BLA filing, we recently had a productive meeting with the FDA to further discuss their expectation around module 3, which is the module focused on manufacturing***. Based on the outcome of that meeting, we expect to submit the BLA in the fourth quarter of this year.
>
> * * *
>
> [Turgeon:] ***Listen, we are aligned with the FDA. We had our meeting. We got aligned. We're being thorough. We're being deliberate. And we went with our filing in the fourth quarter as we said. This was – the questions that we had to answer, were in module 3, which is in the CMC section only. And again, we're being like I said, thorough and deliberate and plan on filing this in the fourth quarter***.

91. On September 11, 2019, during the 2019 Morgan Stanley Conference, Turgeon made the following materially false and misleading statements:

> [David Neil Lebowitz, Analyst, Morgan Stanley:] There was an initial filing put in late last year, and it was pulled back as manufacturing. Could you elaborate on that?
>
> [Turgeon:] Yes, we made the decision. I'll walk you down memory lane. What happened was we filed – and I think it was 22nd of December last year. And what happened was that we had – the government had shut down, so we didn't hear anything from the agency. So the clock started ticking on the 60 days after they got back to at the end of January.
>
> So about 2 weeks before the end of March, we had a meeting with the agency, and they said "By the way, we have an issue with the CMC portion. We had 2 weeks left until the 60 days were up." And I said, "***We need some additional information, nothing that was over the top, but we need this information." And we have formatting issues. We had a lot of translation because a lot of it was done in Korea, and they didn't like the way we were translating things. We had to reformat some of the tabling and things***.
>
> So the bottom line is, we had to get some additional information. We knew we couldn't do it by the 29th of March. ***So we said***, "***Why don't we voluntarily – we'll pull it." Then they said, "Fine," without prejudice***. They said, "We'll give you exactly what we want." ***We've since met with them. They gave it to us, and I'm happy to tell you we're in good shape to launching – to submit it in the fourth quarter***.

92. The statements in ¶¶88-91 were materially false and misleading when made. The statements and omissions regarding Rolontis and its manufacturing facility were materially misleading because:

(a) regarding the BLA, Defendants did not initiate the withdrawal as they publicly described, but rather withdrew the application to avoid an outright rejection. As Turgeon would later admit after the Class Period, on August 12, 2021: "So, they [the FDA] told us, look[,] in this form we wouldn't accept it, so ***you can wait for us to not accept that or you could voluntarily fix this stuff and resubmit***. And that's what happened.";

(b) despite Defendants' claims that they were "aligned with the FDA" because "they told us exactly what they want," and their simultaneous claims that Spectrum was "working diligently to prepare the CMC module," the Rolontis manufacturing facility in South Korea maintained controls and procedures that deviated substantially from FDA requirements; and

(c) as a result of these manufacturing deficiencies, Rolontis could not achieve FDA approval, which was necessary for the drug to reach the market and contribute to Spectrum's bottom line.

**2. Statements Regarding the Second BLA Submission**

93. On November 7, 2019, Spectrum hosted an earnings call with investors and analysts to discuss the Company's Q3 2019 results. On the call, Defendants made the following materially false and misleading statements:

> [Turgeon:] ROLONTIS is our late-stage drug being developed for the treatment of chemotherapy-induced neutropenia. ***As you recall, we voluntarily withdrew our BLA application earlier this year. Since then, we worked closely with the FDA and recently submitted a robust package. We look forward to competing in this market***.
>
> * * *
>
> [Lebel:] On October 24, we submitted an expanded BLA to the FDA. The withdrawal 7 months ago was driven by Module 3 or the CMC section. ***Since then, we've had productive dialogue with the FDA. We implemented their guidance, provided additional data and rewrote and reorganized certain sections of the file resulting in a strong submission***.
>
> * * *
>
> [Riga:] ***We worked closely with the agency. We implemented their guidance. We feel that we've learned from their feedback and put together a strong package and look forward to that action date***.

94. On February 27, 2020, Spectrum issued a press release announcing the Company's Q4 2019 financial results and pipeline update. In the press release, the Company provided the following quote from Turgeon containing materially false and misleading information:

> "***ROLONTIS is in active review by the FDA and we are preparing to launch shortly following approval***," said Joe Turgeon, President and CEO, Spectrum Pharmaceuticals. "We believe this market represents a significant commercial opportunity and our prelaunch activities are well underway. We have a podium presentation on poziotinib in a few short weeks, we have taken steps to adjust our strategy and we have multiple data catalysts in 2020. I look forward to updating you on our progress throughout the year."

95. On May 7, 2020, Spectrum issued a press release announcing the Company's Q1 2020 financial results and pipeline update. The press release stated, in relevant part:

> "The progress in our development pipeline speaks to the investigator interest and the commitment of our team during these unprecedented times," said Joe Turgeon, President and CEO, Spectrum Pharmaceuticals. "The PDUFA date for ROLONTIS remains October 24, 2020 and our ***updated poziotinib strategy is well under way. We continue to drive the business forward and remain focused on achieving our milestones this year***."

96. On the same day, Spectrum hosted the Q1 2020 Earnings Call with investors and analysts to discuss the Company's financial performance. On the call, Turgeon made the following materially false and misleading statements:

> So we feel really good about the data that we've submitted. ***All I can tell you, it's under active review as we speak***. The PDUFA date, which means the date of approval, is October 24. That still stands despite the pandemic. The – ***we're on active review and active work with the agency. So we're hoping that we can get an approval this year***.

97. On August 10, 2020, Spectrum hosted an earnings call with investors and analysts to discuss the Company's Q2 2020 results. During the call, Riga made false and misleading statements:

> Our PDUFA date is just over 2 months away. We are actively engaged in our commercial build-out, and we would like to provide an update on the market opportunity and the progress we are making in our preparations for launch. First and foremost, ***we are ready and look forward to competing if approved. We are investing a great deal of time, effort and research into our strategy and plan of execution***.

