CAMPBELL & WILLIAMS
J. COLBY WILLIAMS, (5549)
710 South Seventh Street, Suite A
Las Vegas, Nevada  89101
Telephone:  702/382-5222
702/382-0540 (fax)
jcw@cwlawlv.com

Local Counsel for Lead Plaintiff
International Trading Group, Inc.

ROBBINS GELLER RUDMAN
   & DOWD LLP
RYAN A. LLORENS
JEFFREY J. STEIN
JOHN M. KELLEY
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
ryanl@rgrdlaw.com
jstein@rgrdlaw.com
jkelly@rgrdlaw.com

Lead Counsel for Lead Plaintiff
International Trading Group, Inc.

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| JOSE CHUNG LUO, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 2:21-cv-01612-CDS-BNW |
| Plaintiff, | ) ) | CLASS ACTION |
| vs. | ) ) | LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS |
| SPECTRUM PHARMACEUTICALS, INC., et al., | ) ) ) | THE AMENDED CONSOLIDATED CLASS ACTION COMPLAINT |
| Defendants. | ) ) ) | |

4866-8821-5884.v1

**TABLE OF CONTENTS**

                                                                          **Page**

I.      INTRODUCTION AND FACTUAL BACKGROUND ........................................................1

II.     LEGAL STANDARD.........................................................................................................4

III.    DEFENDANTS CONCEDE THE RULE 10b-5(a) AND (c) CLAIMS ...........................5

IV.     PLAINTIFF ADEQUATELY ALLEGES A RULE 10b-5(b) CLAIM ...........................5

        A.    Defendants Concede Four Elements of Plaintiff's §10(b) Claims..........................5

        B.    Defendants' Misrepresentations and Omissions Were Materially False or
              Misleading When Made ...........................................................................................6

              1.    Defendants' Misrepresentations and Omissions Concerning
                    Poziotinib Were Materially False and Misleading When Made.................6

                    a.    Defendants Misrepresented the Need for Poziotinib and Its
                          Ability to Address that Need During the MD Anderson
                          Trial...............................................................................................6

                    b.    Defendants Failed to Disclose Known Trial Data
                          Throughout the ZENITH20 Trial....................................................9

              2.    Defendants' Misrepresentations and Omissions Concerning
                    Rolontis Were Materially False and Misleading When Made..................12

              3.    Defendants' Statements Were Not Mere Puffery .....................................14

              4.    The PSLRA Safe Harbor Does Not Apply ...............................................16

        C.    Plaintiff Adequately Alleges Scienter....................................................................17

              1.    Defendants Had Access to Information Undermining Their
                    Statements ................................................................................................18

              2.    The Statements Concerned Spectrum's Core Operations.........................20

              3.    Defendants Had a Motive to Commit Fraud.............................................20

                    a.    Defendants' Suspicious Stock Sales Demonstrate Motive ............21

                    b.    The At-the-Market Offering During the Class Period
                          Establishes Motive ......................................................................23

              4.    Executive Departures Bolster the Strong Inference of Scienter ................23

V.      PLAINTIFF ADEQUATELY ALLEGES §§20(a) AND 20A CLAIMS..........................24

VI.     CONCLUSION.................................................................................................................24

4866-8821-5884.v1

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013).................................................................................................................5

*Baron v. Hyrecar Inc.*,
   2022 WL 17413562 (C.D. Cal. Dec. 5, 2022) .......................................................................22

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ........................................................................................6, 13, 17

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002) ..........................................................................................6, 8, 10

*Casella v. Webb*,
   883 F.2d 805 (9th Cir. 1989) ..................................................................................................15

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
   2022 WL 4491093 (S.D. Cal. Sept. 27, 2022)........................................................10, 17, 21, 22

*City of Roseville Emps' Ret. Sys. v. Sterling Fin. Corp.*,
   963 F. Supp. 2d 1092 (E.D. Wash. 2013),
   *aff'd*, 691 F. App'x 393 (9th Cir. 2017)..................................................................................13

*Colyer v. Acelrx Pharms., Inc.*,
   2015 WL 7566809 (N.D. Cal. Nov. 25, 2015) .......................................................................17

*Eminence Cap., L.L.C. v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) ................................................................................................24

*ESG Cap. Partners, LP v. Stratos*,
   828 F.3d 1023 (9th Cir. 2016) ................................................................................................18

*Fecht v. Price Co.*,
   70 F.3d 1078 (9th Cir. 1995) ....................................................................................................6

*Freedman v. Value Health, Inc.*,
   958 F. Supp. 745 (D. Conn. 1997).........................................................................................23

*Gebhart v. S.E.C.*,
   595 F.3d 1034 (9th Cir. 2010) ................................................................................................18

*Graves v. Arpaio*,
   623 F.3d 1043 (9th Cir. 2010) (per curiam)..........................................................................5, 6

- ii -

4866-8821-5884.v1

**Page**

*Howard v. Everex Sys. Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ......................................................................................23

*HsingChing Hsu v. Puma Biotech., Inc.*,
    2017 WL 3205774 (C.D. Cal. July 25, 2017)................................................................16

*Hsu v. Puma Biotech., Inc.*,
    213 F. Supp. 3d 1275 (C.D. Cal. 2016) ........................................................................18

*In re Allied Nev. Gold Corp.*,
    2016 WL 4191017 (D. Nev. Aug. 8, 2016) ...................................................................13

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021),
    *cert. denied*, __ U.S. __, 142 S. Ct. 1227 (2022).............................................5, 11, 17

*In re Am. Apparel, Inc. S'holder Litig.*,
    2013 WL 10914316 (C.D. Cal. Aug. 8, 2013)...............................................................14

*In re AnaptysBio, Inc.*,
    2021 WL 4267413 (S.D. Cal. Sept. 20, 2021)...............................................................23

*In re Apple Comput. Sec. Litig.*,
    886 F.2d 1109 (9th Cir. 1989) .................................................................................15, 22

*In re Arrowhead Rsch. Corp. Sec. Litig.*,
    2016 WL 6562066 (C.D. Cal. Mar. 29, 2016)...............................................................16

*In re CV Scis., Inc. Sec. Litig.*,
    2019 WL 6718086 (D. Nev. Dec. 10, 2019)...............................................................6, 7

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005) ......................................................................................22

*In re Fibrogen, Inc.*,
    2022 WL 2793032 (N.D. Cal. July 15, 2022)...........................................................23, 24

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ........................................................................................4

*In re Ibis Tech. Secs. Litig.*,
    422 F. Supp. 2d 294 (D. Mass. 2006) ...........................................................................23

*In re Immersion Corp. Sec. Litig.*,
    2011 WL 6303389 (N.D. Cal. Dec. 16, 2011),
    *aff'd sub nom. Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ........................................................................................22

4866-8821-5884.v1

**Page**

*In re Intrexon Corp. Sec. Litig.*,
  2017 WL 732952 (N.D. Cal. Feb. 24, 2017) ...........................................................................16

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ...............................................................14, 15, 16, 17

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d. 970 (9th Cir. 2009) ...........................................................................8, 9

*In re Spectrum Pharms. Inc. Sec. Litig.*,
  2015 WL 1413385 (D. Nev. Mar. 26, 2015) ...........................................................................10

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009) ...........................................................................23

*Jasin v. Vivus, Inc.*,
  2015 WL 3809357 (N.D. Cal. June 18, 2015)...........................................................................16

*Khoja v. Orexigan Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ........................................................................ *passim*

*Kovtun v. VIVUS, Inc.*,
  2012 WL 4477647 (N.D. Cal. Sept. 27, 2012),
  *aff'd sub nom. Ingram VIVUS, Inc.*,
  591 F. App'x 592 (9th Cir. 2015) ...........................................................................16

*Landon-Palmer v. Kijakazi*,
  2022 WL 17081149 (D. Nev. Nov. 18, 2022) ...........................................................................5

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
  416 F.3d 940 (9th Cir. 2005) ...........................................................................20

*Lorenzo v. Sec. & Exch. Comm'n*,
  __ U.S. __, 139 S. Ct. 1094 (2019)...........................................................................5

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)...........................................................................4, 23

*Miller v. Thane Int'l, Inc.*,
  519 F.3d 879 (9th Cir. 2008) ...........................................................................10