* * *

> ***In closing, we are ready to compete. We have all the ingredients to do so, and we look forward to the PDUFA date in October***.

98. On November 4, 2020, during the Q3 2020 Earnings Call, Defendants made the following materially false and misleading statements:

> [Turgeon:] Regarding the ROLONTIS plant inspection, our partner, Hanmi Pharmaceuticals, is a well-established global biopharmaceutical player with a world-class manufacturing facility. Hanmi is the second largest pharmaceutical company in Korea, behind only Samsung. ***They're prepared for the inspection*** and willing to be accommodative to the needs of the FDA as it strives to meet the regulatory obligations. They've been a ***great partner and are working in tandem with Spectrum to obtain an approval for ROLONTIS*** as soon as is possible.
>
> ***I'm really confident in our ability to meet our corporate objectives and advance our programs with the aspiration of bringing new treatments to the patients with cancer who need it***.
>
> * * *
>
> [Lebel:] ***As to the deferred action on our ROLONTIS filing, we have answered all questions from the FDA related to the review of the BLA, and we've had advanced labeling discussions. On the manufacturing side, we have conducted multiple mock inspections of our plant and are exploring ways to expedite the inspection, possibly using alternative methods to ensure the earliest completion of the review of our BLA during this COVID-19 pandemic***. We look forward to updating you on important program milestone in the next 2 months including the outcome of our poziotinib registration discussion with the FDA.
>
> * * *
>
> [Turgeon:] ***In the coming weeks, we'll be doing all that we can to facilitate the completion of the inspection of our ROLONTIS manufacturing facility***.
>
> * * *
>
> And I want to stress another thing. ***We are absolutely ready for this inspection. We've been ready for a long time. We welcome it***. As a matter of fact, the third part of your question was the mock inspections, was it required? They're certainly not required by the agency. ***We do that to make sure we're ready***. ***And I can tell you, we have Spectrum boots on ground there***. We have Hanmi, which I mentioned, is a world-class manufacturer with a world-class plant. ***There are people already, and we work very closely with them with these mock inspections***.
>
> And we have a third leg to the stool. ***We have outside experts we've hired to run these – not only run these mock inspections, but also help the readiness. And these are people who have done this for a living. They do this – they know exactly what people – what the FDA is looking for an inspection. So we feel we're ready. We welcome the inspection and we can't wait***.

* * *

> [Lebel:] ***Obviously, we're actively working to try to make sure that we're ready, as we've indicated***. But as well, we are following up with the FDA to make sure that they understand how important this is for us and patient.
>
> [Turgeon:] On that part – on that question, Alethia, I'll just add 2 things for color. I want to – we're not going to sit around. We want to try and do what we can to push this forward and nudge it, I'll tell you that. ***We're not going to just sit and wait, I can assure you that***.

99. On December 22, 2020, Spectrum held a special conference call to address investors and analysts regarding the devastating poziotinib news. On that call, Turgeon made the following materially false and misleading statements concerning Rolontis:

> I can't give you an exact date when it will be inspected. But I'm going to tell you, ***we're ready***.
>
> The facility has been through ***multiple mock inspections***. It's ***kind of like the army now*** is what I say, we're still going through the drill on a weekly basis, still doing the mock inspections, getting ready for any questions we might get. We have ***Spectrum people on the ground at the plant***. We have, of course, Hanmi people who are very well prepared, been working with us, and we have third-party experts there working for the readiness. So ***we really feel we're ready for this inspection***.

100. On March 30, 2021, Spectrum issued a press release announcing the Company's Q4 and full year 2020 financial results and pipeline update. The press release included a statement from Turgeon, who made the following materially false and misleading statements:

> "In addition, we are delighted that the FDA has scheduled the pre-approval inspection at the ROLONTIS manufacturing facility for May 2021. ***The company has made tremendous progress advancing our development programs*** and conducting our clinical trials, despite the challenges of the global pandemic. I am proud of our employees who demonstrated resiliency and creativity during these unprecedented times."

101. That same day, Spectrum hosted an earnings call with investors and analysts to discuss the Company's Q4 2020 results. During the call, Lebel made the following materially false and misleading statements:

> Regarding the deferred action on our ROLONTIS filing that Joe mentioned, ***we believe that we have answered satisfactorily all questions from the FDA related to the review of the BLA. And we believe that the inspection represents the final step in the review process. We and our partner, Hanmi, are ready for the FDA pre-approval plant inspection that has been scheduled for May***.

* * *

So let me start with – let's just say that when we got the deferral as opposed to a complete response, CRL, that usually indicates that the FDA is – they're pausing their review. And the only step left, to our knowledge, is the inspection. We've had a lot of discussion with the FDA and all the other matters, and ***our understanding is that we have answered all their questions satisfactorily***. So we believe the inspection is fundamentally the last step.

102. On May 13, 2021, Spectrum hosted an earnings call with investors and analysts to discuss the Company's Q1 2021 results. During the call, Defendants made the following materially false and misleading statements:

[Turgeon:] The FDA scheduled the pre-approval inspection of our manufacturing facility for later this month. We believe this inspection marks the final step in the approval process, and that ***Hanmi's world-class facility is ready for this inspection***.

* * *

[Lebel:] Now let me shift to ROLONTIS. ***On the regulatory side, Joe has already updated you on the status of the pre-approval inspection, and we remain confident that our preparation with our partner Hanmi, should result in a positive outcome for this FDA plant inspection***.

* * *

[Turgeon:] Yes, we don't know the exact timing, but let's go back in time where we, as you recall, and I know you well know, we received a deferral back in ***our PDUFA date – back in October, not a CRL, which – clearly if there were problems like many other companies got with our clinical data, we feel we would have gotten the CRL. We didn't***. But because of the pandemic, we couldn't get people to South Korea to do the file. And I know you know all of that. ***We're prepared for the inspection. We're looking forward to it***. I can't give you an exact date, but I think the FDA would take a reasonable amount of time to get back to us once the inspection is done and we feel that's the last step. So without giving an exact time, I think it'll be a reasonable amount of time after the inspection is done.