*Mulderrig v. Amyris, Inc.*,
  492 F. Supp. 3d 999 (N.D. Cal. 2020) ...........................................................................21, 23

*Mulligan v. Impax Lab'ys, Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014) ...........................................................................20

4866-8821-5884.v1

**Page**

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) ...................................................................................................23

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund*
*v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ...........................................................................................4, 5, 23

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ................................................................................................22

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) ..................................................................................................14

*Padnes v. Scios Nova Inc.*,
1996 WL 539711 (N.D. Cal. Sept. 18, 1996) .........................................................................12

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) ........................................................................................... *passim*

*Roberti v. OSI Sys.*,
2015 WL 1985562 (C.D. Cal. Feb. 27, 2015).............................................................................5

*Ronconi v. Larkin*,
253, F.3d 423, 436 (9th Cir. 2001) .........................................................................................22

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) .............................................................................................17, 20

*Schlagal v. Learning Tree Int'l*,
1998 WL 1144581 (C.D. Cal. Dec. 23, 1998) ........................................................................23

*Schueneman v. Arena Pharms., Inc.*,
840 F.3d 698 (9th Cir. 2016) ..................................................................................................10

*Shenwick v. Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017) ............................................................................18, 19

*Siracusano v. Matrixx Initiatives, Inc.*,
585 F.3d 1167 (9th Cir. 2009),
*aff'd*, 563 U.S. 27 (2011) ........................................................................................................17

*Smilovits v. First Solar Inc.*,
119 F. Supp. 3d 978 (D. Ariz. 2015),
*aff'd sub nom. Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ..................................................................................................18

4866-8821-5884.v1

**Page**

*Tadros v. Celladon Corp.*,
   2016 WL 5870002 (S.D. Cal. Oct. 7, 2016),
   *aff'd*, 738 F. App'x 448 (9th Cir. 2018)..................................................................................16

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)..............................................................................................4, 18, 21, 24

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) ...........................................................................................17

*Zamir v. Bridgepoint Educ., Inc.*,
   2016 WL 3971400 (S.D. Cal. July 25, 2016) .......................................................................22

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) .............................................................................................21

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
   §77j(b)..............................................................................................................................5, 24
   §78t(a)...................................................................................................................................24
   §78u-4 ................................................................................................................16, 20, 23
   §78u-4(b)(1)(B).......................................................................................................................6
   §78u-4(b)(2)..........................................................................................................................17

Federal Rules of Civil Procedure
   Rule 10b-5(a) ..........................................................................................................................5
   Rule 10b-5(b) ..........................................................................................................................5
   Rule 10b-5 (c) .........................................................................................................................5
   Rule 12(b)(6)............................................................................................................................4

4866-8821-5884.v1

## I.    INTRODUCTION AND FACTUAL BACKGROUND

Throughout the Class Period, Defendants engaged in a scheme to withhold negative material information about its two drug candidates, poziotinib and Rolontis.[1]  For poziotinib, a drug intended to treat certain types of lung cancer, Defendants made materially false and misleading statements and withheld negative material information and data about the drug's effectiveness.  The misstatements concerned three studies the Company completed during the Class Period to measure the drug's efficacy for patients with a particular genetic mutation, a mutation at exon 20 of the epidermal growth factor receptor ("EGFR").[2]  Importantly, despite contrary guidance from the FDA, Spectrum deliberately chose to conduct all three of these studies on an ***unmasked basis***, which allowed them to see data from the studies as it came in.  ¶¶6, 30-31.

During the first study, conducted at the world-class MD Anderson Cancer Center in Houston, Texas (the "MD Anderson Trial"), Defendants routinely misrepresented the efficacy of existing treatments.  Efficacy was measured in terms of overall response rate ("ORR"), the percentage of patients whose tumors decreased in size.  ¶27.  Turgeon and Riga repeatedly claimed that EGFR-mutated patients had a "huge unmet need" for poziotinib because "other therapies only have a 6% to 8% response rate" and therefore, Turgeon said, "if I can get a 20% to 30% response rate, I can get a drug approved."  ¶¶36, 75.  But these statements were untrue because in reality, existing general therapies had a 23% response rate, and the FDA had informed Defendants that the agency would not approve poziotinib unless it had a response rate of at least 30%.  ¶¶37, 39.

---

[1]    "Defendants" are Spectrum Pharmaceuticals, Inc. ("Spectrum"), Joseph W. Turgeon, Kurt A. Gustafson, Francois J. Lebel, M.D., and Thomas J. Riga.  All capitalized terms not defined herein have the same meaning as set forth in the Complaint (ECF 46) (the "Complaint").  Additionally, all "¶_" and "¶¶_" references are to the Complaint, and unless otherwise noted, citations are omitted and emphasis is added throughout.

[2]    In Defendants' Request for Judicial Notice (ECF 56) ("RJN") and throughout their Motion to Dismiss the Complaint (ECF 55) (the "Motion" or "MTD"), Defendants attempt to bolster their argument and create distraction by adding information extraneous to the Complaint.  For example, they inexplicably ask the Court to take "judicial notice" of post-Class Period documents concerning poziotinib's effectiveness at treating patients with a totally different mutation, at HER2.  But the Ninth Circuit expressly prohibits defendants from "present[ing] their own version of the facts at the pleading stage" because "it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief." *Khoja v. Orexigan Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).  Plaintiff addresses the blatant impropriety of the RJN in the concurrently filed opposition to the RJN.

- 1 -

All of this information was known to Defendants during the MD Anderson Trial.  As Riga admitted on multiple occasions, the Company had "ongoing dialogue with the FDA" and those "conversations with the agency, obviously, do go into the statistics that are expected." ¶¶39, 73, 76, 106.  Defendants do not deny that these conversations occurred or contend that the FDA provided them with incorrect information.  Nevertheless, Defendants did not disclose the higher bar for approval until after the FDA declined Spectrum's Breakthrough Therapy Designation ("BTD") application on December 19, 2018.  ¶41.

During the second and third EGFR studies, cohorts 1 and 3 of the ZENITH20 Trial, Defendants withheld negative data from investors, and instead made misleading statements suggesting the data was positive.  Full data from cohort 1 was available to Defendants in January 2019, and full data from cohort 3 was available to Defendants in June 2020.  ¶¶45, 52.  This data showed poziotinib did not clear the FDA's 30% ORR threshold for either trial, and therefore would not be approved as a treatment for patients with EGFR mutations.  ¶¶47, 55.  Despite possessing this bad data, Defendants continued to tout old data from the single-center MD Anderson Trial, where poziotinib had achieved a 43% ORR.  For example, Turgeon said poziotinib "showed a 43% overall response rate, which was much higher than anything." ¶82.  Lebel echoed that statement and added that certain tweaks Spectrum made to the ZENITH20 Trail "should play in our favor" to make the results even better than those in the MD Anderson Trial.  ¶¶50, 83.

Defendants made these statements without disclosing that the actual data from cohorts 1 and 3 was significantly lower than the MD Anderson data they continued to advertise.  In fact, Defendants provided assurances about that data, with Riga saying "we feel really strong about the data readout" and Turgeon saying "I'm really confident in our ability to meet our corporate objectives . . . of bringing new treatments to the patients with cancer who need it." ¶¶81, 86.

For Rolontis, a drug designed to treat neutropenia, Defendants withheld known problems with the manufacturing plant in Hanmi, South Korea, materially misrepresenting the Company's preparation for an upcoming FDA inspection of the plant.  Spectrum needed to pass the inspection in order to gain approval and start selling the drug in the U.S.  ¶60.  After the FDA effectively rejected Spectrum's first application, Turgeon incorrectly claimed they "voluntarily" withdrew the

- 2 -

application for "administrative" reasons. ¶¶91, 93.  During the pendency of the second application, while they waited for the FDA to schedule its inspection, Turgeon said the Company was "absolutely ready for this inspection" because they had been through "multiple mock inspections," had "Spectrum people on the ground at the plant," and hired "outside experts" to "run these mock inspections, but also help with the readiness."  ¶¶68, 98-99.  As with poziotinib, Defendants themselves admitted they had knowledge about the FDA requirements, with Turgeon admitting Spectrum was "working in tandem" with the FDA, which "told us exactly what they want."  ¶¶65, 67, 89.  But in reality, the manufacturing facility was so neglected by Spectrum that when the FDA finally completed its inspection, it failed miserably, turning up *ten* separate deficiencies, including failures to follow simple protocols and properly clean equipment.  ¶¶70-71.