103. The statements in ¶¶93-102 were materially false and misleading when made. The statements and omissions regarding Rolontis and its manufacturing facility were materially misleading because:

(a) regarding withdrawal of the first BLA for Rolontis, Defendants did not initiate the withdrawal as they publicly described, but rather withdrew the application to avoid an outright rejection. As Turgeon would later admit after the Class Period, on August 12, 2021: "So, they [the

FDA] told us, look[,] in this form we wouldn't accept it, ***so you can wait for us to not accept that or you could voluntarily fix this stuff and resubmit***. And that's what happened.";

(b) despite Defendants' claims that they "worked closely with the FDA" and "implemented their guidance," and their simultaneous claims that they took extreme measures including retaining "outside experts" to run "mock inspections" to ensure compliance with FDA guidance, the Rolontis manufacturing facility maintained controls and procedures that deviated substantially from FDA requirements; and

(c) as a result of these manufacturing deficiencies, Rolontis could not achieve FDA approval, which was necessary for the drug to reach the market and contribute to Spectrum's bottom line.

## ADDITIONAL EVIDENCE OF SCIENTER

### A. Defendants Repeatedly Expressed Their Knowledge of Material Information

104. Throughout the Class Period, Defendants made repeated public expressions of their personal knowledge of material information directly related to the prospects for the poziotinib clinical trials and the Rolontis BLA inspection. Additionally, the scienter of the Individual Defendants and other Spectrum executives is imputable to the Company, as the misrepresentations and omissions of Spectrum, as alleged herein, were of such a nature that they would have been approved by corporate officials sufficiently knowledgeable about the Company to know that those statements and omissions were misleading.

105. With respect to poziotinib, Defendants acknowledged their access to data from the MD Anderson and ZENITH20 Trials well in advance of the disclosure of final results from those studies. For example, on the Q1 2018 Earnings Call on May 3, 2018, Riga expressed keen familiarity with the data from the MD Anderson Trial, saying: "As we evaluate the criteria for breakthrough therapy designation, we believe that pozi meets the criteria ***if the early data continues***." And on May 7, 2020, on the Q1 2020 Earnings Call, Lebel discussed how ZENITH20 is a "an open trial," which means "there will be regular looking at the data," such that "***[w]e will be able to get some insight, gain insight before we fully enroll***."

106. Spectrum executives also repeatedly emphasized their close working relationship with FDA officials and their personal knowledge about the FDA's requirements for poziotinib to obtain BTD status and, ultimately, to be approved for use in the United States. For example, on the Q4 2017 Earnings Call on March 6, 2018, the day before the first day of the Class Period, Riga admitted "we are having ongoing dialogue with the FDA to find the most-expedient regulatory pathway" for poziotinib, and Turgeon said, "[w]e've done extensive research on – and our homework on what it takes for breakthrough therapy." On November 8, 2018, on the Q3 2018 Earnings Call, in response to a question from an analyst regarding the poziotinib BTD application, Turgeon said: "We ***knew exactly . . . what [the FDA] wanted***, and I think we gave them the data they asked for." And with respect to the ZENITH20 Trial, Lebel admitted on the Q4 2018 Earnings Call on February 28, 2019, that "we've had discussion with the FDA. ***There's an agreement, full understanding of what we need to meet***."

107. Defendants made similar statements with respect to the Rolontis BLA. For example, on the Q1 2019 Earnings Call on May 9, 2019, Turgeon stated: "I'll remind you of this: ***we're working diligently*** to prepare the CMC module. I'll remind you, ***they told us exactly what they want***. They're working with us, being very helpful." And on the Q2 2019 Earnings Call on August 8, 2019, Lebel stated: "Regarding our BLA filing, ***we recently had a productive meeting with the FDA to further discuss their expectation*** around module 3, which is the module focused on manufacturing."

108. Thus, with respect to the poziotinib trials and the Rolontis BLA, Defendants made repeated statements during the Class Period indicating their awareness of, and focus on, issues with respect to meeting the efficacy and manufacturing requirements from the FDA. These statements are all highly indicative of Defendants' scienter and that of the Company.

**B. Defendants Engaged in Insider Trading**

109. Defendants engaged in their fraudulent scheme to further inflate the price of Spectrum common stock, enhance the value of their holdings of Spectrum shares, and to allow for significant insider sales. To that end, at certain pivotal times during the Class Period, Turgeon and Gustafson made large insider trades to take advantage of the elevated price of their respective

holdings, immediately prior to disclosures revealing partial truths about the deficiencies of poziotinib and Rolontis.

110. As one example, on May 16, 2019 and June 6, 2019, Turgeon sold over 40,000 shares – at the time his largest sale since becoming CEO, totaling approximately 9% of his available holdings – for nearly $340,000 in profit. When making these sales, he had access to full responsiveness data from every participant in Cohort 1 of the ZENITH20 Trial, which demonstrated poziotinib would fail that portion of the trial.

111. However, the most glaring example came in the form of three sales in November and December 2020, in the days and weeks leading up to Spectrum's disclosure that data from the poziotinib ZENITH20 Cohort 3 study had failed to meet the primary endpoint. Cohort 3 was fully enrolled by April 2020, so Defendants had access to the disappointing data for months by the time they made these sales.

112. Alarmingly, on November 4, 2020, just over a week prior to the first sale, Turgeon feigned confidence about the disappointing data on the Q3 2020 Earnings Call, stating: "I'm really confident in our ability to meet our corporate objectives and advance our programs with the aspiration of bringing new treatments to the patients with cancer who need it." In contrast with that positive outlook, both Turgeon and Gustafson began rapidly dumping their Spectrum holdings.