The Complaint also alleges Defendants' motives for engaging in the scheme to inflate Spectrum's stock price.  First, since neither poziotinib nor Rolontis earned revenue, the Company's survival depended upon its ability to raise money through financings.  Accordingly, the Company engaged a series of at-the-market ("ATM") offerings, in which the sale price is determined by the public price of the stock.  Defendants were motivated to inflate the stock price so the Company could earn enough money to survive until it could start earning revenue.

Second, two of the Individual Defendants – Turgeon and Gustafson – capitalized on the scheme by making large and uncharacteristic sales of their personal shares at times when they knew Spectrum's stock price was artificially inflated.  In May and June 2019, with unmasked ZENITH20 cohort 1 data in hand, Turgeon dumped 9% of his shares and pocketed $340,000.  ¶¶48, 110.  Then, in November and December 2020, with cohort 3 data fully available but not public, Turgeon and Gustafson made even more audacious trades, as Turgeon sold 45% of his holdings for $1.4 million and Gustafson unloaded 7% of his shares for $128,480.  ¶¶54-55.  These sales ended on December 16, 2020 – *just six days before the Company finally disclosed the long-held data demonstrating poziotinib's failure*.  There is no innocent explanation for these highly suspicious trades.  Defendants only weakly suggest that they "could have been engaged in estate planning, financial diversification, or preparing for [their] retirement."  MTD at 22.

But common sense dictates another explanation.  Defendants understood when cohort 3 data

- 3 -

4866-8821-5884.v1

would be released publicly.  ¶¶54-55, 111.  If they were as confident in a positive result as their statements to investors suggested, then they would have retained the stock until after the disclosure, and benefited from the likely stock increase caused by it.  Instead, with the knowledge from the unmasked data, Turgeon and Gustafson decided to dump their stock before the inevitable bad news caused the stock price decline.  This explanation is objectively more compelling than "estate planning."  Tellingly, both Defendants who capitalized on the scheme abruptly "retired" from Spectrum in the months following the revelation of the fraud, Turgeon in December 2021 and Gustafson in February 2022.

Investors learned the truth over the course of four disclosures: (a) the FDA's rejection of BTD status for poziotinib on December 19, 2018; (b) the failure of poziotinib to meet its primary endpoint in cohort 1 of ZENITH20 on December 26, 2019; (c) the failure of poziotinib to meet its primary endpoint for cohort 3 of ZENITH20 on December 22, 2020; and (d) the FDA's Complete Response Letter to Spectrum detailing the ten deficiencies at the Hanmi Rolontis factory on  August 6, 2021.  ¶¶123-140.  Each of these disclosures resulted in immediate and significant declines in Spectrum's share price, which were not consistent with market or industry trends.  *Id.*

## II.     LEGAL STANDARD

When deciding a Rule 12(b)(6) motion to dismiss, the Court must "consider the complaint in its entirety" and "accept all factual allegations in the complaint as true."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *see also No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003).  "[A] district court ruling on a motion to dismiss is not sitting as a trier of fact," and "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).  Thus, at the pleading stage a plaintiff "need only allege 'enough facts to state a claim to relief that is plausible on its face.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011).  "A complaint should not be dismissed unless it appears beyond a doubt that the plaintiff cannot prove any set of facts in support of the claim that would entitle him or her to relief."  *Am. W.*, 320 F.3d at 931.

- 4 -

Although the Private Securities Litigation Reform Act of 1995 ("PSLRA") elevated the pleading standard that applies to private securities fraud class action complaints, "'courts must be careful not to set the hurdles so high that even meritorious actions cannot survive a motion to dismiss.'" *Roberti v. OSI Sys.*, 2015 WL 1985562, at *6 (C.D. Cal. Feb. 27, 2015). This is because "[u]nless reasonable inferences from circumstances suffice to get a case to a jury, the welfare of victimized investors and the integrity of the stock market may be insufficiently protected from deceptive manipulators." *Am. W.*, 320 F.3d at 946.

## III.    DEFENDANTS CONCEDE THE RULE 10b-5(a) AND (c) CLAIMS

Plaintiff alleges Defendants engaged in a scheme or course of conduct that operated as a fraud against Plaintiff and the Class. ¶¶153-163. As the Supreme Court recently held, Rule 10b-5(a) and (c) claims "capture a wide range of conduct" and extend beyond making statements actionable under Rule 10b-5(b). *Lorenzo v. Sec. & Exch. Comm'n*, __ U.S. __, 139 S. Ct. 1094, 1101 (2019). The Ninth Circuit recently reversed a district court's dismissal of such claims because defendants' motion to dismiss did not specifically challenge them. *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021), *cert. denied*, __ U.S. __, 142 S. Ct. 1227 (2022).

Here, Plaintiff explicitly alleges a scheme to defraud, including in a separate section entitled "Scheme Liability." ¶131. Defendants' failure to address these claims cannot be rectified on reply. *See Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) (per curiam) ("[A]rguments raised for the first time in a reply brief are waived."); *Landon-Palmer v. Kijakazi*, 2022 WL 17081149, at *2 & n.2 (D. Nev. Nov. 18, 2022).

## IV.    PLAINTIFF ADEQUATELY ALLEGES A RULE 10b-5(b) CLAIM

### A.    Defendants Concede Four Elements of Plaintiff's §10(b) Claims

To allege a violation of Rule 10b-5(b), six elements must be pleaded and proved: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460-61 (2013). Defendants' Motion is silent as to the latter four

- 5 -

elements, which they cannot address on reply. *See Graves*, 623 F.3d at 1048. Defendants challenge only the allegations pertaining to falsity and scienter.

**B. Defendants' Misrepresentations and Omissions Were Materially False or Misleading When Made**

A complaint adequately pleads falsity where it "specif[ies] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B). A misleading statement "would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Thus, even an objectively true statement "may be misleading if it omits material information." *Khoja*, 899 F.3d at 1008-09. "[W]hether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact," and "only if the adequacy of the disclosure or the materiality of the statement is 'so obvious that reasonable minds [could] not differ' are these issues 'appropriately resolved as a matter of law.'" *Fecht v. Price Co.*, 70 F.3d 1078, 1080-81 (9th Cir. 1995); *In re CV Scis., Inc. Sec. Litig.*, 2019 WL 6718086, at *3 (D. Nev. Dec. 10, 2019) ("'[D]etermining materiality in securities fraud cases should ordinarily be left to the trier of fact.'").

**1. Defendants' Misrepresentations and Omissions Concerning Poziotinib Were Materially False and Misleading When Made**

Throughout the three clinical trials assessing poziotinib's treatment of EGFR-mutated patients, Defendants routinely misrepresented or withheld material information from investors in order to create a misleading picture of the drug's efficacy at treating the disease.

**a. Defendants Misrepresented the Need for Poziotinib and Its Ability to Address that Need During the MD Anderson Trial**

During the initial MD Anderson Trial, Defendants repeatedly misrepresented the efficacy of existing therapies for patients with EGFR mutations and the level of efficacy poziotinib needed to obtain FDA approval. Defendants claimed existing therapies were "unsatisfactory" and touted a "significant unmet need in this population." ¶¶73-78. In particular, Defendants repeatedly claimed

- 6 -

4866-8821-5884.v1

"other therapies only have a 6% to 8% response rate." *Id.*

Defendants told investors that, since "currently therapies only have less than 10%" ORR, poziotinib had a very low bar to clear in order to gain approval and breakthrough therapy designation from the FDA. ¶74. On May 16, 2018, Turgeon provided specifics, telling investors "I know as a drug developer, if I can get a 20% to 30% response rate, I can get a drug approved" and "if you can get a 40% or more response rate, that's a home run." ¶75; *see also* ¶¶74, 77-78.

Defendants assured investors their statements were not conjecture, but grounded in discussions with the FDA. Turgeon and Riga told investors they "know what the requirements [are]" for breakthrough designation based on their "regular discussions with the FDA" in which they "obviously, do go into the statistics that are expected." ¶¶74, 76, 78. As the MD Anderson Trial progressed, Defendants provided increasingly positive assurances regarding the data coming from the unmasked clinical trial. On May 16, 2018, a year into the study, Turgeon told investors, "I'm pleased to tell you" that "early data" shows "we have a 64% confirmed response rate." ¶75. Three months later, on August 9, 2018, Riga reiterated that "[w]e've seen very strong early data" and that it "demonstrates substantial improvement over existing therapies" such that "our belief is steadfast that poziotinib meets the criteria for breakthrough therapy designation." ¶76.