113. On November 18, 2020, Turgeon sold 162,473 shares of Spectrum common stock for a $671,013. Those shares represented 23.5% of Turgeon's holdings at the time. Shortly thereafter, Gustafson also made a large trade: on December 14, 2020, Gustafson sold 25,696 shares (7.1% of his holdings) for proceeds of $128,480. Two days later, on December 16, 2020, Turgeon sold 150,899 more shares, 28.54% of his remaining holdings, for proceeds of $709,225. In total, Spectrum's CEO had offloaded almost half of his Spectrum holdings, for proceeds of almost $1.4 million.

114. Just days after Turgeon and Gustafson pocketed massive profits from Spectrum's inflated stock price, on December 22, 2020, they and the other Spectrum executives disclosed the disappointing data they had been reviewing and collecting for months, driving the Company's stock price downward.

**C. The Fraud Implicated Spectrum's Core Products and Operations**

115. At all relevant times during the Class Period, Spectrum was a relatively small company with less than 250 employees, and an even smaller, tight-knit upper management team. Additionally, on January 17, 2019, Spectrum entered into an agreement for the sale of the FDA-approved product portfolio of seven approved oncology and hematology products to Aurobindo Pharma USA Inc. Following that sale, Spectrum was a two-product company, and both of those products were in development, not earning revenue. As the Company admitted in its 2020 10-K filing with the SEC, Spectrum "[would] not generate any future revenue until our pipeline products, including the late-stage development products [Rolontis] and poziotinib, are approved for commercial sale by the FDA and/or other regulatory agencies."

116. Given the Company's size, complete lack of sales, and singular focus on development and approval efforts for its two developmental drugs, the Individual Defendants were fully aware of the status of all material matters involving poziotinib and Rolontis.

117. Because the success of Spectrum's efforts to receive FDA approval of poziotinib and Rolontis were core to the Company's success, the materially false and misleading statements and omissions detailed herein could not have occurred without the Individual Defendants' knowledge and approval.

118. Moreover, the Individual Defendants were highly sophisticated and in positions to know that their statements concerning the prospects for poziotinib approval and the Rolontis inspection were materially false and misleading.

119. For example, Turgeon joined the Company in October 2012 and was appointed President and CEO in December 2017. In commenting on Turgeon's transition to CEO in 2017, the Chairman of Spectrum's Board of Directors (the "Board") noted that Turgeon "[brought] more than 30 years of experience in the pharmaceutical industry . . . . He had served as Spectrum's President and Chief Operating Officer since April 2014, and had previously served as the Company's Senior Vice President and Chief Commercial Officer from October 2012 to April 2014."

120. Similarly, Gustafson was named as CFO in June 2013, with the Company highlighting his "'20 years of experience in finance'" and called him "'a key addition to our already strong management team.'"

121. Lebel was named as CMO in November 2018, with a specific focus towards what Turgeon referred to as "'several near-term milestones and priorities including expanding the development of Poziotinib in broader patient populations, gaining regulatory clarity for breakthrough designation on Poziotinib, and filing the Rolontis BLA in the fourth quarter.'"

122. Riga was named as COO in December 2017, and CEO in December 2021. In a press release at the time, the Chairman of the Board stated: "'We welcome Tom as the new CEO of Spectrum and look forward to the continued benefits of his entrepreneurial and executive experience as we work to progress our two lead product candidates to commercialization.'" The press release continued: "Mr. Riga has over 20 years of pharmaceutical leadership experience and has demonstrated a record of success . . . . He has led multiple product launches in the oncology market, delivering innovative cancer care while establishing world class partnerships with key industry stakeholders."

123. Additionally, the scienter of the Individual Defendants is imputable to the Company, as the misrepresentations and omissions of Spectrum, as alleged herein, were of such a nature that they would have been approved by corporate officials sufficiently knowledgeable about the Company to know that those statements and omissions were false and misleading.

**D. Turgeon and Gustafson Abruptly Left After the Class Period**

124. The unexpected departures of key executives, namely, the Company's CEO Turgeon, and its CFO Gustafson, so soon after the end of the Class Period, bolster an already compelling inference of scienter.

125. As alleged herein, Turgeon and Gustafson were personally involved in the fraud and knew, or were reckless in not knowing, of the issues with the poziotinib clinical trials and the Rolontis manufacturing plant. Turgeon and Gustafson's culpability for this fraud is further demonstrated by their abrupt and unceremonious departures from the Company just months after it concluded. Turgeon "retired" on December 1, 2021, less than four years after taking over as CEO,

and Gustafson followed shortly thereafter on February 23, 2022. These departures were not pre-planned and not foreseen, and the Company gave no benign reason for the exodus.

**E. Defendants Signed Sarbanes-Oxley Certifications Attesting that They Personally Supervised Spectrum's Controls and Procedures**

126. Within the Forms 10-K and 10-Q filed with the SEC by Spectrum during the Class Period, Turgeon and Gustafson certified that they were "responsible for establishing and maintaining disclosure controls and procedures" and that such controls and procedures were designed "to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared."

**F. Spectrum's Intra-Class Period Financing Incentivized Fraud**

127. Throughout the Class Period, Spectrum was spending money but not earning it. As the stockpile of money dwindled, and their two assets demonstrated that they would not reach market and start earning revenue in the near term, it became clear that Spectrum would need to raise capital through investors in order to survive.

128. In order to maximize the level of investment, Defendants took advantage of the artificial inflation in the Company's stock price by conducting an at-the-market ("ATM") offering. In an ATM offering, the issuer places its new shares into the market incrementally, through broker-dealers at market prices. Rather than do a single offering during the Class Period, Defendants conducted three ATMs: one from April 5, 2019 to March 2, 2020, a second ATM from May 8, 2020 to June 30, 2020, and a third ATM announced on November 6, 2020. The three ATMs allowed the Company to raise up to $150 million from investors.