These statements misrepresented or omitted material information. As Defendants would later admit, existing therapies produced an ORR of 22.9%, substantially higher than the 6-8% they led investors to believe. ¶¶6, 29, 37. To gain FDA approval, a new drug needs to represent a "clinically meaningful" improvement over existing therapies, and the FDA told Defendants it would not approve a drug with less than 30% ORR. ¶29. As a result, Turgeon's claim, "if I can get a 20% to 30% response rate, I can get a drug approved," was materially false and misleading. ¶¶36, 75.

Defendants also knew they needed to clear an even higher bar than 30% ORR for the FDA to grant BTD status, which entitles a drug to an expedited review. ¶38. Specifically, while FDA approval requires only a "meaningful" improvement over existing therapies, BTD status requires a demonstration of "substantial" improvement. ¶38. Thus, Defendants materially misled investors when they referred to "early data" from the MD Anderson Trial showing an ORR of 64%, while they had access to complete unmasked clinical trial data showing the actual ORR from MD Anderson was

- 7 -

only 43%.  ¶¶75, 78.  So while investors thought that the 64% effective drug was exceeding existing 6-8% effective drugs by several magnitudes, in reality the MD Anderson results showed a drug that was only a fraction more effective than existing therapies, and would not qualify as a "substantial" improvement worthy of BTD status.  ¶¶6, 38-40, 74, 76-78.  In other words, Defendants' statements created an "impression of a state of affairs that differ[ed] in a material way from the one that actually exists."  *Brody*, 280 F.3d at 1006.

Rather than confront these allegations, Defendants ignore them.  For example, Defendants argue Plaintiff "does not allege at any point" that "the FDA refused to grant the BTD because a lack of unmet need."  MTD at 7.  But that is exactly what Plaintiff alleges.  The Complaint is clear that the FDA rejected Defendants' BTD application because it "had to be compared to" therapies with a 22.9% ORR instead of the 6-8% ORR that Defendants had cited as evidence of a "huge unmet need."  ¶¶6, 29, 41, 75.

Defendants likewise argue Plaintiff "pleads no specific facts, or any facts" alleging that "the FDA had communicated to Spectrum that a 20-30% response rate would be insufficient."  MTD at 8.  Not so.  The Complaint describes how Defendants admitted to "regular discussions with the FDA" specifically about "the statistics that are expected" for approval, and that in those discussions "the FDA made clear to Defendants, it would not consider any drug with an ORR less than 30% as clinically meaningful."  ¶¶29, 39, 77.  Defendants' failure to address Plaintiff's allegations as pled is fatal to their Motion.

As a fallback, Defendants complain that the allegations concerning the FDA discussions were not specific enough because they do not describe "when those discussions took place, the content of any such discussions, and with whom they occurred."  MTD at 8.  But this level of detail is not required at the pleading stage, especially when Defendants admitted that the conversations occurred and concerned "the statistics that are expected."  *See Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) ("the inference that [defendant] did not have access to the corrosion data is directly contradicted by the fact that she specifically addressed it in her statement").[3]

---

[3]  Defendants' case, *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d. 970 (9th Cir. 2009), is in accord.  There, unlike here, defendants never admitted knowing relevant information.  Instead,

- 8 -

### b.    Defendants Failed to Disclose Known Trial Data Throughout the ZENITH20 Trial

Defendants withheld and misrepresented material data about poziotinib's efficacy from the ZENITH20 Trial.  Spectrum chose to conduct the ZENITH20 Trial on an unmasked basis, which meant that they had access to trial data as it came in.  They chose to grant themselves access to the data even though the FDA recommends blinded trials in order to "avoid[] bias."  ¶30.  The data necessary to determine the efficacy of poziotinib is straightforward.  Each patient has an initial scan to determine the size of his or her tumor, and then a subsequent scan after four weeks of treatment to see if the tumor had "responded to the medication," *i.e.*, to see whether the tumor "disappears or reduces in size."  ¶¶27-28.  A third scan then confirms the result after another four weeks of treatment.  *Id*.  The efficacy of the drug – reported as the "ORR" – is simply a measure of the percentage of patients who responded.  ¶27.

Here, the Complaint details when Defendants had access to a complete set of confirmed data: for cohort 1, they had data in March 2019 showing a 14.8% ORR, and for cohort 3 they had data in June 2020 showing a 27.8% ORR.  ¶¶45, 47, 52, 55.  In both cohorts, poziotinib failed to meet the FDA's 30% ORR threshold required for approval.  Despite their access to confirmed data showing the poziotinib had failed to meet its primary endpoint, Defendants led investors to expect approval.  For example, Defendants held a conference call with investors on September 11, 2019, in which Turgeon claims poziotinib "showed a 43% overall response rate, ***which was much higher than anything***."  ¶82.  But at the time Turgeon had access to data showing poziontinib was actually ***worse*** than existing therapies, with an ORR of just 14.8% compared to 22.9%.  Likewise, although Turgeon knew in June 2020 that poziotinib's failure in cohort 3 would end its chances of FDA approval for treatment of EGFR, in November 2020, he was still assuring investors that "I'm really confident in our ability to meet our corporate objectives," including "bringing new treatments to the patients with cancer who need it."  ¶86.  Poziotinib was the Company's only drug that treated cancer at that time.  ¶¶23-24.

plaintiff relied on completely "unsubstantiated" allegations concerning "internal reports" that alerted defendants to the fraud, but did not provide "any basis" for the court to understand whether the reports existed or, if so, what information they included.  *Id.* at 985.

- 9 -

4866-8821-5884.v1

The Ninth Circuit is clear that a defendant cannot tout positive old data when he "allegedly knew already that the 'new data' revealed" a negative outcome. *Khoja*, 899 F.3d at 1016; *see also Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) ("'[O]nce defendants cho[o]se to tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information."); *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc*., 2022 WL 4491093, at *10 (S.D. Cal. Sept. 27, 2022) (failure to disclose "disappointing subgroup data rendered Defendants' positive statements regarding the results of the studies materially misleading").

In *Khoja*, the Ninth Circuit held statements touting interim results of an obesity drug were misleading because the defendants knew but failed to disclose that those results "have 'a high degree of uncertainty and were likely to change with the accumulation of additional data.'" 899 F.3d at 995. The Court concluded "once [defendants] chose to tout the apparently positive 25 percent interim results, [they] had the obligation also to disclose that they were likely unreliable." *Id.* at 1010. Defendants failed to meet that same standard here.

Defendants argue they should not be held liable for citing outdated data because they accurately cited it. MTD at 10 ("Plaintiff has thus totally failed to allege that any statements about early trial results were *actually* false.") (emphasis in original). Defendants misstate their obligation to be transparent with investors. The Ninth Circuit has repeatedly held that "a statement that is literally true can be misleading and thus actionable under the securities laws." *Brody*, 280 F.3d at 1006; *see also Khoja*, 899 F.3d at 1015 (holding complaint adequately alleged that defendants "[were] so obligated" to disclose "new information that diminished the weight of [previously disclosed interim] results" even though those "interim results were still technically accurate"); *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) ("literally true" statements may be "misleading" due to "'their context and manner of presentation'"). Notably, Spectrum has unsuccessfully made the same argument in the past. *See In re Spectrum Pharms. Inc. Sec. Litig.*, 2015 WL 1413385, at *3 (D. Nev. Mar. 26, 2015) ("defendants' efforts to argue that the statements are accurate fails because . . . even if literally true when considered in isolation, [the statements] were delivered in a context and manner that would mislead rather than accurately inform prospective

- 10 -

4866-8821-5884.v1

buyers"). Under the appropriate standard, once Defendants chose to tout earlier results from the MD Anderson Trial, they were obligated to disclose ZENITH20 data that "indicated those earlier interim results were not so promising after all." *Khoja*, 899 F.3d at 1015.