129. As reiterated in each prospectus, Defendants had to raise funds to pay for "general corporate purposes, including, without limitation, research and development and clinical development costs to support the advancement of our in-development drug candidates, activities in connection with the launch of our in-development drug candidates."

130. Ultimately, between January 1, 2020 and December 31, 2020, Spectrum's ATMs raised over $85 million in cash through its series of dilutive offerings. This was capital the

Company desperately needed to cover its expenses until it found a source of revenue internally. The offering gave Defendants a motive to inflate the price of Spectrum common stock because, but for Defendants' materially false and misleading statements regarding the status of the Rolontis BLA and the poziotinib trials, Spectrum's Class Period stock price would have been substantially lower, and the Company would have been unable to obtain the same level of much-needed capital.

## SCHEME LIABILITY

131. Defendants engaged in a scheme to put profits and self-interests over their obligations to investors by knowingly overstating the efficacy of poziotinib and readiness of the Rolontis manufacturing facility for inspection by the FDA in order to sell their personal shares at a premium price. This conduct caused the price of Spectrum common stock to trade at artificial levels during the Class Period, as the market was unaware that, in fact, poziotinib's clinical trial data was coming in below expectations and the Rolontis manufacturing plant was nowhere near ready for FDA inspection. Each Defendant is liable as a participant in the fraudulent scheme described herein.

## LOSS CAUSATION

132. During the Class Period, Defendants made materially false and misleading statements by misrepresenting the status of Spectrum's developmental drugs poziotinib and Rolontis. They misled the market about poziotinib's efficacy and ability to compete with other cancer drugs, and also misleadingly described their efforts to prepare the Rolontis manufacturing facility for inspection by the FDA. Defendants' material misrepresentations and omissions artificially inflated the price of Spectrum common stock and operated as a fraud or deceit on members of the Class. Later, as the true facts were revealed, the price of Spectrum common stock fell significantly, as the prior artificial inflation came out of the stock price over time. As a result of their purchases of Spectrum common stock during the Class Period, Plaintiff and other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

133. After the market closed on December 19, 2018, Spectrum announced that based on a subset of data from MD Anderson's ongoing Phase 2 clinical trial, the FDA did not grant BTD status to poziotinib for the treatment of patients with metastatic NSCLC with EGFR exon 20 mutations.

134. As a direct result of the disclosures on December 19, 2018, Spectrum's stock price significantly declined. The price of Spectrum stock declined from a December 19, 2018 closing price of $10.44 per share to a December 20, 2018 closing price of $6.39 per share – a decline of 38% on high volume of 7,786,900 shares. In comparison, on December 20, 2018, the S&P 500 Index declined only 1.% and Spectrum's peer index declined 2.5%.[3]

135. But Spectrum's stock price remained artificially inflated because Defendants continued to conceal misrepresentations and omissions related to poziotinib's response rates and performance in clinical trials and the status of the Rolontis BLA application. Moreover, when announcing the FDA's decision to deny poziotinib BTD status on December 19, 2018, the Company confirmed that its "overall development plan and timeline for a New Drug Application remains unchanged."

136. Before the market opened on December 26, 2019, Spectrum announced that poziotinib did not meet its pre-specified endpoint in Cohort 1 of the Phase 2 clinical trial, ZENITH20. The confirmed ORR was only 14.8%. Spectrum's stock price cratered as a direct result of the disclosure. The price of Spectrum stock declined from a December 24, 2019 closing price of $8.75 per share to a December 26, 2019 closing price of $3.50 per share – a decline of over 60% on unusually high volume of 21,312,900 shares. In comparison, on December 26, 2019, S&P 500 Index increased 0.5% and Spectrum's peer index increased 1.4%.

137. But Spectrum's stock price remained artificially inflated because Defendants continued to conceal misrepresentations and omissions related to poziotinib's response rates and performance in clinical trials and the status of the Rolontis BLA application.

138. After the market closed on December 22, 2020, the Company announced that "its pre-specified primary endpoint in its Phase 2 clinical trial, [ZENITH20], evaluating poziotinib in first-

[3] The peer index cited above is based on the Company's 2018 SEC Form 10-K, dated February 28, 2019, and is comprised of publicly traded companies Spectrum identified as peers, including AMAG Pharmaceuticals, Inc., Amphastar Pharmaceuticals, Inc., Eagle Pharmaceuticals, Inc., Enanta Pharmaceuticals, Inc., Fluidign Corporation, Genomic Health, Inc., Halozyme Therapeutics, Inc., Harvard Bioscience, Inc., Infinity Pharmaceuticals, Inc., Luminex Corporation, Merrimack Pharmaceuticals, Inc., MiMedx Group, Inc., NewLink Genetics Corporation, and Vanda Pharmaceuticals, Inc.

line NSCLC patients with EGFR exon 20 insertion mutations was not met in Cohort 3." The announcement included positive news concerning Cohort 2 of the Phase 2 clinical trial, which evaluated a different set of patients. Nonetheless, Spectrum's stock declined 9.1% on the disclosure regarding the Cohort 3 failure, closing on December 22, 2020 at $4.25 per share and closing on December 23, 2020 at $3.87 per share. In comparison, on December 23, 2020, S&P 500 Index increased 0.1% and Spectrum's peer index was stagnant.

139. Artificial inflation related to the statements and omissions concerning the Rolontis manufacturing facilities remained in the stock until the announcement of the Rolontis CRL on August 6, 2021. Before the market opened on August 6, 2021, the Company disclosed that it received a CRL from the FDA regarding its BLA for Rolontis. According to the news release, "[t]he CRL cited deficiencies related to manufacturing and indicated that a reinspection will be necessary." Spectrum stock dropped from an August 5, 2021 closing price of $3.25 to an August 6, 2021 closing price of $2.55 per share – a decline of over 21.5% on high volume of 18,689,900 shares. In comparison, on August 6, 2021, the S&P 500 Index increased 0.2% and Spectrum's peer index decreased merely 0.8%.