Defendants next contend that the allegations concerning unmasked trial data leaves a slew of questions unanswered. In particular, Defendants ask: "What did this trial data say? About what Cohort(s)? How preliminary or comprehensive was it? When could it be accessed? When did Turgeon, Riga, Lebel or Gustafson actually access the adverse data? What did they review?" MTD at 10-11. To the extent these questions are relevant and answerable at the pleading stage, the answers are plainly included in the Complaint, as depicted below:

- "What did this trial data say?" ***Answer: for each patient, "whether the tumor had responded to the medication" by reducing in size and, as a population, the percentage of patients who responded to the medication (i.e. the ORR)*** (¶¶27-28);

- "About what Cohort(s)?" ***Answer: cohorts 1 and 3, the only completed cohorts assessing the EGFR indication*** (¶¶45, 52);

- "How preliminary or comprehensive was it?" ***Answer: Fully confirmed and comprehensive after second scan of final patient*** (¶28);

- When could it be accessed? ***Answer: for cohort 1, "in March 2019," and for cohort 3, "in late June 2020"*** (¶¶45, 52).

Defendants' refusal to acknowledge Plaintiff's allegations does not render them inadequate.

Defendants also ask: "When did Turgeon, Riga, Lebel or Gustafson actually access . . . the supposedly adverse data? What did they review?" These final two questions suggest that Plaintiff should somehow know without discovery when ***Defendants*** "actually access[ed]" the information and "[w]hat [***Defendants***] review[ed]." MTD at 11. But at the pleading stage, alleging access alone is sufficient even without proof that Defendants took advantage of that access. *See Alphabet*, 1 F.4th at 706 (upholding allegations based on access to memo even though "the complaint does not directly allege that [defendant] read the [memo]").

In any event, Defendants admitted they reviewed data throughout the Class Period, so these questions are moot. For example, during the MD Anderson Trial, on August 9, 2018, Riga said "[w]e've seen very strong early data." ¶76. And during the ZENITH20 Trial on August 8, 2019,

- 11 -

Riga said "we feel really strong about [] the data readout in Q4." ¶81.  Defendants' own admissions of knowledge obviate the need for particularized allegations.  *Reese v. Malone*, 747 F.3d at 572 ("It is unclear what further facts plaintiffs would need to plead to create a stronger inference that [they] had access to information [they] discussed publicly.").

While touting the MD Anderson Trial results, Defendants failed to disclose that differences between the MD Anderson Trial and the ZENITH20 Trial would portend a poorer performance for poziotinib in ZENITH20. ¶33.  As a result, the measured efficacy was likely to – and did – decrease significantly.  ¶¶33-34, 46, 50, 83.  Rather than warn investors to expect worse results from ZENITH20, Defendants did the opposite.  On October 2, 2019, an analyst asked Lebel whether "there's going to be a slippage or a variability as you go for a bigger study with more sites?" ¶83.  Because ZENITH20 was unmasked, Defendants had the data, or at least access to the data, to provide an accurate response.  But faced with this pointed question, and with ready access to disappointing but undisclosed cohort 1 data, Lebel should have disclosed the expected and already-observed decline in results.  Instead, he told investors that poziotinib might actually perform better in ZENITH20 than in the MD Anderson Trial because of a series of procedural changes that "should play in our favor." *Id.*  Here again, Defendants made the upcoming ZENITH20 results "appear[] more promising than [defendants] allegedly knew they were." *Khoja*, 899 F.3d at 1010.[4]

> **2.     Defendants' Misrepresentations and Omissions Concerning Rolontis Were Materially False and Misleading When Made**

Defendants also withheld material information concerning manufacturing deficiencies at the Rolontis factory in Hanmi, and made affirmative misrepresentations about the Company's readiness for upcoming inspections.  After the FDA rejected Spectrum's first application for Rolontis approval, Defendants falsely claimed "we voluntarily withdrew" our application.  ¶¶92(a), 93; *see*

---

[4]   Defendants cite *Padnes v. Scios Nova Inc.*, 1996 WL 539711 (N.D. Cal. Sept. 18, 1996) and argue that they were not required to "second guess the methodologies and data of medical researchers."  MTD at 9.  But *Padnes* is easily distinguishable.  There, the court found that a pharmaceutical company does not need to unilaterally engage in "exhaustive disclosures of procedures used" in clinical trials.  Here, by contrast, Plaintiff does not contend that Defendants should have second guessed the data or methodology, just simply accurately disclose the data.  Investors specifically requested information about the impact of switching to multicenter trials and Lebel had access to data showing the results would be worse, yet he still misleadingly assured the investor that the results could be better.

- 12 -

*also* ¶91. Turgeon claimed Spectrum withdrew the application only to fix minor issues identified by the FDA, claiming there was "nothing that was over the top" identified by the agency and listing only administrative problems, such as "formatting issues" and issues with "translating things" from Korean to English. ¶91. In reality, as Defendants would later admit, the FDA told Spectrum it "wouldn't accept" the application and instructed the Company to withdraw it to avoid a formal rejection. ¶103(a). It would take Spectrum over six months to resubmit the application after the withdrawal, and even the second, revised application was rejected for ongoing substantive deficiencies, including substandard manufacturing practices at the plant itself. ¶71.

Defendants argue they should be excused for falsely describing the withdrawal as "voluntary" because investors should have understood that "[o]bviously, withdrawal of the [application] signals a problem." MTD at 11. But the misconception lies in the magnitude of that problem. By telling investors that they "voluntarily" withdrew the application to fix minor problems and withholding that the FDA was on the verge of substantively rejecting the application, they gave investors "the 'impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed].'" *Berson*, 527 F.3d at 985.[5]

After the withdrawal and during the pendency of the renewed Rolontis application, Defendants made assurances about their extreme effort to ensure the Rolontis factory complied with FDA standards. Riga said Spectrum had "worked closely with the agency" to understand the requirements. ¶93. Lebel said Spectrum had "conducted multiple mock inspections of our plant," and Turgeon said "we have Spectrum people on the ground at the plant" in South Korea, including "outside experts" on factory compliance that help "run these mock inspections, but also help with the readiness." ¶¶98-99. Defendants further claimed – repeatedly and in no uncertain terms – that as a result of these efforts, the Company was "absolutely ready for this inspection," had "been ready for a

_____

[5] Defendants cite cases involving statements where the speaker accurately described the current situation, and therefore do not apply to the false and misleading descriptions at issue here. *See* MTD at 11-12. In *City of Roseville Emps' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017), defendants honestly believed their statements describing the company's financial reserves as "'adequate and appropriate,'" which only proved incorrect because of the subsequent and unexpected 2009 financial crisis. *Id.* at 1118. And in *In re Allied Nev. Gold Corp.*, 2016 WL 4191017, at *7 (D. Nev. Aug. 8, 2016), the court found "no basis to doubt" that defendants believed their statements when made. *Id.* at *7.

- 13 -

long time," and "can't wait" for it to be underway.  ¶98; *see also* ¶¶99, 101-102.

These statements were materially false and misleading when made because the Company was nowhere close to ready for the inspection and had not taken the measures it described to investors.[6] When the FDA ultimately conducted its inspection of the Hanmi facility in May 2021, it noted **ten** distinct deficiencies with the plant and rejected Spectrum's application on those bases.  For example, the FDA admonished Spectrum because its protocols were simply "not followed" and documents designed to ensure adequate cleaning were "deficient."  ¶70.  Such fundamental deficiencies would have been caught by even a rudimentary review from a person with a manufacturing background, let alone multiple mock inspections from experts and Spectrum personnel.  The Company's failure to catch these obvious deficiencies raises the compelling inference that the mock inspections and other preparations did not occur as described to investors.  *See In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 10914316, at *14 (C.D. Cal. Aug. 8, 2013) (company "repeatedly stated that it had made 'diligent efforts' to ensure compliance" but subsequent violations made it "it implausible to conclude that these statements were not false when made").

### 3.    Defendants' Statements Were Not Mere Puffery

Defendants contend that "virtually all" of their alleged statements are inactionable "puffery," or "generalized statements of corporate optimism."  MTD at 12-13.  But "[s]tatements by a company that are capable of objective verification are not 'puffery' and can constitute material misrepresentations."  *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).  And even "'general statements of optimism, when taken in context, may form a basis for a securities fraud claim'" when those statements "address specific aspects of a company's operation that the speaker knows to be performing poorly."  *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017).