140. The declines in Spectrum's stock price on December 20, 2018, December 26, 2019, December 23, 2020, and August 6, 2021 were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors and the market. The timing and magnitude of Spectrum's stock price declines negate any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic, or industry factors, or by Company-specific factors unrelated to Defendants' misrepresentations. Instead, the economic losses suffered by Plaintiff and other members of the Class were a direct result of Defendants' misrepresentations that inflated Spectrum's stock price and the subsequent decline in the value of the stock when the misrepresentations and omissions were revealed.

## NO SAFE HARBOR

141. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading

statements pleaded in this pleading. None of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about data and information that Spectrum had access to.

142. Spectrum's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability because they were not accompanied by meaningful cautionary language. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Spectrum were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

143. Defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the statement was false or misleading and was authorized and/or approved by an executive officer of Spectrum who knew that the forward-looking statement was false.

**SPECTRUM SECURITIES TRADED IN AN EFFICIENT MARKET**

144. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Spectrum common stock traded in an efficient market, was liquid and traded with moderate to heavy volume during the Class Period;
- the Company's stock was traded on the NASDAQ and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and
- Plaintiff and members of the Class purchased, acquired and/or sold Spectrum stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

145. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

146. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed herein.

**CLASS ACTION ALLEGATIONS**

147. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all those who purchased or otherwise acquired Spectrum stock during the Class Period and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are the Individual Defendants and their immediate families, the officers and directors of the Company, at all relevant times, and members of their immediate families, legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

148. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Spectrum common stock was actively traded on the NASDAQ in an efficient market. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Spectrum or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

149. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

150. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

151. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Spectrum;
- whether the Individual Defendants caused Spectrum to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the price of Spectrum stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

152. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**For Violations of §10(b) of the Exchange Act**
**Against All Defendants**

153. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

154. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

155. Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in connection with the purchase and sale of securities in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class during the Class Period.

156. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members as alleged herein; (ii) artificially inflate and maintain the market price of Spectrum common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Spectrum stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

157. Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Spectrum stock. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Spectrum's business practices.

158. By virtue of their positions at Spectrum, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were

committed willfully or with reckless disregard for the truth. In addition, each of the Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

159. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Spectrum, the Individual Defendants had knowledge of the details of Spectrum's internal affairs.

160. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Spectrum. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Spectrum's business practices. As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Spectrum stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Spectrum's business and financial condition that were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Spectrum stock at artificially inflated prices and relied upon the price of the stock, the integrity of the market for the stock and/or upon statements disseminated by Defendants, and were damaged thereby.

161. During the Class Period, Spectrum stock traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Spectrum stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Spectrum stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The

market price of Spectrum stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and the other Class members.

162. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

163. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's stock during the Class Period, upon the disclosure of the facts alleged herein.

**COUNT II**

**For Violations of §20(a) of the Exchange Act**
**Against the Individual Defendants**

164. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

165. During the Class Period, the Individual Defendants participated in the operation and management of Spectrum, and conducted and participated, directly and indirectly, in the conduct of Spectrum's business affairs. Because of their senior positions, they knew the adverse non-public information about Spectrum's business practices.

166. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Spectrum's financial condition and results of operations, and to correct promptly any public statements issued by Spectrum which had become materially false or misleading.

167. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings that Spectrum disseminated in the marketplace during the Class Period concerning Spectrum's results and operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Spectrum to engage in the wrongful acts complained of herein. Spectrum, in turn, controlled the Individual Defendants and all of its employees. The Individual Defendants, therefore, were "controlling persons" within the meaning of §20(a) of the

Exchange Act. In this capacity, they participated in the unlawful conduct alleged that artificially inflated the market price of Spectrum stock.

168. By reason of the above conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

**COUNT III**

**For Violations of §20A of the Exchange Act Against the Individual Defendants**

169. Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

170. As detailed herein, the Individual Defendants were in possession of material non-public information concerning Spectrum. The Individual Defendants took advantage of their possession of material non-public information regarding Spectrum to obtain significant insider trading profits during the Class Period.

171. The Individual Defendants' sales of Spectrum common stock (set forth below and in the attached Appendix) were made contemporaneously with Plaintiff's purchases of Spectrum common stock (set forth below and in Plaintiff's certification (Exhibit A) during the Class Period.

172. Turgeon made the following sales of Spectrum common stock contemporaneously with the following Plaintiff purchases of Spectrum common stock:

| Turgeon Sales | | | Plaintiff Purchases | | |
|---|---|---|---|---|---|
| **Date** | **Amount** | **Price** | **Date** | **Amount** | **Price** |
| 1/11/2019 | 36,311 | $10.87 | 01/14/2019 | 10,000 | $10.60 |
| 1/16/2019 | 5,091 | $10.44 | 01/17/2019 | 10,000 | $10.52 |
| 5/16/2019 | 22,702 | $8.53 | 05/16/2019 | 7,000 | $8.43 |
| 11/18/2020 | 162,473 | $4.13 | 11/18/2020 | 9,600 | $4.14 |

173. Gustafson made the following sales of Spectrum common stock contemporaneously with the following Plaintiff purchases of common stock:

| Gustafson Sales | | | Plaintiff Purchases | | |
|---|---|---|---|---|---|
| **Date** | **Amount** | **Price** | **Date** | **Amount** | **Price** |
| 1/11/2019 | 33,692 | $10.87 | 01/14/2019 | 10,000 | $10.60 |
| 1/16/2019 | 3,207 | $10.44 | 01/17/2019 | 10,000 | $10.52 |