In reality, most of the alleged statements are plainly capable of objective verification, and Defendants concede as much by not specifically challenging them on "puffery" grounds.  For

---

6    Defendants incorrectly argue Plaintiff "do [sic] not allege that these preparations did not occur or that Defendants did not actually have confidence in Hanmi's preparedness."  But that is exactly what Plaintiff alleges.  See ¶70 ("The details of this report reveal that ***Defendants had not prepared for the investigation as they had led investors to believe***.")

- 14 -

example, for statements regarding poziotinib, Defendants ostensibly concede that statements such as "[c]urrent therapies only have . . . a 6% to 10% response rate," "if I can get a 20% to 30% response rate, I can get a drug approved," and "poziotinib is showing indications of being substantially better than currently available treatments" are objectively verifiable.  ¶¶74-75, 78.  Likewise, for statements concerning Rolontis, Defendants do not challenge objectively verifiable claims such as "we voluntarily withdrew our BLA application," "we have conducted multiple mock inspections," "we have Spectrum people on the ground at the plant," and "[w]e have outside experts we've hired." ¶¶93, 98.

The few remaining alleged statements are likewise actionable because Defendants knew but failed to disclose that their expressed optimism was unwarranted.  Even a statement that could be characterized as optimism is actionable if: (1) the statement is not "genuinely believed"; (2) the speaker had no "reasonable basis for that belief"; *or* (3) the speaker was "aware of any undisclosed facts tending to seriously undermine the accuracy of the statement." *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989).  Specifically, optimistic statements are actionable when they "address specific aspects of a company's operation that the speaker knows to be performing poorly." *Quality Sys.*, 865 F.3d at 1143-44; *see also Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.").

Here, during poziotinib's MD Anderson Trial, Defendants knew but did not disclose the FDA efficacy requirements and the unmasked trial data.  Accordingly, their expressed "enthusiasm for pozi[otinib]" and their purported "clear shot at BTD" lacked any basis and painted a false picture to investors.  ¶¶76, 80.  For the ZENITH20 Trial, Defendants likewise had access to the unmasked data demonstrating failure, but nevertheless told investors "we feel really strong about the data," modifications to the protocol "should play in our favor," and "I'm really confident in our ability" to bring "new treatments to the patients with cancer who need it."  ¶¶50, 81, 83, 86.[7]

---

[7]  Defendants argue courts "routinely" deem "statements regarding the medical or commercial potential of products" as puffery, but cite a string of fundamentally different cases where defendants

- 15 -

4866-8821-5884.v1

#### 4.        The PSLRA Safe Harbor Does Not Apply

The PSLRA's safe harbor protects only "certain" forward-looking statements – those "'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement'" or not "made 'with actual knowledge . . . that the statement was false or misleading.'" *Quality Sys.*, 865 F.3d at 1141.

Here, the safe harbor does not immunize Defendants' statements because they withheld or misrepresented contemporaneously known data, and therefore their statements were not forward-looking. A statement is not forward-looking when it expresses optimism without disclosing known information undermining that optimism. *HsingChing Hsu v. Puma Biotech., Inc.*, 2017 WL 3205774, at *3 (C.D. Cal. July 25, 2017). In *Puma*, like the poziotinib allegations here, plaintiff alleged defendants withheld new bad data and instead "directed their attention to historically positive results." *Id.* at *3-*4. The *Puma* court concluded that the statements were not forward-looking, noting "[d]efendants shouldn't benefit from safe harbor by simply saying they 'anticipated' success when, in fact, they had a reasonable belief that defeat was just around the corner." *Id*. The same rationale applies to Defendants' statements of optimism regarding the Rolontis inspection, where Defendants withheld the fact that they had not actually undertaken the extreme preparations they described to investors.

Defendants argue that "the safe harbor covers statements by pharmaceutical companies regarding potential approvals." MTD at 15. But, critically, none of the cases they cite in support involved a situation where defendants ignored bad data. Rather, in each case, defendants expressed optimism about unknown future data that ended up being merely a "bad guess about an event that had not yet occurred." *Kovtun*, 2012 WL 4477647, at *13; *see also In re Intrexon Corp. Sec. Litig.*, 2017 WL 732952, at *3 (N.D. Cal. Feb. 24, 2017); *In re Arrowhead Rsch. Corp. Sec. Litig.*, 2016

***did not have access to contrary information such as trial data***. MTD at 13. *Tadros v. Celladon Corp.*, 2016 WL 5870002, at *11 (S.D. Cal. Oct. 7, 2016) (no allegation that defendants "did not believe that Mydicar was not performing as they stated"), *aff'd*, 738 F. App'x 448 (9th Cir. 2018); *Jasin v. Vivus, Inc.*, 2015 WL 3809357, at *10 (N.D. Cal. June 18, 2015) ("Plaintiffs have not shown that Defendants were aware that Vivus was failing . . . ."); *Kovtun v. VIVUS, Inc.*, 2012 WL 4477647, at *13 (N.D. Cal. Sept. 27, 2012) (no "facts indicating that defendants made statements about the trial results that were false at the time they were made"), *aff'd sub nom. Ingram VIVUS, Inc.*, 591 F. App'x 592 (9th Cir. 2015).

- 16 -

WL 6562066, at *7 (C.D. Cal. Mar. 29, 2016); *Colyer v. Acelrx Pharms., Inc.*, 2015 WL 7566809, at *10 (N.D. Cal. Nov. 25, 2015).[8]

Even if the statements were forward-looking, the Complaint sufficiently alleges Defendants had actual knowledge they were misleading and failed to warn investors. First, the unmasked trial data provided Defendants with the trial data that they publicly commented on, creating a strong inference of actual knowledge. Second, Defendants' vague warnings about the possibility that poziotinib would not gain approval or that Rolontis would not pass the FDA's inspection failed to adequately disclose to investors known information demonstrating that the near certainty of both negative outcomes. The Ninth Circuit is clear that "[r]isk disclosures that 'speak[] entirely of as-yet-unrealized risks and contingencies' and do not 'alert[] the reader that some of these risks may already have come to fruition' can mislead reasonable investors." *Alphabet*, 1 F.4th at 703 (quoting *Berson*, 527 F.3d at 985-87); *see also Khoja*, 899 F.3d at 1016 (a warning that study results that "'may'" be inconsistent with interim study results was misleading because the company "allegedly knew already that the 'new data' revealed exactly that"); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1182 (9th Cir. 2009) (statement that warned of "the risks of product liability claims in the abstract" misleading because it failed to disclose that the risk had already come to fruition), *aff'd*, 563 U.S. 27 (2011).[9]

### C.    Plaintiff Adequately Alleges Scienter

To plead scienter, a complaint must allege defendants made false or misleading statements either intentionally or with deliberate recklessness. 15 U.S.C. §78u-4(b)(2); *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008). "'An actor is deliberately reckless if he had reasonable

---

[8]    Defendants also suggest that certain statements "contain 'mixed' portions of forward-looking and non-forward-looking statements." MTD at 15 n. 12. But even if withholding known information could be considered partially forward-looking (it cannot), "the safe harbor is not designed to protect companies and their officials when they . . . make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement." *See Quality Sys.*, 865 F.3d at 1142.

[9]    Defendants briefly suggest in their safe harbor analysis that certain of the alleged statements are inactionable because they constitute "'a pure statement of opinion.'" MTD at 16 (quoting *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1196 (9th Cir. 2021). But phrasing a statement as an opinion does not grant the speaker the right to withhold material information, such as trial data contrary to the statement. *See Acadia*, 2022 WL 4491093, at *10.

4866-8821-5884.v1

grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort.'" *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1135 (N.D. Cal. 2017). "[T]he ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity." *Gebhart v. S.E.C.*, 595 F.3d 1034, 1042 (9th Cir. 2010).

"The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. A "'strong inference'" is one that a reasonable person would deem "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. In other words, "if two possible inferences – one fraudulent and the other nonfraudulent – are equally compelling, a plaintiff has demonstrated a strong inference of scienter." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1033 (9th Cir. 2016).