174. Lebel made the following sales of Spectrum common stock contemporaneously with the following Plaintiff purchases of common stock:

| Lebel Sales | | | Plaintiff Purchases | | |
|---|---|---|---|---|---|
| **Date** | **Amount** | **Price** | **Date** | **Amount** | **Price** |
| 6/22/2020 | 5,474 | $3.16 | 06/22/2020 | 10,000 | $3.11 |
| 6/23/2020 | 4,167 | $3.35 | 06/26/2020 | 5,000 | $3.01 |
| 6/22/2021 | 5,821 | $4.09 | 06/22/2021 | 10,000 | $3.98 |

175. Riga made the following sales of Spectrum common stock contemporaneously with the following Plaintiff purchases of common stock:

| Riga Sales | | | Plaintiff Purchases | | |
|---|---|---|---|---|---|
| **Date** | **Amount** | **Price** | **Date** | **Amount** | **Price** |
| 1/16/2019 | 10,499 | $10.44 | 01/17/2019 | 10,000 | $10.52 |
| 5/14/2019 | 2,388 | $8.82 | 05/15/2019 | 1,000 | $8.50 |
| 5/13/2020 | 2,086 | $3.25 | 05/13/2020 | 8,000 | $3.10 |
| | | | 05/13/2020 | 1,700 | $3.08 |
| | | | 05/13/2020 | 300 | $3.08 |
| | | | 05/13/2020 | 1,000 | $3.10 |
| | | | 05/13/2020 | 142 | $3.10 |
| 5/14/2020 | 1,125 | $3.06 | 05/14/2020 | 7,716 | $3.04 |

176. Plaintiff and members of the Class who purchased shares of Spectrum common stock contemporaneously with sales by the Individual Defendants suffered damages because: (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act as alleged herein; and (2) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

DATED: September 26, 2022

ROBBINS GELLER RUDMAN
& DOWD LLP
RYAN A. LLORENS
JEFFREY J. STEIN
JOHN M. KELLEY

s/ Jeffrey J. Stein
JEFFREY J. STEIN

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
ryanl@rgrdlaw.com
jstein@rgrdlaw.com
jkelly@rgrdlaw.com

\

Lead Counsel for Lead Plaintiff International Trading Group, Inc.

CAMPBELL & WILLIAMS
J. COLBY WILLIAMS
710 South Seventh Street, Suite A
Las Vegas, Nevada 89101
Telephone: 702/382-5222
702/382-0540 (fax)
jcw@cwlawlv.com

Local Counsel for Lead Plaintiff International Trading Group, Inc.

**APPENDIX**
**Individual Defendants' Trades**

| **Gustafson, Kurt A.** | | | |
|---|---|---|---|
| Transaction Date | Price | Shares Sold | Proceeds |
| 3/22/2018 | $18.13 | 2,640 | $47,863 |
| 3/26/2018 | $17.38 | 1,300 | $22,594 |
| 3/28/2018 | $16.35 | 4,350 | $71,123 |
| 1/11/2019 | $10.87 | 33,692 | $366,232 |
| 1/16/2019 | $10.44 | 3,207 | $33,481 |
| 3/25/2019 | $9.46 | 3,797 | $35,920 |
| 3/26/2019 | $9.90 | 926 | $9,167 |
| 3/29/2019 | $10.65 | 5,974 | $63,623 |
| 4/1/2019 | $10.73 | 3,000 | $32,190 |
| 4/1/2019 | $10.81 | 1,642 | $17,750 |
| 1/16/2020 | $3.37 | 2,522 | $8,499 |
| 1/17/2020 | $3.33 | 1,621 | $5,398 |
| 2/19/2020 | $2.77 | 4,733 | $13,110 |
| 2/20/2020 | $2.85 | 3,333 | $9,499 |
| 3/31/2020 | $2.31 | 4,326 | $9,993 |
| 4/1/2020 | $2.23 | 3,135 | $6,991 |
| 12/14/2020 | $5.00 | 25,696 | $128,480 |
| 1/19/2021 | $3.81 | 2,582 | $9,837 |
| 1/20/2021 | $4.31 | 1,944 | $8,379 |
| 2/19/2021 | $3.64 | 4,672 | $17,006 |
| 2/22/2021 | $3.73 | 4,000 | $14,920 |
| 3/15/2021 | $3.63 | 20,365 | $73,925 |
| 3/16/2021 | $3.69 | 16,318 | $60,213 |
| **Total** | | **155,775** | **$1,066,194** |

| **Lebel, Francois** | | | |
|---|---|---|---|
| Transaction Date | Price | Shares Sold | Proceeds |
| 11/6/2019 | $8.16 | 6,963 | $56,818 |
| 4/2/2020 | $2.17 | 1,228 | $2,665 |
| 4/3/2020 | $2.18 | 854 | $1,862 |
| 6/22/2020 | $3.16 | 5,474 | $17,298 |
| 6/23/2020 | $3.35 | 4,167 | $13,959 |
| 11/6/2020 | $3.50 | 7,025 | $24,588 |
| 11/9/2020 | $3.56 | 5,000 | $17,800 |
| 3/15/2021 | $3.63 | 22,631 | $82,151 |
| 3/16/2021 | $3.69 | 18,828 | $69,475 |
| 4/5/2021 | $3.31 | 1,125 | $3,724 |
| 4/6/2021 | $3.24 | 1,025 | $3,321 |
| 6/22/2021 | $4.09 | 5,821 | $23,808 |

| | | | |
|---|---|---|---|
| 6/23/2021 | $4.00 | 5,000 | $20,000 |
| **Total** | | **85,141** | **$337,468** |