The allegations that support falsity also give rise to a strong inference of scienter against all Defendants. *E.g.*, *Smilovits v. First Solar Inc.*, 119 F. Supp. 3d 978, 1000 (D. Ariz. 2015) (analyzing falsity and scienter together because "[t]hese elements are closely intertwined and dependent upon similar facts"), *aff'd sub nom. Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018). Coupled with Defendants' personal knowledge, the importance of poziotinib and Rolontis to Spectrum's core operations, Defendants' high-ranking positions at the Company and Sarbanes-Oxley certifications, and Turgeon's and Gustafson's unusual and suspicious stock sales, scienter is adequately pled.

### 1. Defendants Had Access to Information Undermining Their Statements

Defendants had access to data and information from the FDA that undermined their statements, and they repeatedly acknowledged that access throughout the Class Period. ¶¶78, 80, 90, 92(a), 103(a). "'[T]he ***most direct way*** to show both that a statement [is] false when made and that the party making the statement knew it was false is ***via contemporaneous reports or data, available to the party***, which contradict the statement.'" *Hsu v. Puma Biotech., Inc.*, 213 F. Supp. 3d 1275, 1287 (C.D. Cal. 2016). The strength of such allegations is further bolstered when, as here,

- 18 -

4866-8821-5884.v1

defendants "'bridge[d] the [scienter] gap' [themselves] by referencing the data directly." *Reese*, 747 F.3d at 572. As the Ninth Circuit explained in *Reese*, "'[b]y making a detailed factual statement, contradicting important data to which she had access, a strong inference arises that she knowingly misled the public as to its clear meaning.'" *Id.*

Here, Defendants repeatedly made statements about their personal knowledge and the knowledge of their colleagues regarding the FDA's expectations and requirements for poziotinib. For example, on November 8, 2018, Turgeon acknowledged "*[w]e* knew exactly what the FDA wanted" for the poziotinib BTD application. ¶106. On August 9, 2018, Riga commented on the ZENITH20 Trial, acknowledging that "*our* conversations with the [FDA], obviously, do go into statistics that are expected, and *we're* very much aligned with the agency." ¶36. The Complaint also alleges that Defendants had access to full, confirmed data from cohorts 1 and 3 of ZENITH20 in March 2019 and June 2020, respectively. ¶¶45, 52. Further, on May 7, 2020, Lebel *admitted* that ZENITH20 is an "open trial" (*i.e.*, unmasked) and therefore "there will be regular looking at the data" such that "*we* will be able to get some insight." ¶105. These first-person plural statements create a strong inference of each Individual Defendant's personal knowledge regarding both the necessary parameters for approval and the actual data to measure against those parameters. Accordingly, each Individual Defendant understood whether poziotinib had met its primary endpoint well before the Company disclosed that information to investors.[10]

Defendants similarly discussed the status of the Hanmi manufacturing facilities and the FDA's requirements to approve Rolontis. After Spectrum claimed it "voluntarily" withdrew the Rolontis application, the Company assured investors the application lacked only "certain additional manufacturing-related information," and Turgeon said the FDA told them "exactly what [FDA] want[s]." ¶¶63, 65. After the application was re-submitted, but before the FDA rejected it for a host of deficiencies, Turgeon said Spectrum was "going to have everything [the FDA] want[s] and then

---

[10] Defendants do not deny they looked at the unmasked clinical trial data available to them. But even if they could establish they had ignored this crucial data, scienter would be established through their deliberate recklessness. A defendant is liable for deliberate recklessness when he "'fail[s] to obtain and disclose . . . facts although he could have done so without extraordinary effort.'" *Shenwick*, 282 F. Supp. 3d at 1135.

- 19 -

some." ¶67.  These statements were either knowingly false or made with a deliberate recklessness as to the truth.  Defendants either knew what the FDA wanted and knowingly failed to provide it or they recklessly spoke about knowing what the FDA wanted when in fact they did not know.  Either scenario is enough to adequately plead scienter.

### 2.    The Statements Concerned Spectrum's Core Operations

This Court may also impute scienter to the Individual Defendants "based on the inference that [they] have knowledge of the 'core operations' of the company."  *Reese*, 747 F.3d at 575; *see also S. Ferry*, 542 F.3d at 785-86.  When "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter," scienter may be inferred just on the basis of the core operations doctrine.  *Id.* at 786.  Here, because Spectrum owned only two clinical-stage products, it would be "absurd" to imagine that senior management was unaware of available information crucial to either product's FDA approval.  *See Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 970 (N.D. Cal. 2014) ("given the importance of manufacturing and quality control to the success of Impax and the fact that both areas of operation had been flagged by the FDA, it is a logical, and strong, inference that the defendants were aware of the alleged severe and pervasive problems in Impax's Hayward facility.")

Defendants cite *South Ferry* to argue that "[t]he Ninth Circuit 'has rejected . . . core operations [theory].'"  MTD at 18.  But that is not *South Ferry's* holding.  Rather, the Ninth Circuit held that allegations concerning the theory are still "properly considered," noting only that such allegations "usually fall short of the PSLRA standard" where "core-operations inference . . . is ***the only basis for scienter in the complaint***."  542 F.3d at 784.  Other courts have found scienter properly pled based on the core operations theory alone.  *See, e.g.*, *Impax*, 36 F. Supp. 3d at 968-69.  Plaintiff's core operations allegations here supplement its already extensive scienter allegations.  ¶¶104-130.

### 3.    Defendants Had a Motive to Commit Fraud

Allegations of motive contribute to a finding of scienter.  *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 949 (9th Cir. 2005).

- 20 -

4866-8821-5884.v1

**a.    Defendants' Suspicious Stock Sales Demonstrate Motive**

"Unusual or suspicious stock sales by corporate insiders may also constitute circumstantial evidence of scienter." *Acadia*, 2022 WL 4491093, at *13 (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009). "Among [the] factors that must be considered to determine whether stock sales raise a strong inference of deliberate recklessness are: '(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history.'" *Zucco*, 552 F.3d at 1005.

Here, Turgeon and Gustafson made outsized sales of stock while they had access to inside negative information that had not been disclosed. First, just two months after the ZENITH20 cohort 1 data was available in March 2019, Turgeon made two consecutive stock sales – on May 16 and June 6 – that constituted his largest sale since becoming CEO, dumping 9% of his shares and collecting $340,000 in personal profit. ¶¶48, 110. Courts have found equivalent sales to be probative of scienter. *See, e.g.*, *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1030 (N.D. Cal. 2020) (suspiciously timed sale probative of scienter, even though only one defendant sold, he pocketed $186,656, and plaintiff did not allege the percentage of shares he sold).

But Defendants did not stop there. In fact, they became much more brazen in the face of cohort 3 data, which spelled the end of poziotinib as a potential treatment for patients with EGFR mutations. Turgeon made a series of two very large sales, on November 18, 2020 and December 16, 2020, which occurred five months after the cohort 3 results became available to Defendants and concluded just *six days* before the data was announced publicly. ¶¶54-55, 113. These two sales alone unloaded *more than 45%* of his holdings onto investors who did not have access to the cohort 3 data, and netted him almost *$1.4 million in personal profit*. Gustafson also got in on the action, dumping 7% of his shares for $128,480 on December 14, 2020. ¶¶54, 113.

Defendants cannot offer a compelling non-fraud-related reason for these sales that addresses the suspicious timing and size of the trades. They provide only the half-hearted inference that Defendants "*could* have been engaged in estate planning, financial diversification, or preparing for [their] retirement." MTD at 22. But the *most* compelling inference is that Turgeon and Gustafson knew the bad data and decided to jump ship and secure a windfall for themselves. *Tellabs*, 551 U.S.

- 21 -

at 324 (a case will survive motion to dismiss when "inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged").

Defendants argue that the Court should disregard most of these sales because they do not meet a purported "threshold" of a defendant selling 37% of his shares. MTD at 21.[11] But the percentage of sales is not determinative, and must be considered along with other markers of suspicious insider trading. *See Acadia*, 2022 WL 4491093, at \*13 (sales weighed in favor of finding of scienter even though the complaint did "not allege the percentage of shares sold"); *Baron v. Hyrecar Inc.*, 2022 WL 17413562, at \*15 (C.D. Cal. Dec. 5, 2022) (despite low percentage of sales, "the court finds the sales timing and inconsistency with their prior trading patterns may contribute to such an inference when evaluating the SAC's allegations on a holistic basis."); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (sale representing just 2.1% of holdings suspicious given timing and trading history).[12]

Defendants further argue the sales are not suspicious because Turgeon and Gustafson could have sold at different times for even greater personal gain. But the test is "suspicious" timing, not perfect timing. In other words, "'the trading must be in a context where defendants have incentives to withhold material, non-public information, and it must be unusual, well beyond the normal patterns of trading by those defendants.'" *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022-23 (9th Cir. 2005). Here, Turgeon's first sale was near the peak stock price and his second sale was for a lower price, but still irregular and while he knew Spectrum's stock price was highly inflated.[13,14]

---

[11] Defendants concede, as they must, that this argument does not apply to Turgeon's sales in November and December 2020, in which he unloaded 45% of his shares days before Spectrum disclosed the ZENITH20 cohort 3 failure.