| **Riga, Thomas J.** | | | |
|---|---|---|---|
| Transaction Date | Price | Shares Sold | Proceeds |
| 3/26/2018 | $17.41 | 220 | $3,830 |
| 4/2/2018 | $15.58 | 1,948 | $30,350 |
| 4/16/2018 | $18.60 | 3,900 | $72,540 |
| 4/17/2018 | $19.07 | 1,840 | $35,089 |
| 5/14/2018 | $18.10 | 3,290 | $59,549 |
| 6/25/2018 | $18.76 | 235 | $4,409 |
| 1/16/2019 | $10.44 | 10,499 | $109,610 |
| 2/20/2019 | $11.47 | 2,285 | $26,209 |
| 4/2/2019 | $10.57 | 1,882 | $19,893 |
| 4/11/2019 | $10.75 | 16,493 | $177,300 |
| 5/14/2019 | $8.82 | 2,388 | $21,062 |
| 1/16/2020 | $3.37 | 11,381 | $38,354 |
| 1/17/2020 | $3.26 | 5,000 | $16,300 |
| 2/19/2020 | $2.77 | 5,085 | $14,085 |
| 2/20/2020 | $2.85 | 2,500 | $7,125 |
| 3/31/2020 | $2.31 | 1,854 | $4,283 |
| 4/1/2020 | $2.23 | 938 | $2,092 |
| 5/13/2020 | $3.25 | 2,086 | $6,780 |
| 5/14/2020 | $3.06 | 1,125 | $3,443 |
| 1/19/2021 | $4.00 | 64,626 | $258,504 |
| 1/19/2021 | $3.81 | 11,657 | $44,413 |
| 1/20/2021 | $4.31 | 10,000 | $43,100 |
| 2/19/2021 | $3.64 | 5,018 | $18,266 |
| 2/22/2021 | $3.73 | 5,000 | $18,650 |
| 3/15/2021 | $3.63 | 23,291 | $84,546 |
| 3/16/2021 | $3.69 | 18,828 | $69,475 |
| 5/13/2021 | $3.09 | 3,402 | $10,512 |
| 5/14/2021 | $3.07 | 2,250 | $6,908 |
| **Total** | | **219,021** | **$1,206,675** |

| **Turgeon, Joseph W.** | | | |
|---|---|---|---|
| Transaction Date | Price | Shares Sold | Proceeds |
| 3/22/2018 | $18.17 | 3,100 | $56,327 |
| 3/28/2018 | $16.40 | 4,810 | $78,884 |
| 4/17/2018 | $19.00 | 11,565 | $219,735 |
| 1/11/2019 | $10.87 | 36,311 | $394,701 |

| | | | |
|---|---|---|---|
| 1/16/2019 | $10.44 | 5,091 | $53,150 |
| 3/25/2019 | $9.46 | 5,315 | $50,280 |
| 3/29/2019 | $10.65 | 6,307 | $67,170 |
| 5/16/2019 | $8.53 | 22,702 | $193,648 |
| 6/6/2019 | $7.95 | 18,240 | $145,008 |
| 1/16/2020 | $3.37 | 3,753 | $12,648 |
| 1/17/2020 | $3.33 | 1,944 | $6,474 |
| 2/19/2020 | $2.77 | 6,262 | $17,346 |
| 2/20/2020 | $2.85 | 3,750 | $10,688 |
| 3/31/2020 | $2.31 | 4,059 | $9,376 |
| 4/1/2020 | $2.23 | 2,502 | $5,579 |
| 11/18/2020 | $4.13 | 162,473 | $671,013 |
| 12/16/2020 | $4.70 | 150,899 | $709,225 |
| 1/19/2021 | $3.81 | 3,844 | $14,646 |
| 1/20/2021 | $4.31 | 3,889 | $16,762 |
| 2/19/2021 | $3.64 | 7,257 | $26,415 |
| 2/22/2021 | $3.73 | 7,500 | $27,975 |
| 3/15/2021 | $3.63 | 40,091 | $145,530 |
| 3/16/2021 | $3.69 | 28,243 | $104,217 |
| **Total** | | **539,907** | **$3,036,796** |

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on September 26, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Jeffrey J. Stein
JEFFREY J. STEIN

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

Email: jstein@rgrdlaw.com

# Mailing Information for a Case 2:21-cv-01612-CDS-BNW Luo v. Spectrum Pharmaceuticals, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **John P. Aldrich**
  jaldrich@johnaldrichlawfirm.com,traci@johnaldrichlawfirm.com,eleanor@johnaldrichlawfirm.com,sorme@johnaldrichlawfirm.com
- **Joseph Alexander Hood , II**
  ahood@pomlaw.com
- **John M. Kelley**
  JKelley@rgrdlaw.com,jkelley@ecf.courtdrive.com
- **Patrick R. Leverty**
  pat@levertylaw.com,staff@levertylaw.com,patleverty@gmail.com
- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com
- **Ryan A. Llorens**
  ryanl@rgrdlaw.com,ryanl@ecf.courtdrive.com,E_File_SD@rgrdlaw.com
- **Andrew R. Muehlbauer**
  andrew@mlolegal.com,witty@mlolegal.com,sean@mlolegal.com
- **David C OMara**
  david@omaralaw.net,val@omaralaw.net,bsnyder@omaralaw.net
- **Jordan T. Smith**
  jts@pisanellibice.com,kap@pisanellibice.com,sd@pisanellibice.com,lit@pisanellibice.com
- **Jeffrey J. Stein**
  jstein@rgrdlaw.com,JStein@ecf.courtdrive.com,E_File_SD@rgrdlaw.com,CReis@ecf.courtdrive.com,creis@rgrdlaw.com
- **J Colby Williams**
  jcw@cwlawlv.com,pre@cwlawlv.com,cbb@cwlawlv.com,srm@cwlawlv.com,jyc@cwlawlv.com,mmh@cwlawlv.com,maw@cwlawlv.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Michael Albert**
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

**Jennifer N. Caringal**
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

**Danielle S. Myers**
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

**Juan Carlos Sanchez**
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101