[12] The two cases Defendants cite are in accord, as the sales at issue there were deemed non-suspicious for other reasons. *See In re Immersion Corp. Sec. Litig.*, 2011 WL 6303389 (N.D. Cal. Dec. 16, 2011) (sales occurred while the company was underreporting revenue, so stock price not inflated), *aff'd sub nom. Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014); *Zamir v. Bridgepoint Educ., Inc.*, 2016 WL 3971400, at \*10 (S.D. Cal. July 25, 2016) (no scienter because "*[n]one* of these factors supports a strong inference of scienter").

[13] Defendants cite a series of cases where the timing of defendants' sales worked against a finding of scienter (MTD at 21-22), but the timing in each was much poorer than here, and inconsistent with a scheme to capitalize on an inflated stock price. *See Apple*, 886 F.2d at 1117 (defendant sold an equivalent amount in sales in the period leading up to the Class Period); *Ronconi v. Larkin*, 253, F.3d 423, 436 (9th Cir. 2001) ("price increase allegedly caused by the fraud occurred *after* they

- 22 -

**b.** **The At-the-Market Offering During the Class Period Establishes Motive**

A financing establishes motive to commit fraud when it is "necessary to ensure that [the company] would not run out of cash and could fund ongoing operations." *See In re Ibis Tech. Secs. Litig.*, 422 F. Supp. 2d 294, 317 (D. Mass. 2006); *see also Howard v. Everex Sys. Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000) (finding "motive to inflate sales to raise financing"). Throughout most of the Class Period, from April 5, 2019 until November 6, 2020, Spectrum ran an ATM offering to fund the Company's expenses, ultimately raising $85 million. ¶130. The Company's two products were not earning revenue, so the financing represented the sole means through which the Company could fund its operations, including "research and development." ¶¶127-129. An ATM offering means Spectrum sold securities to the general public at market prices, which motivated Defendants to inflate the stock price. ¶130.[15]

**4.** **Executive Departures Bolster the Strong Inference of Scienter**

Turgeon and Gustafson, the same two executives with suspicious insider trading activity, were removed from their positions as CEO and CFO of Spectrum within seven months of the Class Period. ¶¶124-125. A corporate executive's "abrupt resignation tends to support scienter and may be considered together with other allegations." *In re Fibrogen, Inc.*, 2022 WL 2793032, at *25 (N.D. Cal. July 15, 2022); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975-76 (N.D. Cal.

---

sold"); *In re AnaptysBio, Inc.*, 2021 WL 4267413, at *9 (S.D. Cal. Sept. 20, 2021) (conceding defendant "did not have to sell his stocks at their peak price to constitute suspicious activity").

[14] Defendants argue the lack of sales from two of the defendants negates a finding of scienter, but "[n]umerous courts have upheld scienter allegations under the Reform Act where some but not all defendants traded." *Schlagal v. Learning Tree Int'l*, 1998 WL 1144581, at *17 (C.D. Cal. Dec. 23, 1998); *see also Mulderrig*, 492 F. Supp. 3d at 1030 (stock sales probative of scienter when one of two defendants sold); *Freedman v. Value Health, Inc.*, 958 F. Supp. 745, 749 (D. Conn. 1997) (three of nine defendants sold); *Am. W.*, 320 F.3d at 944 ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period.").

[15] Plaintiff's motive allegations set this case apart from *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 408 (9th Cir. 2020), which Defendants cite to suggest a company would never misrepresent trial data because doing so "has no basis in logic or common experience." MTD at 19. Furthermore, the evidence supporting scienter is much stronger here. In *Nguyen*, defendants' optimistic statements there were **supported** by "*favorable*" trial data, whereas here they are **contradicted** by **unfavorable** trial data. 962 F.3d at 418. Plaintiff has adequately pled motive, but even so, "[t]he absence of a motive allegation, though relevant, is not dispositive." *Matrixx*, 563 U.S. at 48.

- 23 -

2009) ("the timing of Defendants' departures might suggest that the Company believed Defendants had been involved in wrongdoing with respect to corporate finances").

Defendants attempt to balkanize Plaintiff's supplemental scienter allegations, addressing them individually and arguing that each – by itself – does not establish a compelling inference of scienter. But each contributes to a finding of scienter, which is "reviewed holistically." *Fibrogen*, 2022 WL 2793032, at \*25 (quoting *Tellabs*, 551 U.S. at 322-23 ("The relevant inquiry 'is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'")).

## V.     PLAINTIFF ADEQUATELY ALLEGES §§20(a) AND 20A CLAIMS

Defendants do not contest Plaintiff's §§20(a) and 20A claims, other than to argue they are derivative of the §10(b) claims. The §10(b) claims are properly pled, so these claims also survive.

## VI.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion in its entirety. If the Court decides to dismiss any portion of Plaintiff's claims, then Plaintiff should be granted leave to amend. *See Eminence Cap., L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1051-52 (9th Cir. 2003).

DATED:  January 27, 2023                   Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
RYAN A. LLORENS
JEFFREY J. STEIN
JOHN M. KELLEY

                                    s/ Jeffrey J. Stein
                                  JEFFREY J. STEIN

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
ryanl@rgrdlaw.com
jstein@rgrdlaw.com
jkelly@rgrdlaw.com

Lead Counsel for Lead Plaintiff International
Trading Group, Inc.

- 24 -

4866-8821-5884.v1

CAMPBELL & WILLIAMS
J. COLBY WILLIAMS
710 South Seventh Street, Suite A
Las Vegas, Nevada  89101
Telephone:  702/382-5222
702/382-0540 (fax)
jcw@cwlawlv.com

Local Counsel for Lead Plaintiff International
Trading Group, Inc.

- 25 -

4866-8821-5884.v1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on January 27, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Jeffrey J. Stein
JEFFREY J. STEIN

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

Email: jstein@rgrdlaw.com

4866-8821-5884.v1

# Mailing Information for a Case 2:21-cv-01612-CDS-BNW Luo v. Spectrum Pharmaceuticals, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **John P. Aldrich**
  jaldrich@johnaldrichlawfirm.com,traci@johnaldrichlawfirm.com,eleanor@johnaldrichlawfirm.com,sorme@johnaldrichlawfirm.com

- **Joseph Alexander Hood , II**
  ahood@pomlaw.com

- **John M. Kelley**
  JKelley@rgrdlaw.com,jkelley@ecf.courtdrive.com

- **Patrick R. Leverty**
  pat@levertylaw.com,staff@levertylaw.com,patleverty@gmail.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com

- **Ryan A. Llorens**
  ryanl@rgrdlaw.com,ryanl@ecf.courtdrive.com,E_File_SD@rgrdlaw.com

- **Andrew R. Muehlbauer**
  andrew@mlolegal.com,witty@mlolegal.com,sean@mlolegal.com

- **David C OMara**
  david@omaralaw.net,val@omaralaw.net,bsnyder@omaralaw.net

- **Jordan T. Smith**
  jts@pisanellibice.com,kap@pisanellibice.com,sd@pisanellibice.com,lit@pisanellibice.com

- **Jeffrey J. Stein**
  jstein@rgrdlaw.com,JStein@ecf.courtdrive.com,E_File_SD@rgrdlaw.com,CReis@ecf.courtdrive.com,creis@rgrdlaw.com

- **J Colby Williams**
  jcw@cwlawlv.com,pre@cwlawlv.com,cbb@cwlawlv.com,srm@cwlawlv.com,jyc@cwlawlv.com,mmh@cwlawlv.com,maw@cwlawlv.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Michael          Albert
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

Jennifer         N. Caringal
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

Danielle         S. Myers
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

Juan             Carlos Sanchez
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
```