————2:21-cv-01612-CDS-BNW————

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

JOSE CHUNG LUO,                    )
Individually and on Behalf        )  Case No. 2:21-cv-01612-CDS-BNW
of All Others Similarly           )
Situated,                         )  Las Vegas, Nevada
                                  )  Tuesday, February 6, 2024
        Plaintiff,                )  10:02 a.m. - 12:50 p.m.
                                  )  Courtroom 6B
      vs.                         )
                                  )  Motion Hearing
SPECTRUM PHARMACEUTICALS,         )
INC., et al.,                     )  **C E R T I F I E D   C O P Y**
                                  )
        Defendants.               )
                                  )
_____    )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE CRISTINA D. SILVA,
UNITED STATES DISTRICT JUDGE

APPEARANCES:      See next page

COURT REPORTER:   Samantha N. McNett, RMR, CRR, CCR
                  United States District Court
                  333 Las Vegas Boulevard South, Room 1334
                  Las Vegas, Nevada  89101
                  Samantha_McNett@nvd.uscourts.gov

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

2:21-cv-01612-CDS-BNW

**APPEARANCES**

For the Plaintiff International Trading Group, Inc.,

> **JEFFREY J. STEIN  ESQ.**
> **JOHN M. KELLEY, ESQ.**
> **RYAN A. LLORENS, ESQ.**
> ROBBINS GELLER RUDMAN & DOWD, LLP
> 655 West Broadway, Suite 1900
> San Diego, California 92010
> 619-338-3824
>
> -AND-
>
> **J. COLBY WILLIAMS, ESQ.**
> CAMPBELL & WILLIAMS
> 710 South Seventh Street, Suite A
> Las Vegas, Nevada 89101
> 702-382-5222

For Defendant Spectrum Pharmaceuticals, Inc.:

> **JOHN B. LAWRENCE, ESQ.**
> BAKER BOTTS, LLP - TEXAS
> 2001 Ross Avenue, Suite 900
> Dallas, Texas 75201
> 214-953-6500
>
> -AND-
>
> KEVIN SADLER, ESQ.
> BAKER BOTTS, LLP
> 1001 Page Mill Road
> Building One, Suite 200
> Palo Alto, California 94043
> 650-739-7518
>
> -AND-
>
> JORDAN T. SMITH, ESQ.
> PISANELLI BICE, PLLC
> 400 South 7th Street, Suite 300
> Las Vegas, Nevada 89101
> 702-214-2100

* * *

2:21-cv-01612-CDS-BNW

LAS VEGAS, NEVADA; TUESDAY, FEBRUARY 6, 2023; 10:02 A.M.

--oOo--

P R O C E E D I N G S

THE COURTROOM ADMINISTRATOR:  This is the time set for the motion hearing in case number 2:21-cv-01612-CDS-BNW, Luo versus Spectrum Pharmaceuticals Incorporated, et al.

Beginning with plaintiff's counsel, please enter your appearances for the record.

MR. WILLIAMS:  Good morning, your Honor.  Colby Williams of Campbell and Williams on behalf of the plaintiffs and appearing with me are my cocounsel from the Robbins Geller firm who I'll allow to introduce themselves.

THE COURT:  Good morning.

MR. STEIN:  Good morning, your Honor.  Jeff Stein, Robbins Geller behalf of the plaintiff.

THE COURT:  Good morning.

MR. KELLEY:  Good morning, your Honor.  Jack Kelley on behalf of the plaintiff.

THE COURT:  Good morning.

MR. LLORENS:  Good morning, your Honor.  Ryan Llorens on behalf of plaintiff.

THE COURT:  All right.  Good morning.

Good morning, your Honor.  Jordan Smith of Pisanelli Bice, and with me today are my cocounsel John Lawrence and Kevin Sadler.

THE COURT: All right.

MR. SADLER: Good morning, your Honor.

MR. LAWRENCE: Good morning.

THE COURT: All right. We'll get started here in just a moment.

First off, I want to thank both sides for meeting and conferring and submitting that updated chart. It's certainly helpful to the Court. Having done this for a couple years now, I've learned that sometimes what one party has seemingly challenged isn't what the other party intended and whatnot and so I have found that having you all talk is helpful. And in this instance, that seems to have been true. So I certainly appreciate that and I certainly appreciate you doing that on the weekend. At least it wasn't Super Bowl Sunday, right?

All right. So what I intend on doing this morning is ruling through that chart. And I anticipate talking, first, about whether the identified statements are -- are false and/or misleading and then turning to the phrase I always say wrong: Scienter. How do you all say that?

MR. STEIN: Scienter.

THE COURT: Scienter. I'm going to work on that.

And to some degree, those are related. And so to the extent there's crossover or I have additional, you know, questions, we'll go into that.

So if everyone has that chart in front of you, I want

2:21-cv-01612-CDS-BNW

to jump right in and just go statement by statement.

Before I do that, let me ask -- oh, you're standing -- if any party would like to kind of present any opening argument, if you will.

MR. LAWRENCE:  Well, your Honor, I guess two things -- John Lawrence for defendants.  We have prepared an opening argument that I think would be helpful to frame the issues --

THE COURT:  Sure.

MR. LAWRENCE:  -- that I'd be happy to give you.

And in addition, defendants have prepared a version of the chart that adds a column to give our kind of shorthand answers to your questions, if that's helpful, that I can hand up.

THE COURT:  That's fine, as we go through statement by statement, if you want to display that.  Is it electronic?

MR. LAWRENCE:  This is not electronic.

THE COURT:  Or is it paper form?

MR. LAWRENCE:  This, I have -- the chart I have in paper form.

THE COURT:  All right.  If you want to provide a copy to opposing counsel --

MR. LAWRENCE:  Yes.

THE COURT:  -- and to the Court, we'll go through that and I'll look at that as we through the statements.

MR. LAWRENCE:  Great.  And if you -- also, if you

would allow me to make the opening presentation --

THE COURT: Sure.

MR. LAWRENCE: -- I think that would be helpful.

THE COURT: It's your motion; you get to go first. Go ahead. You're welcome to come to the podium or you're welcome to stay there, whatever is easier.

MR. LAWRENCE: I think I need to plug in up there.

THE COURT: Sure.

MR. LAWRENCE: That's where I know to plug in, so I'll walk up there.

THE COURT: No problem.

MR. SADLER: Your Honor, these are not counsel appearing on our behalf.

THE COURT: You know, very advanced.

MR. SADLER: I just want to clarify for the record.

THE COURT: Very advanced.

MR. LAWRENCE: I apologize.

Thank you, your Honor. I know we're going to spend some time today walking through each of the remaining alleged 21 misstatements in the complaint, but as I mentioned before we do that, I think it would be helpful to talk about a couple of issues to help frame that discussion.

First, even after being pared down, the remaining 21 statements still have a lot of just unactionable statements, statements that, as a matter of law, are not actionable. That

includes forward-looking statements like your Honor asked about.  This top one is an example we see, Statement 6, where the speaker, Mr. Riga, says, "We have a clear shot at the BTD." That's a forward-looking statement.

We also have a lot in these remaining 21 statements, statements of opinion or belief, statements that the Supreme Court and Ninth Circuit tell us are generally not actionable and really only false if not honestly believed.  So that's before we even get to the scienter analysis on statements of opinion.

The first question is:  Did the speaker honestly believe it or is there an allegation the speaker did not honestly believe it?  For example, here, Statement 1, the statement from Mr. Riga, "We think Pozi qualifies for both," under the case law, whether or not Pozi did qualify is irrelevant to whether or not that statement is false.  The question on the falsity prong here is whether Mr. Riga thought it qualified.

And then third -- the third category of just unactionable statements that remain are puffery, these vague statements of corporate optimism that, also, under the laws are not actionable.  Statement 13 is a great example, Mr. Turgeon saying at the start of a conference call, "I'm really confident in our ability to meet our corporate objectives and advance our programs with the aspiration of bringing new treatments to

patients with cancer who need it." That is vague statement of corporate optimism. It is not an actionable statement under the securities laws.

The second general area that I'd like to discuss that I think helps frame this issue is -- I know we're going to look at this from the front end of the misstatements in order and whether or not they are false and misleading. I think it's helpful to maybe start by looking at it from the back end and what are the reasons that the plaintiffs say these statements are false.

The PSLRA requires statement that plaintiffs -- to not only identify each statement that is alleged to be false but also to explain why, and if an allegation of why is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. And what we're going to see here is a lot of these reasons for falsity in the complaint, when we look at the facts that are alleged, the facts don't support those core reasons plaintiffs say that several of these groups of misrepresentations are false.

The complaint breaks the misrepresentations into five categories. There are four here. I've combined the ZENITH trial Cohorts 1 and 3 into one category. But as your Honor knows, the complaint has a section that lists every alleged misstatement, has a few paragraphs about every misstatement,

and then afterwards has a paragraph that says, "The foregoing representations are false for these reasons." And those are the reasons I'd like to talk about before we start talking about the misrepresentations themselves.

The first category in plaintiff's complaint are misstatements about the Pozi MD Anderson trial, Statements 1 through 8 on the list. And the first reason plaintiffs give as to why the statements defendants made about the Pozi MD Anderson trial are false and misleading, plaintiff says defendants incorrectly claimed that current therapies only have less than 10 percent response rate, when, in reality, defendants knew that the FDA compared Pozi to even the best existing therapy, which had a 22.9 percent response rate.

First, setting the stage for that, as I'm sure your Honor's aware from reading everything, Pozi, this drug, is a type of drug called a tyrosine kinase inhibitor. Pozi itself is a TKI. And there's no dispute -- plaintiffs allege it themselves -- that TKIs like Pozi had been producing response rates in the single digits. So -- so a statement that -- that TKIs other than Pozi had response rates of under 10 percent is not itself something that is false.

So what do plaintiffs say is misleading about these statements?

Plaintiffs say that, actually, defendants knew that the FDA was going to compare Pozi to non-TKIs, higher response

rates. And first, there's no allegation defendants did know that. But even more fundamentally, when we look at the facts alleged like we have to, not just the information and belief, but the facts, there is not a particularized allegation in this complaint that the FDA actually did compare Pozi to non-TKIs.

Let's look at paragraph 41 here. What plaintiffs say is that Turgeon admitted on December 19, 2018 for the first time that TKIs with single digit response rates were not the appropriate comparators. That's what they say this says. Now what does it say? Noting, as required by the FDA's guidance on BTD, in the absence of target specific control, the efficacy of Pozi in patients with mutations had to be compared to non-mutation specific non-small cell lung cancer patients.

I'm an art history major who became a lawyer. I don't know all those words, but I know "patients." What this is saying -- what the facts they are allege -- they allege are saying is that the FDA ended up comparing the mutation -- the patients with mutations in the Spectrum trial to patients that did not have those mutations. It does not say -- there is no fact alleged in this complaint that says that the FDA was comparing or ever did compare, as part of this process, Pozi to non-TKIs. It's comparing patients in the study to a broader set of patients, not comparing this drug to a broader set of drugs.

The second reason plaintiffs say that these statements

2:21-cv-01612-CDS-BNW

are false and misleading is that they say defendants knew that the FDA would not consider anything under 30 percent as clinically meaningful.  And again, when we look at the facts alleged and not just the narrative information and belief, there's nothing behind it.  Listed on this screen is every single paragraph in the entire complaint that talks about this 30 percent that supposedly the FDA was going to compare it to and supposedly defendants were told the FDA would hold defendants to.

Paragraph 29, they say, "The FDA made clear to defendants."  How?  When?  Who?

Paragraph 37, the second bullet, they say, "As defendants would later admit," but there's no admission.

And then the third one, "Since defendants knew the FDA required."  Again, they're just saying these things happened without the PSLRA required facts -- all facts supporting their information and belief.  There are no --

THE COURT:  I apologize for interrupting you, but let me ask you a question about that.

MR. LAWRENCE:  Yes.

THE COURT:  In terms of what the FDA knew or what Spectrum told the FDA, would that be a matter of public knowledge or would that be a matter of something you would have that plaintiffs would need and would have to have discovery in order to obtain?

2:21-cv-01612-CDS-BNW

MR. LAWRENCE:  There could be some things that could be public knowledge.  There would be some things that would not be public knowledge.  I don't know if this statement ever even occurred so I couldn't tell you if -- if a statement that I don't know existed would be public knowledge or not.  Clearly, there are some -- there is some information inside of a company that plaintiffs may not know.

And we have to step back to '96 when Congress passed the PSLRA and said these securities fraud suits are getting out of hand, they are hurting investors because cases that are being brought and making it past the motion to dismiss without sufficient pleading are -- are a drain on investors.

And so the standard is -- the standard is that they need to allege facts before discovery.  That's why there's a discovery stay.  The system -- the entire regime is set up so that they have to look at what they can get publicly.  And if there's something they wish they could have privately but they can't get it, that doesn't mean they get discovery.

THE COURT:  I realize that.  Although, the way the argument is phrased, it suggests that, essentially, this was impossible as opposed to plausible, right, which is what we're working underneath here.

All right.  I'm sorry to interrupt you.  Keep going.

MR. LAWRENCE:  Also, in that, they're alleging this on information and belief.  It has to come from somewhere, right?

2:21-cv-01612-CDS-BNW

Either it comes from somewhere or it's made up.  And I -- I -- it's on information and belief.  I trust that.  It comes from somewhere.

THE COURT:  Right.

MR. LAWRENCE:  Whatever that is, they need to plead.

And then the third reason why plaintiffs claim that the Pozi MD Anderson statements are misleading is this idea that defendants failed to disclose that Pozi would perform materially worse in the upcoming multi-center trial but instead claimed that early scans and different dosing would lead to improved results in the ZENITH20 trial relative to the MD Anderson trial.

And first, again, there is no allegation in the complaint that would say that it is a given.  It's a matter of fact that Pozi would perform materially worse.  The idea that that was some sort of foregone conclusion, that that's something that defendants knew, that's not in the complaint.

What we do know from the complaint is that defendants did warn of this risk.  Defendants told the investors that there was a risk that the ZENITH trial may do worse than the MD Anderson trial.

And we'll look at this statement in more detail when we get to the individual statements in the chart.  This is number 12.  When we look at this, we'll see in the words that are said, it is not true that Spectrum said that these changes

were going to lead to improved results relative to the MD Anderson trial.  That's not what this says.  And we'll look at that as we go through the chart.

The second broad bucket is the Pozi ZENITH20 trial. These are Statements 9 through 13 in plaintiff's chart.  And this one really comes down to the idea that plaintiffs say that because they was an open and unmasked trial, therefore, defendants had access to data and knew that results were worse than they were letting on to investors as they were making public statements.

THE COURT:  Well, as alleged in the complaint, it appears that they were continuing to tout the results of that MD Anderson, that 43 percent number, but they had already gotten more data, correct?

MR. LAWRENCE:  Yes.  As alleged in the complaint is that -- is that defendants continued to talk about historical data that had been --

THE COURT:  Really positive, right?

MR. LAWRENCE:  It was positive while defendants knew of existing data that was worse.  That is the allegation.

THE COURT:  Right.

MR. LAWRENCE:  And it's really that second half that's missing here.

The idea -- the case law here on the screen, there is an ability for the Court to -- for the plaintiffs to use

———2:21-cv-01612-CDS-BNW———

falsity, use -- use proof that there is something that's false to -- to pair that with the management's role at the company and say, well, I think that management would have known that. But when you do that, you have to make allegations that are particular and suggest the defendant had actual access to disputed information, not just bald allegations of he's a CEO, he would have known.

But here's what the Ninth Circuit says:  When those allegations are buttressed with detailed and specific allegations about management's exposure to factual information within the company.

Now, this is, here, not just a slander issue.  It's also a falsity issue.  This is not the case like the cases we see in the case law where there is a memo at the company and the question is did the CEO see it.  Where there is data at the company -- no dispute about that.

THE COURT:  Right.

MR. LAWRENCE:  The question isn't if the CFO saw it. The question here, before we even get to the scienter part of this is:  Was this data even at the company?  Was this supposed data about these trials that were ongoing even at the company?

And again, let's look at the facts that are alleged by plaintiff to try to say that this data was at the company. Paragraph 31, plaintiffs say that Pozi trials were conducted on an unmasked basis which means that Spectrum could access the

data and results as they came in.  Again, just to -- a bald statement saying because of this, because of unmasked, therefore, Spectrum could access data.  I would note it says, even here in plaintiff's own words, "could access," not "did access."

And when we look at the factual background for this statement, the statement that plaintiffs say that unmasked equals access to data, what they're talking about is this paragraph ahead of paragraph 31, this FDA guidance talking about guidance for industry and how masking works.  And when we look at paragraph 31 and we read what it says, it doesn't say what plaintiffs say it says.  It doesn't say there is data available, more data is being produced.

What is says about unmasked or open trials is the same thing the Dresner Court said which is that open label is about identification of treatments.  That's what open label means.  It means the treatment is identified.  The patient knows what they're on.  The doctor knows what they're on.  Not that there is more data being gathered, more data being funneled up to somebody else, just that the treatments are identified.

THE COURT:  Well, it also talks about assessment of end points, right, exclusion of analysis, etc., which would be suggestive of data.

MR. LAWRENCE:  Well, what it says, your Honor, is that it is to -- the reason for the blinding or masking is to -- is

2:21-cv-01612-CDS-BNW

to limit bias that may occur -- I'm looking for your ends points word.

Yeah, looking for data that may -- sorry -- limit to bias that may occur when you have those assessments at end points. Not saying you're going to have assessments at different points but to limit -- when you're doing these assessments, you're going to do an assessment as whatever point you're going to do it whether the trial is masked or unmasked, and the question is by making sure that the data is masked, does that help alleviate concerns about concerns of some sort of unconscious bias clouding how those end points are being assessed.

THE COURT: Okay.

MR. LAWRENCE: This is the Dresner opinion that I know your Honor is aware of that says -- it says just that. Open label simply means both the patient and the researcher are aware of what drug is given and when.

I'd even say on the guidance for industry, there's no allegation that that was guidance that was specific to this trial or that -- that was followed in this trial.

As a matter of fact, this -- I want to say this case is Dresner, but this case is actually weaker than Dresner for an important reason.

Let's step back and talk about just the very fact that plaintiffs allege this was an open trial. They allege that

2:21-cv-01612-CDS-BNW

throughout the complaint.  What is the only fact they point to in their entire complaint to say this was an open trial?  They say at paragraph 105 that on May 7, 2020, two years into the class period, which makes sense when you read it, Lebel discussed now ZENITH20 is a "open trial which means there will be regular looking at data such that we will be able to gain some insight before we fully enroll."

Look at Exhibit 21 to our motion, page 15.  What was Mr. Lebel saying in that call?  The words plaintiffs leave out, Mr. Lebel says, "So Cohort 5 is an open trial."  Not Cohort 1.  Not Cohort 3.  There is no fact in this complaint even supporting that Cohorts 1 and 3 were unmasked open trials.

THE COURT:  During this call, was he talking about the other cohorts or was he only addressing Cohort 5?

MR. LAWRENCE:  I do not recall the entirety of the call.  We can pull it up, but he, here, is clearly saying Cohort 5 is an open trial.  There is no allegation or fact plaintiffs can point to today that says that somebody at some point says Cohorts 1 and 3 were open trials.

And you may say, well, would they have been different?  We know they were different.  We know from the complaint that Cohort 5 was the compassionate use cohort, right?  It was the cohort that the FDA said there are people who couldn't get into these trials.  Can we find a space for them?  So it would make sense in that instance to have an open trial.

And when we look at the bolding -- the bolded sentence in 105 where Mr. Lebel says, "We will be able to gain some insight before we fully enroll," looking at the paragraph, he's not talking there about that being the case because it's an open trial. What he's saying is for Cohort 5, we don't have to fully enroll so we'll be able to get some data earlier.

And what we know from the complaint, paragraphs 43 and 52, plaintiffs say that in the complaint that Cohorts 1 and 3, there was full enrollment before data came out. So we know Cohort 5 is different.

And there's no fact alleged in the complaint that Cohorts 1 or 3 were even open. And if they were open, it doesn't mean anybody knew it. It doesn't mean anybody knew data contradicting what they were saying. So this -- this does not support any falsity for any of these statements.

The third bucket, now we move on to the second drug, Rolontis. The third bucket is the first biologics license application for Rolontis. These are the allegations about misleading statements of this submission being voluntarily withdrawn, Statements 14 to 15 in the chart.

Plaintiff says this was false and misleading because, in reality, defendants did not initiate the withdrawal as they publicly described but, rather, withdrew the application to avoid an outright rejection. And they say they know because Turgeon admitted in August 2021 -- after the class period, he

admitted this, they say. So they told us, in this form, we wouldn't accept it so you can wait for us not to accept that or you can voluntarily fix this stuff and resubmit. And that's what happened. That's the admission. According to them.

Let's look at what actually happened.

Late 2019 is when the FDA started its review of this submission, which we know from the complaint meant the FDA had 60 days to decide whether or not it could move forward to full review. March 15, 2019 -- this is in the complaint -- Spectrum announced the voluntary withdrawal of the BLA. That's in the complaint. And they quote a brief snippet of that in the complaint. It's Exhibit 10 to our motion. What they don't do in the complaint, and it's obvious when you look at it, is allege that that was a misrepresentation.

THE COURT: Well, I mean, I can -- we can agree as to why they didn't allege that to be a misrepresentation, right? They did, in fact, voluntarily withdraw. Yeah.

MR. LAWRENCE: Well, I would say when we look at the -- they don't allege that's a misrepresentation --

THE COURT: Right.

MR. LAWRENCE: -- because in that document, Spectrum actually announced everything plaintiff says was not disclosed until two years later.

So they -- they allege that September 11, 2019 was a misrepresentation because defendants said it was voluntarily

withdrawn.  They say that's not -- that was misrepresenting.  You didn't say the full facts about that withdrawal.

THE COURT:  Right.

MR. LAWRENCE:  They say the same for November.

They don't say the same for March because when we look at March, Exhibit 10, what did Spectrum tell investors when they actually announced this withdrawal?  They said Spectrum announced today that due to the FDA's request for additional manufacturing related information for Rolontis, the company has voluntarily withdrawn its biologics license application.  So they say what plaintiffs say in the first instance wasn't disclosed.  They say that the withdrawal was because the FDA needed more information.

They also say -- Spectrum also says in the second paragraph, "Spectrum's decision to withdraw the BLA was the result of the company needing more time to provide certain additional manufacturing related information which was required before March 29, 2019, the day the FDA's 60 day review period ends."  So in March, when they announced this, they said that it was withdrawn because the FDA asked them for more information.

THE COURT:  But they also identified, what, ten deficiencies?  Is that disclosed in this March 15th disclosure?  Let me say "disclose" a couple more times.

MR. LAWRENCE:  That they announced ten deficiencies?

2:21-cv-01612-CDS-BNW

THE COURT: Yeah. Or any deficiencies, right? Because there is a -- would you agree with me or disagree with me that there's a difference between a request for additional information and identification of certain deficiencies that contributed to the decision to withdraw?

MR. LAWRENCE: I think that -- I'm not sure if your Honor is talking about the deficiencies related to this withdrawal or with respect to the Hanmi plant inspection.

THE COURT: Maybe I'm getting them confused.

MR. LAWRENCE: Okay.

THE COURT: If I am, that's why I'm drinking the coffee.

MR. LAWRENCE: Exactly.

THE COURT: Yeah. So explain that to me.

MR. LAWRENCE: Sure. So there are two different sets of misrepresentations about Rolontis.

THE COURT: I remember now.

MR. LAWRENCE: Okay.

THE COURT: Yes.

MR. LAWRENCE: So now we're talking about just the first set which are -- right. And let's look back. Why did they say -- remember, they are -- their job is to say why it's false and misleading. And they say it's false and misleading because of this, paragraphs 92 and 103. They say that defendant did not initiate the withdrawal but, rather, withdrew

the application to avoid outright rejection and that Turgeon admitted, two years later, that in this form, we won't accept it. So you can either wait for us not to accept it or you can withdraw it and fix it. That, what was supposedly announced two years later, was announced in March 2019.

THE COURT: All right. I see what you're saying now. Okay.

MR. LAWRENCE: So when we look later at the misrepresentations in September and November, on these calls where Turgeon says, "Hey, remember we announced earlier voluntary withdrawal," he's talking about what was already disclosed.

THE COURT: Okay.

MR. LAWRENCE: Then the fourth category is this second BLA submission for Rolontis. At this point, Rolontis did make it past that initial two month review and now is moving on to the inspection process. And what plaintiffs say is that over the course of a year and a half, starting in 2020, the start of COVID into mid-2021, statements that Spectrum made about readiness for that inspection were false.

What plaintiffs say is the Rolontis manufacturing facility in South Korea maintained controls and procedures that deviated substantially from FDA requirements.

And, again, when we look at the actual facts, what the FDA actually said, according to the facts in plaintiff's

complaint, the CRL, which is the -- the document the FDA provided, the CRL cited deficiencies related to manufacturing and indicated that a reinspection will be necessary, not maintained controls and procedures that deviated substantially.

What we see here is that the facility in South Korea was inspected and the FDA said there are some deficiencies here.

And when we go through later on the alleged misstatements on this issue, we're going to see, first, there was never a promise of passing inspection. There couldn't be, of course. What we see are clear statements of opinion, statements of belief by the defendants saying, "We think we're ready. Here's what we've done to get ready. And for those reasons, we think -- we think we'll pass. We're confident in that." And they were. There's no factual allegation that defendants did not honestly believe those statements when they were made.

And then when we turn after falsity to scienter and we weigh the competing inferences like the Supreme Court says to, the more compelling inference is that -- is that these defendants who were waiting for inspection of a drug that plaintiffs say was really important to its business, that defendants, while waiting for inspection of this drug, over the course of a year and a half, did honestly believe, based on the steps that were being taken, that that facility was ready for

inspection.  That is the more compelling inference.

The other inference that plaintiffs would have you believe is that, instead, for a year and a half, these defendants just lied through their teeth about readiness for a drug that was important to the company.  And that, when you weigh those inferences of do you think they believed they were ready or do you think for a year and a half they knew they weren't ready for an important inspection, the balance, to me, clearly falls in the non-fraudulent balance.

With that, I'm happy to take more questions or...

THE COURT:  I don't have any questions at this time.  Thank you very much.

MR. LAWRENCE:  Thank you.

THE COURT:  Let me turn to plaintiffs.

Would you all like to make an opening statement or respond to what has been presented?

MR. STEIN:  A very brief one, your Honor.

THE COURT:  Sure.

MR. STEIN:  Jeff Stein, your Honor, on behalf of the plaintiff.

Wow.  Okay.  I got to be honest, your Honor.  We made a presentation, as well.  We scrapped that on Thursday because we understood your order to mean that we're going to go statement by statement.  So I'm a little taken aback by the length of that presentation and also the content of it.

There's a bunch of facts in that presentation that aren't -- don't appear in the complaint, they don't appear in the motion to dismiss, and they don't appear in the reply.

So we're making stuff up on the fly. Now all of a sudden, they didn't know that the best existing therapy for one of their two drugs was 23 percent. Never said that on reply. Never said that in their motion. I'm hearing it for the first time today.

Also, for the first time today, we're hearing that open label means something other than the data is open to the company that's running the clinical trial. And we find out today, for the first time, that, actually, Cohort 3 and Cohort 1 weren't open label.

We've got a bunch of case cites in the presentation that aren't anywhere in the briefing. Now Metzler is a falsity case. I thought it was cited for scienter. Same for the Zucco case.

I did want to point the Court -- I mean, I thought I showed up for a motion to dismiss hearing that we briefed, and instead, I'm here on an MSJ hearing that I didn't get to brief. So I'm in a little bit of a scramble.

THE COURT: We're going to stay within the MTD framework.

MR. STEIN: Great.

THE COURT: So, know that.

2:21-cv-01612-CDS-BNW

MR. STEIN: Okay. All right. I do want to point, just -- I had a couple minutes there to try to -- to create and to scramble and try to find some facts to counter their factual argument, which we're not supposed to be considering, by the way, because we're on motion to dismiss.

But if the Court would look at Defendant's Exhibit 17, it's Document 55-18, page 5 of 11, this addresses two of the new facts that they've alleged are -- you know, they allege that 23 percent is nowhere to be found and there's no basis for it.

Well, here's first disclosure when they're saying, after they've told investors that TKIs are the right comparator, that it's 6 to 8 percent, that we're going to be looking at TKIs, we're not looking outside of TKIs. But we've talked to FDA. We know their requirements. How they know the requirement but they don't know the right comparator, I don't know. But when they disclose what the right comparator was here, it's page 5 of 11, a paragraph that says -- starts, "Let me provide." It says, "For comparison purposes, the historical objective response rate pre-mutation specific non-cellar lung cancer patients range between 0 and 8 percent." It's a lot of words. But they're saying, yeah, for TKIs, it's 0 to 8 percent.

However, as required by the FDA's guidance on BTD, another comparator is correct. And if you look down in that

paragraph, the best existing therapy that's listed is combination chemotherapy with VEGF inhibitor with an objective response rate of 22.9 percent. So this is the disclosure. They're saying right here that it's 23.9 percent -- or 23 percent.

THE COURT: Yeah.

MR. STEIN: So I'm not sure how they can come here today and say that that was, you know, a bad allegation or not true.

And in the paragraph below that, it says, "Let me remind you that the ZENITH20 trial is an open label multi-center Phase 2 study."

So now we get here today and some of it's open label and some of it isn't. And I'm just curious how we can get up at the podium and change our argument and make it inconsistent with what we said in the past. So it's going to be hard to parse through what we can trust today and what we're -- I just want to refocus the attention on the complaint, the allegations. Let's not stray outside of the complaint because, as we can see from this evidence, when we do that, we get in the situation where we're arguing facts that aren't in the brief and that's going to be a long and confusing day.

Okay. I wanted to address those points.

Other than that, before we got into the statements, I just want to set the stage and just explain what the company is

really quick and where they are, where they were as we enter the class period.

It's a two product company. It's a small pharmaceutical company. They have two developmental drugs. They sell off the rest of their portfolio. So as they entered this class period -- they sell off the portfolio a little bit into the class period, but for most of the class period, they have two experimental drugs. They're making no money and they're spending a bunch on clinical trials. So they have this pressure. They got to get these through and be profitable sooner rather than later. And they start experiencing delays. And they start to scramble. And then they start running these at-the-market financings where they issue new shock -- new stock and sell it at market prices. So now they have motivation to keep the stock price high.

And, you know, that's where the problems come in. They have this motivation to keep the stock price high. So they do exactly what they did in the Christiansen case which is they're not honest. They're not -- they take liberties with the truth. They're not honest about their interactions with the FDA. They're not honest about their status of their clinical trials. And in this case, they're not honest about what they know about the efficacy of their drugs and the readiness of Rolontis for an inspection.

So that's all I wanted to say. I just kind of set the

stage for the statements.  And I'm happy to go statement by statement and address some of these more particular arguments.

THE COURT:  I appreciate that.  And we're going to go statement by statement here shortly.

What I do want, though, is defense to respond to the argument about what you knew and when you knew it based on the argument that was just raised by Mr. Stein.

MR. LAWRENCE:  Great.  So I think Mr. Stein misunderstood what I was saying on the 23 percent.  And I am worried the Court may have, as well.

So the -- we're not saying that Spectrum was not aware that there are other non-TKI therapies out there that had higher response rates than 6 to 8 percent.  We're not saying that we weren't aware that Spectrum was not aware that there were non-TKIs, different type of drugs that had higher response rates.

What we're saying is when plaintiff says that -- that the reason why the BTD didn't pass was because the FDA was comparing Pozi to non-TKIs that had higher response rates, that the facts don't support that.  And the very sentence Mr. Stein pointed to shows that.  We're not saying that we're not aware that there are non-TKIs that had higher response rates.  We're saying that in comparison to TKIs, those statements were true.

And when you look at the statement Mr. Stein pointed to on page 4 of his exhibit, for comparison purposes, the

2:21-cv-01612-CDS-BNW

historical objective response rate pre-mutation from specific non-small cell lung cancer patients ranged between 0 and 8 percent for TKIs. That's true.

The statement we have that explains why --

THE COURT: Well, I guess that's kind of -- I understand your point that there is a difference between TKI and other treatments.

My question is: Was that distinction clearly conveyed to investors? Because there seems to be a reliance on that 22.9 percent statistic. And so that's my question. Was that distinction clearly conveyed to investors?

MR. LAWRENCE: Yes. When we look at the misstatements, we'll see that when -- when defendants were telling investors about the 6 to 8 percent comparison, that that was in the context of talking about TKIs.

THE COURT: Okay.

MR. LAWRENCE: And that when the FDA -- when Spectrum later says in accordance to FDA guidance, they ended up comparing our mutation patients to patients without mutations, that is not saying that the FDA, in denying this request, compared our drug to different classes of drugs. So these other classes of drugs that had response rates in the 20s.

If the allegation of falsity is that it was misleading to not let investors know that Spectrum would be compared to non-TKIs, the fundamental problem with that is that there is no

—2:21-cv-01612-CDS-BNW—

fact alleged that the FDA actually did compare Spectrum to non-TKIs.  The FDA compared Spectrum's mutated mutation patients to non-mutation patients.  There's not a fact alleged that Spectrum's drug was compared by the FDA to non-TKIs.

THE COURT:  Well, let's take a look at -- just for -- continue down the path.  Let's look at Exhibit 81-1, the chart that was filed after my minute order, Statement Number 4, this is page 3, last sentence.

(Court reporter interruption.)

THE COURT:  "When you get to these exon 20 insertion mutations, talking about unmet need, you have a progression-free survival of 1.8 months and current TKIs and other therapies only have a 6 to 8 percent response rate, huge unmet need."

To me, that kind of groups everything together as opposed to distinguishing this in comparison to other TKIs alone.  Rather, it's kind of a mixed bag.

MR. LAWRENCE:  Your Honor, this is exactly why the incorporation by reference doctrine exists so we can look at -- the word said after what plaintiff quotes.  So if you turn to Exhibit 13, page 5.

THE COURT:  Of your motion to dismiss?

MR. LAWRENCE:  Sorry.  Of the motion to dismiss.

THE COURT:  Okay.  One second.  Let me get there.

MR. LAWRENCE:  Page -- I believe it's page 6 of the

PDF, page 5 of the document.

THE COURT:  One second.

MR. LAWRENCE:  Sorry.  Page 4 is where the misrepresentation alleged is, the bottom paragraph of page 4 of this May 16, 2018 presentation.

THE COURT:  May 16th.  I'm looking at -- you said Exhibit?

MR. LAWRENCE:  Exhibit 13.

THE COURT:  13.  55-13?

MR. LAWRENCE:  It's 55-14 because of the --

THE COURT:  55-14.

MR. LAWRENCE:  There was a cover page.

THE COURT:  No problem.  All right.  Page 4.

MR. LAWRENCE:  And at the bottom, the -- the bottom paragraph on this first page, the first few sentences -- maybe the first two sentences are the alleged misrepresentation.  And we see at the bottom of -- of that second sentence is where we see the bolded part in plaintiff's chart that current TKIs and other therapies only have a 6 to 8 percent response rate.

What that is saying, and I'll point you to a few lines down -- you probably know that's what they're saying.  What they're saying is the use of TKIs with -- people don't take TKIs only.  People who have this -- have these diseases are on a set of therapies together.

And when we look at the next sentence -- so the next

page, same paragraph -- Mr. Turgeon continues, four lines down, "When you're looking at why these TKIs don't work in the current therapies, it's the static hindrance that happens."  So he's talking -- and investors know this because they're hearing him give this entire presentation.  He's not saying TKIs and other drugs, other classes of drugs.  He's saying when we look at TKIs being used in these therapies.

Again, nobody's having a TKI and no other course of treatment.  It's a -- it's a -- it's an overall therapy.  And we see that from later on in that same paragraph where Mr. Turgeon says when you're looking at why these TKIs don't work in the current therapies.  He's talking about response rates for TKIs within these groups of therapies that an individual patient is receiving.

THE COURT:  All right.  All right.  Well, let's go -- let's -- feel free to step back.  We'll go through statement by statement.

All right.  Let's start with page 2, Statement 1 about -- which is cited in paragraph 74.  The speaker is Riga.

My question here is for plaintiff in terms of how are these statements false and/or misleading?

MR. STEIN:  Sure, your Honor.

And if it's helpful, it might save time, I've grouped some statements together that are very similar.

In this case, I think that Statement 1 is very similar

2:21-cv-01612-CDS-BNW

to Statements 3, 6, and 7.  They're all talking about discussions with the FDA and what Spectrum gleaned from those discussions with the FDA.

THE COURT:  Okay.

MR. STEIN:  So first, I think it's important to step back and talk about these clinical trials, what's being measured.  They're measuring objective response rate.  That's all they're measuring.  That's all they need for breakthrough therapy.  That's all they need for FDA approval and it's all they're looking at for what the current therapies -- what level are they at.

So MD Anderson is the breakthrough therapy, subset single-center trial, and it's got this high standard where that's the highest ORR.  That's the highest statistic they're looking at.  FDA approval is below that.  It's got to be a clinically meaningful advance over existing therapies.  And existing therapies is just what's the market at right now.  And so Spectrum has to demonstrate that its drug exceeds current therapies by these particular margins, one for FDA approval and one for BTD.

So -- all right.  When we look at these statements -- so -- so those are the statistics that are important, right?  The ORR for existing therapies, for ORR for FDA approval, and the ORR for breakthrough therapy designation.  That's all there is to know.

All right.  So we look at these statements and they're saying we are in regular discussions with the FDA to expedite the regulatory approval.  We know what the requirements are, is Statement 3.  Statement 6 is we have alignment with the agency on our Phase 2 trial.  We have a clear shot at BTD.  And 7 is so our conversations with the agency, obviously, do go into the statistics that are expected and were very much aligned with the agency.

Okay.  All the statements they're talking about -- they know all these statistics.

And it's an awkward place to start for what I'm talking about, why these statements are false, but we think the statements are true.  Of course, they knew these statistics.  How could you go into a clinical trial and not know what the target is?  How could you not know what the best existing therapies are for your drug out there?

The reason why we included them as false statements is because they're totally inconsistent with statements they make later because they come out and say they're talking about existing therapies being 6 to 8 percent.  That's not the best existing therapy.

And later in the -- in the ZENITH20 trials -- I'll pause.  It looks like you might have a question.

THE COURT:  I do.  So if they were true, then why are they included?  Because to me -- I understand your argument

2:21-cv-01612-CDS-BNW

that they're later inconsistent with representations, but if they're true at the time that they're made, either they're, A, true, or my interpretation when I was reviewing them was one of corporate optimism, then how can I find them to be false and misleading if you conceded that they're true?

MR. STEIN:  I'm conceding that they're -- I'm conceding that they're true.  I'm -- but the reason why I included them is because it's an either/or situation.  So if these are true, then the later statements are false.  And if they get up and say the later statements were true, then these are false because you didn't know what the requirements are. So it's -- we're covering our bases.

So we've -- that's why we've trimmed down -- we've put forth a lot of effort to trim down these statement that -- to the ones we really allege are false.  This is the one exception.  The reason why we've included it is just -- is just because of this tension, because one has to be false between either the later statements or these.

THE COURT:  All right.

MR. STEIN:  And we think it's the later statements.

THE COURT:  Well, let's -- since we're here and it's -- you're identifying an either/or.  What are the later statements that if true make these false?

MR. STEIN:  Okay.

THE COURT:  Let's jump because that would make more

sense to me.

MR. STEIN:  Right.  So it's the 6 to 8 percent statements.  It's really -- really all the statements.  So it's not a brief diversion.  I'm happy to wait to talk about those.  And I'm going to be referring back to these statements here, "We know what the statistics are" because it really makes a lot of these statements that are alleged false.  Like, when they're incorrectly citing to the therapies and later when they're talking about the data and when they're talking about their -- they're expressing optimism about the company's -- about Pozi's ability to get FDA approval when they have data in hand showing that they have failed to meet the statistics that they purportedly know about.

So I'm happy to kind of explore that tension when we get to those statements.

THE COURT:  Okay.  Let me ask this question.  Are you also including these as relevant to scienter?

MR. STEIN:  Right.  Yes.  These are -- these are statements that are demonstrative of scienter.

THE COURT:  Okay.

MR. STEIN:  Because they know what the statistics are and they've said that repeatedly.  And, of course, they do.

THE COURT:  All right.  And let me ask you this question.  And I know that you make these allegations in terms of knowing the numbers, but where is it pled specifically

2:21-cv-01612-CDS-BNW

that -- what the numbers were, what they knew the numbers needed to be?

MR. STEIN:  Where are the numbers themselves pled? Sure.  Let me -- so for paragraph 29 of the complaint -- that's not it.  That's where the 23 percent is alleged.

"According to the FDA, at the time of the Pozi trials, the best existing therapy for patients with EGFR (unintelligible) mutations" --

(Court reporter interruption.)

MR. STEIN:  All right.  "According to the FDA, at the time of the Poziotinib trials, the best existing therapy for patients with EGFR exon 20 mutations was chemotherapy combined with an EGFR inhibitor which achieved an ORR of 22.9 percent." So that's the allegation.

And we have similar allegations for the 30 percent saying that they got this from the FDA.

Defendants seem to take issue with the -- with the fact that we don't source these allegations.

THE COURT:  Right.

MR. STEIN:  Well, for the 22.9, we do.  We say exactly where they got it from and exactly what those comparators are.

For the 30 percent, we say they got it from the FDA. That's based on a press release that they've sent.  So this is coming from them.

The idea that we have to source every allegation in

the complaint is a new one to me.  That's not the requirement. We have to state our -- we have to state with particularity the -- the statements who, what, where, why, and when.  Who said it?  When did they say it?  Where were they when they said it?  And why is it false?  We've done that.

And, you know, we just disagree that every single allegation in the complaint needs to be sourced.  That's not the rule and they haven't cited to any case law saying that that's the rule.

The case law they cite in the brief is Silicon Graphics.  Silicon Graphics is a 1999 case.  It's since been -- it's not good law anymore.  Let's see.

THE COURT:  I think the -- what they're taking issue with is -- and this is where I think potentially there could be a challenge -- is the timeline isn't clear.

So I'm going to be honest with you.  Like, the allegations are there.  I'm seeing the allegations.  For me, when I'm going through, I'm reading the motion to dismiss and I'm looking at the complaint, I understand the factual allegations.  The timeline wasn't clear to me.

So -- so that statement that you're referencing about what they knew -- for example, I think Riga is the one who makes that statement about the 22.9 percent.  So they had that information.  I had to go back and look.  Did he have that information in 2018?  Did he have that information in 2019?

And so that is -- that is the issue that I see.

So I don't disagree with you in terms of sourcing every single thing.  For me, the challenge is when they knew it.  And so I tell you that now so as we continue to move through the statements, it might be helpful in addressing that for me.

Let me -- you've made a little bit of argument this morning.  I'm going to let defense respond.

MR. STEIN:  Okay.

THE COURT:  And I want to focus on the statements that he has focused on.

MR. STEIN:  Great.  Thank you, your Honor.

MR. LAWRENCE:  So looking at Statements 1 through -- 3, 6, and 7 -- first of all, let me respond to the idea that they don't have to source every fact in the complaint and there's no case law that says it.  The statute itself says it. That's on page 3 of my presentation.  The statute that we're governed by, which is quoted in this Metzler case that is in our brief, says the plaintiff's complaint, quote -- the statute says, "shall specify the reason or reasons why each statement is misleading, and if an allegation is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."

We know that this entire complaint, other than the paragraph saying the plaintiff's name, is on information and

2:21-cv-01612-CDS-BNW

belief.  They say that in paragraph 2.

So when they say a fact -- and you're focusing on the right issue, your Honor.  When they say something like the FDA made clear they would need 30 percent, what they're telling you is the plaintiff here has information and belief that supports that.  And what the -- Congress said was, in these cases, you're not supposed to take that on faith.  You're supposed to look at the facts that they allege that support that information and belief.

So they absolutely do have to, when they say something like the FDA told them 30 percent or forget it, they need to say where they got that from.  And as you pointed out, they need to say where they got that from that shows that it was known at a time relevant to these claims.

THE COURT:  Well, here, have they not alleged that?  Because, for example, Riga knew, if I recall correctly -- let me find it.  He talks about that 22.9 percent number in -- I believe in December of 2018.  If I'm wrong, tell me.

And so have they not met that pleading requirement, that exacting -- I think that's the language that the Ninth Circuit uses, that exacting pleading requirement?

MR. LAWRENCE:  Well, my short answer is no, they have not.  I'll explain.

THE COURT:  I'm surprised you're saying that.

MR. LAWRENCE:  He did admit that four weren't false so

2:21-cv-01612-CDS-BNW

there's so -- you know, stranger things have happened.

So first of all, there's two different percentages we're talking about here.  There's the 30 percent and the 23 percent.  The 23 percent where Mr. Riga says that in December -- that December statement where he says that is the statements where they say this was revealed as prior statements being false.

December of 2018 is where the announcement is made that, despite our prior belief, we did not get approval for this.  That's the -- that December 2018 analyst call is where Mr. -- I think you said Riga -- my memory is not that good right now -- said that as required by the FDA's guidance on BTD, in the absence of target specific control, the efficacy of Pozi has to be compared to non-mutation specific patients.  And I believe that's where he goes on to talk about the 22.9 percent.  I do think that's right.

I do they think that allege that that fact was something that at least one of the defendants stated publicly, that non-TKIs had that higher response rate.  They don't allege, I don't believe, that it was known beforehand.

And again, I'll go back to what we were talking about earlier which is they don't allege -- when we're looking at why is this false.  That's the first step.  They say it's false because the FDA was comparing Pozi to these non-TKIs that had higher than 10 percent response rates.  And the -- the fact

they used to support that doesn't say it.  The fact they used to support that doesn't say that the FDA even did ever compare Pozi to non-TKIs.  It says the FDA compared our patients with mutations to patients without mutations.

So, again, that's, I think, really important that regardless of what they pled about, what percentages were known, which they don't plead either, the idea that any statement was false because the FDA was going to compare Pozi to non-TKIs, that fact isn't alleged either.

THE COURT:  All right.

MR. LAWRENCE:  And I'm happy to go -- I think -- I appreciate Mr. Stein trying to group these.  I think that's helpful.

I also think there are some important issues on each of these, like I pointed out with the one your Honor asked about, which is if you look a sentence later, there's an explanation.  And so my chart -- you know, for each of these, we tried to break that column on the right into three buckets, the three questions you asked.  The first one says:  Is it a forward-looking statement?  We can talk about that.  And then it also talks about the other two issues I raised which were statements of opinion and puffery.

And I'd be happy to go through -- I think he's withdrawn those as false and misleading, so I don't want to waste the Court's time.

THE COURT: Well, he hasn't withdrawn them. He's, rather, tethered them to other ones. But we'll get there. So let's hold -- let's hold that thought.

MR. LAWRENCE: If I could -- I'm sorry -- just respond on that point?

THE COURT: Yes.

MR. LAWRENCE: If the idea here is that because -- because somebody said on a certain date we're aware of the percentages we need or we've talked to the FDA -- let me find an actual quote so I don't mess this up.

So for example, Statement 3, they point to the fact that Mr. Turgeon says, "We know what the requirements are." You don't get to just to point to somebody saying we know what the requirements are and then have nonspecific allegations about what those requirements were and say, therefore, he must have known them. They could have said the FDA told them 40 percent. They could have said the FDA said you have to have a thousand patients.

THE COURT: That goes back to the question I asked --

MR. LAWRENCE: Exactly.

THE COURT: -- during your opening argument as to whether or not they would have access to that, right? Is that application public? Is it not? And would they need to have discovery in order to get that? And I don't know the answer. And I don't know if you do either.

2:21-cv-01612-CDS-BNW

MR. LAWRENCE:  I don't know what FDA information is or is not public.  I do know that this case law is designed to -- to not allow discovery.  That's why we see in a lot of these cases confidential witnesses.  We see investigations.  These plaintiffs --

THE COURT:  Right.

MR. LAWRENCE:  This plaintiff right here had 11 months after it entered this case before it filed this complaint.

THE COURT:  Right.

MR. LAWRENCE:  So that's why people do this so that -- so that plaintiff has every --

(Court reporter interruption.)

THE COURT:  Usually it's me being scolded for being too fast.  So thank you, I guess, both of you.

MR. LAWRENCE:  It's always me.  So I'll take some heed to that.

THE COURT:  It's usually me.

MR. LAWRENCE:  There is case law, I believe, even saying just that, which is the fact that the plaintiff doesn't have access to the information is not -- it's kind of a -- it's how it works.

THE COURT:  Right.  I know.  It's an interesting -- it's an interesting area of the law.  That's how I'll couch that.

But my question is genuine.  I don't know.  Is it

public?  Is it not public?  These are questions that --

MR. LAWRENCE:  Right.

THE COURT:  -- inquiring minds want to know.

MR. LAWRENCE:  All I know, your Honor, is the -- is the burden and what's in the complaint.

THE COURT:  Sure.  I understand.

All right.  Anything else?  I'm sorry.  I interrupted you.

MR. LAWRENCE:  On -- on Statements 1, 3, 6, and 7 -- let me -- sorry -- just look quickly at my chart and make sure nothing else.

I do want to point out that these are forward-looking statements, which I'm happy to discuss more.

They're also -- to the extent plaintiffs are -- I think they no longer are, but are alleging that these gave false impressions of ability for this drug to be improved, they're riddled with "We believe," "We think."  And there are no allegations that would -- would indicate that those -- that would establish that those beliefs were not honestly held.

You know, they've been -- in Statement 1, they bold, "We are in regular discussions with the FDA to expedite the regulatory approval for Pozi."  That's -- I don't think that's supposed to be false.

And if you look at that -- that bottom, bolded statement, it begins with -- you know, it begins with, "When we

look at those criteria, there are two. First, there needs to be a clear unmet medical need, and second, the potential for substantial improvement over existing therapies needs to be there. We think Pozi qualifies for both." Again, that's a forward-looking statement. That is a statement of belief.

And what we see throughout all these is never a statement of "We guarantee approval," you know, "Buy, buy, buy our stock. It's approved," but, "Based on where we are in this process, we've had this meeting, we've had that meeting, based on where we are in the process, here's how we feel about it."

Statement 3, if you looked at Exhibit 12, at page 10, you'd see the very next paragraph after what they cite says, "Breakthrough therapy designation if achieved." Again, allowing -- acknowledging that things were ongoing and that it might not be achieved.

Paragraph 6. I think they like the statement that says, "We've seen very strong early data in area of high unmet medical need," and they think that means we've seen some secret data you haven't seen.

What we know from plaintiff's own complaint is that they allege that strong early data was announced back in Q4 of 2017, March of 2018, May of 2018. And so when somebody on a conference call a couple months later says we've seen really strong early data, there is no implication that they're saying I'm going to let you in on a secret. I've seen something that

-2:21-cv-01612-CDS-BNW-

we're not ready to disclose yet.  I'm telling you what it is.  They're saying what plaintiffs say, which is, the data we've been announcing over the last eight months have been really strong and we're happy about that and we're still in discussions with the FDA.

THE COURT:  All right.  Let's move on.  We kind of grouped 1, 3, 6, and 7.  Let's move to Statement 2.

MR. LAWRENCE:  I'm sorry, your Honor.  I don't want to interrupt, but there is one more thing on 7 that --

THE COURT:  Oh, okay.

MR. LAWRENCE:  -- they didn't -- 7 actually does have a statement about 10 percent in there.

THE COURT:  Uh-huh.

MR. LAWRENCE:  There, again, if you look at Exhibit 14, the same document at page 5, if you look at what is said more broadly, what is said on that call is the median progression-free survival rate of available TKIs is approximately two months with an overall response rate of less than 10 percent.  That's said on page 5.

And then this quote in the complaint is a response to a later question from an analyst.  And that's why the speaker, Mr. Riga, says, if you start with memory lane -- remember what I told you a few minutes ago?  Ten percent.  And it looks, in this paragraph, like there's no distinction of it being TKIs, but the call, as a whole, looking at what was said, memory

lane, it says, specifically, of available TKIs is less than 10 percent.  That is not a misrepresentation.

THE COURT:  All right.  All right.  Let's move on to Statement 2.  I know that's grouped with other ones, also.  Do you have 2 grouped?  Or is 2 --

MR. STEIN:  Yeah, I have grouped together Statement 2 as well with some other statements if that's helpful.

THE COURT:  All right.  What statements?

MR. STEIN:  So the statements that are similar to Statement 2 are 4 and 7.

THE COURT:  All right.

MR. STEIN:  Make sure that's it.  Yeah.

Okay.  This is one of those statements that depends on whether or not it's statistics.  Did they know the statistics?

And just to answer your question about when -- what -- when in time did they know, we can look at the statements that we just looked at.  They said we know what the requirements are.  They said that on May 3rd.  And on August 9th, Riga says our conversations with the agency, obviously, do go on the statistics that are expected.

So we don't need to plead more than that.  There's only three statistics to know.  What else could they possibly be talking about?

At the pleading phase, this is more than enough.  You're right that we're going to need discovery to know exactly

what was said in those conversations.  We're going to have to take depositions.

THE COURT:  I know.  But the challenge is what Congress has told us, right?  Do you get to that point?  And so why don't you address that for me given the interesting standard that was created by Congress.

MR. STEIN:  Well, it's about inferences.  Like, they say -- they say they know it.  We know what the requirements are.  Our conversations with the agency, obviously, do go in the statistics that are expected.  And so they're telling us directly that they know.  And so that's all we need to plead.

It's just -- we don't -- the securities fraud standard under the PSLRA is heightened but it's not an insurmountable task.

THE COURT:  Sure.

MR. STEIN:  I mean, if that was the task, that we had to mind reads and we have to say more than -- we have to point to something more than the defendants themselves saying we know this stuff, I'd be out of a job.  So that's my response to that.  But that's still Statements 1 --

THE COURT:  Okay.

MR. STEIN:  All right.  So this group, 2, 4, and 7, they're talking about current therapies.  These are just false statements.  Current therapies only have less than 10 percent. I think 6 to 10 percent response rate.  No mention of TKIs.

The next one says current -- current TKIs and other therapies only have a 6 to 8 response rate.  That's not true.  It's 23 percent response rate is the best one available.

And then Riga says current available treatments is less than 10 percent.  So these are just false statements.  We point this out.  We make this argument in our opposition.  It's not addressed on reply.

That reminds me that defendant's chart, to the extent it's inconsistent with the briefs, we'd object to those portions.

THE COURT:  I understand.

MR. STEIN:  Okay.  So --

THE COURT:  Just for the record, this will be considered demonstrative.  It will not be admitted for purposes of this hearing.

MR. STEIN:  Great.  Thank you, your Honor.

Okay.  And -- oh, I did want to point to one more portion of the statement in Statement 1, and this is alleged in the complaint as demonstrative of scienter, as well.  If you look at the last sentence of Statement 1, "The tone of the meeting was very encouraging and the understanding around the unmet medical need for patients with exon 20 insertion mutations was very clear."

So that's him specifically saying we are very clear with the agency about the expectations around the unmet medical

need.  That means what therapies are out there.  So that's a specific statement about this 6 to 8 percent that conflicts with them saying 6 to 8 percent because we know that the best existing therapies are 23 percent.

THE COURT:  Okay.  Anything else you want to add?

MR. STEIN:  That's it for those statements, your Honor.  Thank you.

THE COURT:  All right.

MR. LAWRENCE:  Start in reverse looking at the sentence in -- in Statement 1 Mr. Stein pointed to.  I'd, first of all, say nothing in here is alleged to be false.  I think -- again, I don't think it is alleged to be false anymore.  But the tone of the meeting was very encouraging.  Nothing alleging that was not true.  It is also puffery and a forward-looking statement.

And the understanding around the unmet medical need for patients with exon 20 insertion mutations was very clear.  This is not saying that the -- the drugs to which we will be compared, including non-TKIs, was very clear.  It's saying the unmet medical need.  He's saying it was really clear.  We're in agreement with the FDA that these people with this horrible disease have an unmet medical need.  That is not alleged to be false or misleading in the complaint.

As to -- on the similar vein, the statements Mr. Stein pointed to again saying things along the lines of we know what

the requirements are, again, there's no dot connected there to say that when somebody said that, what they were saying was we know that the FDA is going to compare us to non-TKIs.  And we don't even know that that is what happened.

We don't have -- we don't have somebody saying, "I know we're going to be held to a 30 percent threshold."  Again, you don't get just to -- get to just say Mr. Smith said he talked to Mr. Jones.  Therefore, he must have heard from Mr. Jones.  What I'm going to say without any fact behind it, Mr. Jones told him.  You have to put that fact in.

Looking at Statements 2, 4, and 7, Statement 2 -- these are the 10 percent statements.  Statement 2, Mr. Turgeon says current therapies only have less than a 10 percent -- I think a 6 to 10 percent response rate.  That is a statement of belief, which I'll get to in a second.  But it's also not misleading.

If you look at the March 16th -- March 6, 2018 earnings call that plaintiffs cite to in their complaint at page 5 of that, the market was already aware that Pozi was in this class of TKIs and that it was comparing itself to other TKIs.  But I --

THE COURT:  Well, I think the issue here, counselor, that I see is that the statements seem to kind of ping pong between talking about specifically TKIs and then grouping the TKIs with other treatments.  And based on the allegations in

the complaint, it seemed like the most effective treatment was the TKI-plus. That's what I'm doing to call it, right? The TKI-plus, the other treatments. And so, that, I see as an issue. And so address that for me.

MR. LAWRENCE: First of all -- and Mr. Stein can correct me if I'm wrong, the allegation in the complaint is not that the most effective treatment is TKIs-plus. This 22.9 percent is not using TKIs. It's using an entirely different class of drugs. Also --

THE COURT: Gene therapy. The --

MR. LAWRENCE: Well -- no. Other -- a different class of drugs. I don't know what they're called. But -- and everybody who is on one of these treatments is on a set of -- is on a therapy --

THE COURT: Okay.

MR. LAWRENCE: -- right? No one's just -- this is important that these people are healed. No one's trying to do trials where you only give somebody one medication. Some of those patients are on a TKI in addition to therapies. Some of those patients are on whatever the drug is that is alleged to have the 22.9 percent response rate and other therapies.

And so --

THE COURT: All right.

MR. LAWRENCE: So they're -- I can't remember --

THE COURT: Taking your argument as true, right --

2:21-cv-01612-CDS-BNW

MR. LAWRENCE:  Yeah.

THE COURT:  -- that they're on this or that --

MR. LAWRENCE:  Yeah.

THE COURT:  -- and then you look at the various statements, if there isn't clarity as to what you're referring to when it comes to the numbers, could that be an issue?

MR. LAWRENCE:  I think there is clarity.  We can walk through them each individually.  We did one earlier.

This particular one, Exhibit 12, is one where I do not have something else in that same document making that clear but the two important points.  First of all, it was clear from the prior exhibit.

But this is where the Wochos case in our brief and the Omnicare case and the Supreme Court case are important.

He says I think a 6 to 10 percent response rate.  What Omnicare told us is an example of when -- when could an opinion be misleading.  Omnicare, the Supreme Court said -- here's your example.  An a TV executive says, "I think our TVs have the highest resolution on the market."  And a plaintiff then says, "Aha, that wasn't true because I've got data showing that some other TV company has a higher resolution."  And so therefore, that CEO's statement about "I believe our TVs have the highest resolution on the market" was false.

What the Supreme Court tells us in Omnicare is that's not how it works.  If the CEO of this TV company says, "I think

our TVs have the highest resolution on the market," the relevant question in looking at that particular statement is: Did that person, when he or she was saying that, actually think that their TVs had the highest resolution on the market?

And so for this one, for paragraph 74 of their complaint, Statement 2, that belief -- you can see he's answering a question and he is purposefully, I believe, adding this language to make clear "I don't have that data in front of me. Here's what I think." He's speaking a little more generally, again, in the context of what was said on the earlier calls.

And then when you look at Numbers 4 and 7 -- I think 7's the one we looked at where -- where -- no, sorry. Maybe we've talked about all of these now. Four was the one you asked me about during my opening argument, the TKIs and other therapies where I pointed our that, keep reading down the same paragraph and what he's saying is -- is when you look at TKIs in these other therapies -- I don't know if this was a mis-transcription or not, "in" for "and." It doesn't matter. It's the same idea. What he says later is TKIs in other therapies don't work because of the stasis. That's what he says later on in that same paragraph.

So there, in the same paragraph in the same document, it actually is clear that he's talking about TKIs, not about other drugs being used without TKIs.

My understanding, TKI is, like, the -- the base.  You start with a TKI and you layer on top of it.  Another drug that has 22.9 response rate, you start with that one and layer chemo and other therapies on top of it.

And so it is clear in Statement 4 from the language just below what plaintiffs cite, the part they cut off that he's talking about 6 to 8 percent rate in these TKI combined therapies.

And Statement 7 is the one we looked at earlier where he's answering a question at Statement 6.  Mr. Riga's answering a question -- sorry -- yes, it's Mr. Riga answering a question in Statement 6.  If you start down memory lane where we are in current available treatments is less than 10 percent.  If we look earlier in that same earnings call, what Mr. Riga had said earlier in that same earnings call is the median progression-free survival rate of TKIs is approximately two months with an overall response rate of less than 10 percent.  So it is, in each of these instances, in context to the reasonable investor, which is what we look at here, clear what is being compared.

THE COURT:  All right.  All right.  Let's move on to Statement 5.  This is the statement regarding "if I can get 20 to 30 response rate, I can get a drug approved."

So I'll hear -- well, let me ask plaintiff this question.  At the end of that paragraph, Turgeon -- I apologize

2:21-cv-01612-CDS-BNW

if I'm saying that incorrectly -- states, "That's exciting and promising."

And so when I was reviewing that statement all together, how is this not a forward-looking or corporate optimism statement?

MR. STEIN: Well, at the very end, I see -- okay. Sure, your Honor. Because -- because he goes on to talk about something else. Because what he's talking about when he says that's exciting and promising is these intermediate results that they've got from MD Anderson. So he's moved on.

What he says above and what we allege is false here is "I know, as a drug developer, if I can get a 20 to 30 percent response rate, I can get a drug approved." Nothing forward looking about that. He's saying what he knows in the moment. So that's to answer your question right out of the gate.

And I'm sorry to do this, but I'd like to just talk about Omnicare for two seconds about the resolution case and highest resolution.

What -- if our case were Omnicare and if we could keep that metaphor going about resolution and how that's parallel here, what we have that the plaintiffs in Omnicare didn't was we talked to the TV agency and the TV agency told us exactly what resolution is -- is expected. We know exactly what the statistics for resolution are. So we have these extra allegations that aren't present in Omnicare. I'll say that and

-2:21-cv-01612-CDS-BNW-

leave it.

And I can move on to discuss -- so that's the safe harbor for 20 to 30 percent.  If you have questions about falsity or scienter, I can launch into that.

THE COURT:  Well, I want to -- let me ask this question.  Are you done with Statement 5?  Are they connected to other statements?

MR. STEIN:  Statement 5 is all by itself.

THE COURT:  Okay.  All right.  Anything you would like to respond to in regards to Statement 5?

MR. LAWRENCE:  Yeah.  So on the forward-looking statement, what Mr. Stein made it not a forward-looking statement is there was a piece of it that was in the moment.

Now, look at the Wochos case from, I think, two years ago, Ninth Circuit, the Wochos v. Tesla case where it talks about forward-looking statements, what the Court said there is directly analogous to this and it directly responds to that argument.

The plaintiffs there said that a statement that the company was on track to meet its projections wasn't forward looking because, no, you're talking about -- you're saying right now, we're on track.  That means it's in the present.  And what the Ninth Circuit said was, no, every forward-looking statement is granted in the present, clearly, right?  Nobody's ever saying, five months from now, I might believe something

ten months from now.  Every forward-looking statement is grounded in what is known now and what do the people -- what does the speaker think about the goals, the products of the company in the future.

And so I absolutely agree with your Honor that -- that this statement talking about, you know, what I can get done as a drug developer is a forward-looking statement.  It's talking about here's what I believe now based on what I know about what I can get done in the future.

This statement is also -- is also a statement of opinion fully.  It starts off with -- Mr. Turgeon is -- is right down the street in Las Vegas.  He's giving a speech, a presentation and he says, "Let me tell you a story."  He said let me give you a perspective.  He's not -- he's not announcing some corporate news.  He's saying let me give you a perspective.  Let me give you my perspective.  And then he tells a story about "I was in Las Vegas just down the street, talked to a bunch of experts, and I said what do I need here? I know, as a drug developer, if I can get a 20 to 30 response rate, I can get a drug approved.  What do you guys think is a home run?"

I'd, first of all, say there, when he says, "I know that if I can get 20 to 30 percent -- if I can get 20 to 30 percent, I can get a drug approved," that's a statement of opinion.  He's saying -- he's saying what could happen.  He's

-2:21-cv-01612-CDS-BNW-

also not saying I would get a drug approved.  He's not saying what plaintiffs say he's saying here, which is I guarantee you if I hit 20 percent, there's approval.

He actually even asks these other experts:  What's a home run?  What does that even mean?  If you can get a drug approved at 20 percent, what is he asking by saying what's a home run?  They're saying is a home run, that's more.

So I just think, again, looking at this in the context of a reasonable investor, what a reasonable investor heard Mr. Turgeon telling this story about something that he heard from some experts in the past and -- and what he thinks the -- the potentials are for how you get a drug, a nameless drug approved in the future was not a forward-looking statement, a statement of opinion, and it is also, I think, pretty full of puffery.

THE COURT:  All right.  I want to keep moving to Statement 8.  And is that grouped with anything else?

MR. STEIN:  I hadn't addressed falsity and scienter on the last statement.

THE COURT:  Oh.  Go ahead, sir.  I'm sorry.  I apologize for interrupting you.

MR. STEIN:  That's okay.

You know, it doesn't -- and I am focusing on this "I know as a drug developer, I can get the 20 to 30 percent response rate, I can get it -- I can get a drug approved."

-2:21-cv-01612-CDS-BNW-

That portion of the statement is really the key portion and the portion that's alleged to be false.

A lot of times in these cases, we are trying to figure out what did he know at the time and trying to argue about what does this statement mean. Does this mean he knew it at the time? Is it present tense? Is it future looking? And it's a difficult analysis.

In this case, he just says "I know." He tells you what he knows. And it's -- he doesn't say "I think." So in our view, this is a pretty easy non-forward-looking statement.

As far as why is it false and why do they know that, it goes back to the statistics that are expected. You can't say that I know 20 to 30 percent is good enough when you know the statistics. And you know that 23 percent is the minimum bar just to meet existing therapies and you know that the FDA approval doesn't happen until 30 percent. So -- so it's the -- it's just the breadth of the range.

If he had said, "I know if I can get a 30 percent response rate, I can get a drug approved," we wouldn't have a problem with that because that would be true. But it's this pushing the range lower, too low, low enough that you know the statistics that you know in your head don't match up to it, that's what it makes it false. And scienter and falsity in this case go together.

THE COURT: All right. Now, focused on what he knew

and when he knew it, it -- is that the only allegation against Turgeon in terms of this kind of broader 20 to 30 percent statement?

MR. STEIN:  That's the only statement where he makes the 20 to 30 percent range, yes.

THE COURT:  Okay.  And his knowledge -- let me think about this.

MR. STEIN:  I think I know where you're going, your Honor.

On the same date -- oh, sorry.  Two weeks earlier, Statement 3, he says, "We know what the requirements are."  So he tells the investor --

THE COURT:  Oh.  It's him saying that?

MR. STEIN:  Yeah, that's him.  "We know what the requirements are.  We know the requirements are 20 to 30 percent."  What's a reasonable investor think?  They think 20 percent's good enough.  And we think it's pretty clearcut for this particular statement.

THE COURT:  Okay.

MR. LAWRENCE:  Can I respond to that, your Honor?

THE COURT:  Yes.

MR. LAWRENCE:  I don't agree that somebody saying two weeks earlier, "I know what the requirements are" and then -- and then two weeks later in a presentation in a different location saying "I know, as a drug developer, I can get" -- "if

I can get a 20 to 30 response rate, I can get a drug approved" is some admission that Mr. Turgeon was told by the FDA that he needed a 20 to 30 response rate for this drug.  That's not what he's saying at all.  Piecing together two statements 14 days apart, one of them saying something broad and general that I know what the requirements are -- I don't know what requirements he was talking about.  And then later saying this -- this general not -- not talking about Pozi.  He doesn't say "I know if I can get 20 to 30 percent for Pozi, I can get it approved."  He's not saying that.

This is also -- again -- your Honor, we're all supposed to, at the end, weigh competing inferences.  This doesn't make sense to me with this theory because what we know from plaintiff's complaint is that the MD Anderson had a 40 percent response rate and it was denied.  And so the implication was -- this just doesn't make sense.

And I'm also struck by the idea that it's baked into plaintiff's claims that just from a common sense perspective, that the FDA says, okay, our best available treatment for people without mutations on the market is 22.9 percent.  We're not going to approve any other drug for this horrible disease that -- that might have -- might help these people with these mutations that might have different side effects.  We're not going to -- we're not -- even if it's 23 percent, we're not going to approve it.  You better hit 30 percent or your drug to

help these people that are dying of cancer within months isn't going to be approved.

THE COURT: Well, I understand the argument that you're making. I think, though, that we're getting a little bit further down the road, right?

I think what they're focused on is kind of the -- I'll call it the commitment to investors as to what was known, when was it known, and how did that impact investing in a broader sense. So I appreciate your argument but -- yeah.

MR. LAWRENCE: Well, on that one --

THE COURT: Anything else you would like to add?

MR. LAWRENCE: I apologize.

THE COURT: No, no, you're fine.

MR. LAWRENCE: On that one, I really would just say if the statement in this paragraph that plaintiffs are pointing to is this "I know, as a drug developer, if I can get a 20 to 30 response rate, I can get a drug approved," that is a forward-looking opinion and it's also not false. The idea that a drug developer can get a drug approved at those percentages, again, this is -- the -- the word "Pozi" is not in that sentence. He's not saying that.

THE COURT: All right. Let's go ahead and move on to Statement 8.

MR. STEIN: Statement 8 -- yeah.

THE COURT: Is 8 connected to other statements?

2:21-cv-01612-CDS-BNW

MR. STEIN:  No.  Eight's by itself, your Honor.

THE COURT:  Okay.  This is November 8, 2018.  At the time, based on what I understand from the complaint, they had access to the MD Anderson results.  So --

MR. STEIN:  Right.

THE COURT:  -- why is this statement false and/or misleading?

MR. STEIN:  Okay.  So this -- I think, here, a timeline is helpful.  This is -- the breakthrough therapy designation -- they announce the final results.  Here's the ORR we got in MD Anderson, which is that single-center trial at MD Anderson, world class cancer institute, and they come out and say we got 43 percent ORR.  Three months later, they announce that that actually wasn't good enough for breakthrough therapy designation.  Stock drops almost 40 percent.

THE COURT:  So Spectrum announces that.

MR. STEIN:  Spectrum announces that.  That's one of our alleged drops.

THE COURT:  Okay.

MR. STEIN:  So there's this three month window between -- we know what the data is and we tell investors what the data is -- or tell investors what the results -- how the FDA viewed that data.  So 43 percent wasn't good enough.

Of course, when investors hear in September that 43 percent ORR is what was achieved, everyone's excited because

they think 6 to 8 percent was the existing therapies.  So 43 percent is announced, everyone thinks breakthrough therapy designation is a foregone conclusion, and then, nope, it wasn't good enough, and there's a 40 percent stock drop.

Now, this statement here takes place in that window when -- when defendants know that they got 43 percent and, according to them earlier, they know what the requirements are for breakthrough therapy designation.  So they know what the -- the results they got and they know the target and they know the results don't meet the target.  So they know that they haven't gotten breakthrough therapy designation.  They know that because, according to them, they know what the requirements are.  Not we think we know what the requirements are.  We know the requirements.

THE COURT:  So hold on.  Let's back up a little bit.

So for example, if I'm looking at Statement 2, current -- the current therapies have only less than 10 percent, are they talking about breakthrough designation or are they talking about approval?

MR. STEIN:  That's -- that's separate and apart from either.

THE COURT:  Okay.

MR. STEIN:  There's three levels.

THE COURT:  So then when you're talking about other statements connecting this to they know and that investors are

relying on those additional numbers, what statements are you referring to?

MR. STEIN:  Sure.  I should have been more clear.

So I just used the 6 to 10 percent statement to show that investors were excited.  The -- what defendants know, as of September 28th, because they announced it, is what ORR they got in the MD Anderson trial.

THE COURT:  Right.

MR. STEIN:  And they know they're submitting this to get breakthrough therapy designation.

THE COURT:  Right.

MR. STEIN:  Investors don't know what's happened yet. They don't announce how the FDA viewed that information until December.  And in the middle of these two, they say Poziotinib is showing indications of being substantially better than currently available treatments.  That's ultimately the criteria.

So substantially better is the breakthrough therapy designation criteria.  That's the standard for breakthrough therapy.  So what they're saying with this statement is the 43 percent is good enough to get breakthrough therapy designation.  That's -- that's what this is saying.  Poziotinib is showing indications of being able to get breakthrough therapy designation.

But if they know what the requirements are and those

2:21-cv-01612-CDS-BNW

requirements do go in the -- into the statistics that are expected, then -- then they know that they've failed.  So this is a false statement because they're showing optimism when they have no basis for optimism.

THE COURT:  Right.  And where is that -- your argument pled in the complaint?

MR. STEIN:  Where --

THE COURT:  So you have the statement, but what are you connected to it?

MR. STEIN:  Sure.  Let me see.  It is 79-C, your Honor.

THE COURT:  79-C?

MR. STEIN:  The ready access to data from the unmasked MD Anderson trial.  That's a basis for -- it's misleading because they misrepresented --

(Court reporter interruption.)

MR. STEIN:  "Defendants failed to disclose that the data compiled and available to them throughout the trial demonstrated an ORR well below expectations."

THE COURT:  Okay.  I'm going to be candid with you. That is really unclear to me because when I read the complaint, it reads to me like 43 percent was really -- a really great ORR.  And they achieved that.  And then here, you're saying the data available to them, it fell below expectations.

And so I think I'm following your argument, but I'm

—2:21-cv-01612-CDS-BNW—

going to be candid with you:  It's not clear in the complaint.

Instead, the way it reads -- and I think part of this goes back to my earlier comment about the timeline as to who knew what exactly when.  This is confusing because, to me, I read it and I'm like, well, the MD Anderson results were really good and so how was it below the demonstrated ORR and what was the ORR and what did the FDA tell them was needed and how did it not meet that.  So that's my concern.

MR. STEIN:  Sure.  So while in the complaint we do state what the levels are for those other two important statistics, existing therapies, FDA approval line, you're right, we don't allege the line for BTD designation. Defendants never disclosed it.  But they tell us over and over again they know what they are.

And they might have been excited about 43 percent because maybe that means they can get FDA approval, but if they were telling the truth when they said they know what the statistics are and we know what the requirements are, then they know that that 43 percent wasn't going to be good enough to meet the expectations for breakthrough therapy designation.

THE COURT:  And, perhaps, that's the inference that can be drawn, right?  But that isn't in the complaint.  And that is my concern.  If you're telling me I'm wrong and it's in the complaint, it's not clear to me.

MR. STEIN:  So when we say "well below expectations"

here, your Honor, we're talking about FDA expectations.  So --

THE COURT:  I understand that.  But in the complaint it doesn't say -- I'm going to give you an example.

All along, defendants were saying they knew what the standards were and even after achieving 43 percent, it didn't -- it didn't get approved.  So if they knew the standards and they knew they needed to be higher, that wasn't conveyed to investors.  I'm being very general and probably not articulating it very well as I sit here this morning.  But that is what I -- where things start to become less clear to me.  And I think that's a challenge.  And I think that's why we're sitting here today.

So I understand the argument that you're making.  It's just not clear to me in the complaint.

MR. STEIN:  Understood, your Honor.

You know, we think that this -- that this paragraph here, 79-C, clears the standard.  I understand your reservations, but we have kind of --

THE COURT:  So when you're saying the defendants failed to disclose the data, are you referring to the MD Anderson data or are you referring to the data as to what they knew what was required of them?  Or are you saying that what they had available to them -- right?  There's a couple different questions that --

MR. STEIN:  Sure.

THE COURT: -- are raised and when was that information conveyed to them, etc.

MR. STEIN: So these three subparagraphs, as we see from the top of paragraph 79, are talking about all the statements, 73 through 78, some of which we've dropped. And we're trying to, with that, see -- capture and explain all the statements in one.

So you're right that there's not specificity to the November 8th statement, but the -- the idea is the same. No matter where you look in time, in that chunk of time that's covered by the MD Anderson trial -- so earlier before they make this announcement, in September, they know -- we alleged originally. We've taken them out because -- because we didn't think there they're as strong as this one because, here, we can point to this September 28th disclosure of the actual ORR that was achieved.

What we had previously alleged was that they know the data all along because it's an open label trial. And so this subparagraph C is to address that entire time period. They know data all along, but since we've narrowed the statements, now we're talking about just this one time period. They know the data. They know the results. And the reason why they know the data and the -- and the reason why we know that is because they announced the results.

So I understand that this could have been more geared

towards that November 8th statement, but we think, as a general statement, it's still hits -- it still hits what it needs to hit in order to get it through to discovery.

THE COURT:  And I appreciate that and I understand.

I'm going to be honest:  Some of these statements, I disagree with you, respectfully.  And it is that really interesting pleading requirement, right?  That exacting pleading requirement.  And so this is one of those statements where I'm like I understand but it's not there.

MR. STEIN:  Okay.

THE COURT:  So -- okay.  I want to keep going because it's almost -- we're almost here -- we're rolling up on two hours, so I'm going to give my staff a break shortly.

Let's move on to Statement 9.

MR. LAWRENCE:  Your Honor, I didn't respond to that one.  I don't --

THE COURT:  I don't think you need to.

MR. LAWRENCE:  I didn't think so.

THE COURT:  Yeah.

MR. LAWRENCE:  Okay.

THE COURT:  Let's move on to Statement 9.

MR. STEIN:  Okay.  Statement 9, I've paired with Statement 12.

THE COURT:  All right.

MR. STEIN:  And these are the statements -- call them

2:21-cv-01612-CDS-BNW

baseless optimistic statements.

So just to put us in place in time, we are now talking about the ZENITH20 trial which is the trial for FDA approval. Breakthrough therapy designation has been -- you know, their application for that has been rejected and so now we're moving forward with just the standard trial. It's much more patients. It's through cancer centers throughout the United States.

And so this is where defendants find out did we get that 43 percent because our drug is great or did we get that 43 percent because it was MD Anderson? And they -- they announce to investors in December of 2019 that their ORR for Cohort 1 was 15 percent. So they got their answer.

It shows that Pozi isn't even as good as existing therapies. It's a disaster. The stock price drops 60 percent in one day. And so we have that as kind of the close of the window when investors finally learn what's going on.

We have as the open of the window, March of 2019, and this is when defendants know the data from the Cohort 1 study. And we've alleged in the complaint how we get to that date, what they knew, and why it was available to them. And we know they had access to this trial because it was an open trial and because they reference over and over again having access to data.

So we -- we got the March 2019 date by -- we know the study's fully enrolled in January of 2019. So the very last

—2:21-cv-01612-CDS-BNW—

patient is enrolled.  Four weeks after that, we have a first scan where they measure the tumor to see if it has shown any improvement.  And then there's a second scan four weeks after that to measure the tumor again.  And if the tumor goes down at any point, Pozi is effective.  And if it doesn't, then Pozi's not effective.

And so we know that they had data not only because it's an open trial but because they reference early data.  Turgeon says, "I'm feeling pretty good about early data" when you look at that.  That's in May of 2018.

And I should say that ZENITH20 and MD Anderson were ongoing at the same time.  So ZENITH20 is going on in May of 2018.  And in August 9th of 2018, Riga says, "We've seen very strong early data in an area of high unmet need."

And then Lebel says, in May of 2020, ZENITH20 is an open trial.  He's talking about Cohort 5, as defense counsel stated in his opening remarks.  But he's defining here what an open trial means.  It's an open trial.  There will be regular looking at the data such that we'll be able to get some insight, gain some insight before we fully enroll.  So all of ZENITH20 is an open label trial, and Lebel, here, is responding to a question about Cohort 5, but he's saying what that means. We have access to that data.  They'll be regularly looking at it even before enrollment is complete.

And so we've conservatively set the date of access to

complete data as the date in which the final scan for the final patient has been completed.  So that's in -- that's in March of 2019.  The disclosure's in December of 2019.  So we have a nine month window where defendants know the data and investors don't.  And so that's where we get to these statements where they express optimism about the future of Pozi.

Riga, on August 8th, which is five months into this period, he's had the data for five months.

And to step back, this is -- this is important data. These patients -- these patients -- this is a terrible disease. They need -- I mean, most of them don't live a year.

THE COURT:  Right.

MR. STEIN:  And so it's not like you have five months and they're "I don't know if your cancer's growing or not." They know.

So five months into this period of having data, he says we feel really strongly about the data -- about the data readout in Q4.  He's talking about the disclosure that they're going to give in December of Q4.

So, you know, it's not forward looking if you don't believe it and if you have actual knowledge that it's -- that it's false.  Here, they have the data.  They have access to the data showing that there's no reason to be excited about the data readout in the Q4.

The second statement is similar.  Lebel is talking

about the distinctions between MD Anderson and the Cohort 1 study and he's saying that these changes that they've made should play in our favor. But he knows that the changes haven't played in their favor. He knows that they failed because now he's seven months into this time period where defendants have the data, the trial is open study.

So -- so it's just -- you can't -- I'll say it again. You can't make a forward-looking statement if you don't believe it. And you can't expect -- you can't express optimism if you don't believe it. And so that's why these reasons -- that's why these statements are false and that's why they're not puffery or subject to the safe harbor.

THE COURT: All right.

MR. STEIN: I'm sorry, your Honor. Can get one more statement on the record?

THE COURT: Sure.

MR. STEIN: Here's a statement that's not alleged to be false, but it was made -- we allege it in the scienter section. This is -- it's specific to ZENITH20 because this is a statement from Lebel on -- on February 28, 2019, which is after MD Anderson is closed. He says, "There" -- "There's an agreement, full understanding of what we need to meet." So they know what's required. They know the data. And -- and access to the data is enough.

In South Ferry, they say allegations made

2:21-cv-01612-CDS-BNW

independently satisfy the PSLRA where they are particular and suggest that the defendants had actual access to the data.

We also cite Alphabet. We find scienter even though plaintiff doesn't allege that they actually had access to this memo -- that they actually looked at the memo. All you have to allege is access. And that's a core operations argument. When it's really important information, as long as you have access, it's assumed you've looked at it.

Here, there's no more important information to Spectrum than the -- this data. It's existential. They only have two drugs and this is whether or not their drug is going to actually earn money for the company.

THE COURT: I'm sorry. Go back. You made the statement that it's very important information, as long as you have access, it's assumed you've looked at it.

Now, what were you relying on in making that argument or statement?

MR. STEIN: Sorry. Can you repeat that?

THE COURT: Sure. You said, "As long as you have access," referring to the data, "it's assumed that you've looked at it."

MR. STEIN: So it's a core operations argument, your Honor.

THE COURT: Oh, okay.

MR. STEIN: And there's core operations cases. I

—2:21-cv-01612-CDS-BNW—

cited to Alphabet and South Ferry.  And if it's important data and you have access, that's enough to establish scienter.

And then I just wanted to -- I forgot to mention the two additional -- just pile on top for scienter.  Here, we also have stock sales.  Turgeon makes stock sales in this same nine month window where they're making optimistic statements.  He sells nine percent of his shares.  Defendants point out that's not a huge amount.  It's the most he's ever made as CEO and it's in this period of time where he has access to data that inventors don't.

And also during this time period, they're running one of these ATM financings, the at-the-market financings where they're selling stock.  They need the stock price to be high.  And so they have a motive to make the statements and keep the stock price elevated.

THE COURT:  All right.

MR. LAWRENCE:  I'd like to start with the Alphabet case that Mr. Stein says means if you've got the access to data, you've looked at it.  The Alphabet case was a case about Google and -- and there was a memo, there was a specific memo -- I think it was called, like, the -- the bug memo.  It was about a bug in the software, a specific memo that was known before the complaint was filed, was discussed in the complaint. The CEO of Google read the memo.  That was alleged.

What was not alleged in the complaint specifically but

2:21-cv-01612-CDS-BNW

in the Alphabet case the plaintiff relied on was whether the CEO of Alphabet also saw the memorandum.  They didn't allege that the CEO of Alphabet, which is a holding company that holds all the different Google entities -- the plaintiffs there did not allege specifically that the CEO of Alphabet saw it.  And so there, the Court said -- looking at these theories, something that's very different than we're talking about here.

There, the Court said the CEO of Alphabet used to be the CEO of Google.  There are allegations in the complaint that he worked hand-in-hand daily with the CEO of Google on issues related to the issues in the bug memo and that -- and that, in fact, the two of them, the CEO of Alphabet who was not specifically alleged to have seen the memo and the CEO of Google, who was specifically alleged to have received that specific memo, actually worked together to try to address the issues raised in the memo.

And the Court there said something very different than what we're seeing here is -- so the guy -- the guy worked hand in hand with the guy that we know received this memo and he -- he worked with him even to address the problems in the memo, I'm going to go ahead and assume that his direct report on this existential issue to Google's and Alphabet's survival told him what was in the memo.

Here, we have no fact that anybody inside Spectrum knew any data other than the fact that it was a "open trial."

2:21-cv-01612-CDS-BNW

That's all we have.

THE COURT:  Well, they reference, right, data in various statements.

MR. LAWRENCE:  They do reference data in various statements.

THE COURT:  Right.

MR. LAWRENCE:  Speaking -- speaking -- I can't remember which prospectively -- speaking backwards, speaking about the past, Mr. Stein pointed out a specific quote that I want to turn to where one of the defendants said, "We feel really strongly the data readout in Q4."

So I want to find that in the -- do you recall which paragraph that was?  I'm sorry.

MR. STEIN:  It's in the complaint.

THE COURT:  Yeah.

MR. LAWRENCE:  So we can see this.  We could -- we can see this in the complaint itself.  What Mr. Riga is doing there, he's answering a question.  They're answering a question from a analyst about this new drug from Takeda.  He says, "Hey, have you guys seen this new Takeda drug?  What's the market going to look like?"  That's his question:  What is the market going to look like?

Mr. Riga responds, "We've looked at that data in detail."  There, he's talking about the Takeda data.  It looks like that study is starting.  He says, "I think our position,

we feel really strong about with the data readout in Q4 and is well ahead in the life cycle with Poziotinib." The "with" in that was excised from their opposition brief. It's in their complaint. He's saying, in response to a question about how this market is developing with this competitor and what their position is in that market, "I think our position, we feel really strong about the data readout in Q4 and is well ahead in the development lifecycle with Pozi."

And we know if we do turn to the exhibit to our motion to dismiss, which is Exhibit 19, that before we came to this question in this earnings call, Spectrum had told investors, "We are looking forward to the top line results of Cohort 1 in the fourth quarter of this year."

And so when you -- when you pull that quote out of context and take a word out of it, it looks like maybe he's saying, it's August. I'm looking forward to that December data. It's really good. When you look at it in context, what is he clearly saying is good question on Takeda. We feel where we are in the lifecycle -- remember, we've got a data readout in Q4. They don't have that. They're behind us. We feel really good about that in terms of "our position" is "well ahead in the development lifecycle of Pozi."

So every single one of these statements where they say one of our defendants said the word "data," it's, we feel really strongly about the past data. And there was really

strong past data.  Or it's things like this where they say -- I think it's the only one -- we feel really strong about data coming out in the future.  He's not saying I feel really strong about the contents of that data, as we know the data turned out not to be good.  Again, when you're weighing competing inferences about what somebody would say if they actually knew that, we'll come that.  But all he's saying is we're ahead in the lifecycle from them.  We feel good.  We've got a readout in Q4.  That's what that is.

And so this is not the Alphabet case.  It's really closer to the Zucco case, the Ninth Circuit case where the Court even, with confidential witnesses saying "I had this position at the company and I happen to know that these executives looked at this sort of data," the Ninth Circuit said that's not enough.  That was specific data at the company that confidential witnesses said these sorts of executives met about this sort of data.  The Ninth Circuit said that's not enough.

Here, we don't have specific data that somebody would have known other than plaintiffs using their calendar and saying, well, it was announced this date.  The cohort would have been fully enrolled by this date.  So eight weeks later is this date.  So therefore, because it's an open study on that date, there's some turmoil inside Spectrum where data is flowing into.

We don't even have that of -- of there being data in

the company.  And we don't have anything with a confidential witness or anybody saying that quote from Zucco from my presentation, there must be buttressed with particular facts about the access.  Not just he's the CEO, he had access to whatever is in the company.  You got to talk about specific facts buttressing the idea that there was actual access to data.

The Cohort 5 issue we talked about earlier where the -- where the -- where the speaker there said, as a result, we're going to get this data early.  What we saw when we looked at that exhibit was he's not talking about getting -- you know, data being available early because it being an open trial. What he's talking about there is data being available earlier than it otherwise would be because we don't need full enrollment for Cohort 5, which we know is not the case.

And I would like to briefly touch on the stock sales issue.

THE COURT:  Well, hold on because I think that goes more to scienter.

In terms of reviewing data and having access to data, can I say, well, they admitted to reviewing data in the past so it's a fair inference that they reviewed data going forward or, like, referencing later data?

MR. LAWRENCE:  I would say, first of all, no, it's not, because you have to plead with particularity what data was

2:21-cv-01612-CDS-BNW

known when.

But I would also say, before we even get to that question, there is no admission in here of anybody looking at inside data in the past. There's not some admission anywhere in here of Mr. Turgeon or Mr. Riga or Mr. Lebel or anybody saying on a conference call, I -- you know, I've looked at this data. We haven't shown it to you yet, but I've looked at data.

Every single time they say they've looked at data, they are talking about the same data that was announced to the market.

THE COURT: So that would be the MD Anderson data?

MR. LAWRENCE: It would be the MD Anderson data, yeah.

Or in this case, in paragraph 81, talking about what will happen in Q4, there, he's talking about -- about the future data that will be released for -- for the Zenith trial.

And there's even a case -- which case is this? There's a case just like this. I'll find it. But there's a case along these lines of, you know, what -- what data was actually reviewed when.

THE COURT: Okay. Anything you'd like to --

MR. LAWRENCE: Stock sales?

THE COURT: Let's hold on to stock sales.

MR. STEIN: Your Honor, it sounds like what we're doing a lot of here is we're now going back at the hearing and re -- so this isn't in the briefs. We're going back at the

hearing now and we're rereading statements and defendants are offering a competing interpretation of the statements.

I mean, we have -- first of all, this is alleged to be a false statement as well, that we feel really strong about the data readout in Q4. So if that's a -- if they're talking about forward, then it's false because they have no reason.

THE COURT: Right. Because they didn't have access to it? Right. They're saying but they didn't have the data but --

MR. STEIN: Yeah, right.

THE COURT: Right.

MR. STEIN: They're giving -- yeah, we feel strong about this data that's coming up in Q4. So if that's what they mean, it's false. If they mean the prior Q4, then now they're talking about reading data and just bolstering the fact that they have access to data, which they've said throughout. I mean, we -- it's not just before. They do say they have access to the MD Anderson trial data.

They also say, after the fact, with Cohort 5, which is in the same clinical trial, ZENITH20, which is open label, they say we're -- we will be regularly looking at the data before enrollment is complete. So we have defendants in this case admitting that they're looking at data.

And, you know, we can sit here all day and wonder what they really mean or what's the right --

2:21-cv-01612-CDS-BNW

THE COURT:  Right.

MR. STEIN:  -- you know.  But these are -- these are factual questions.  They're not appropriate for the pleadings stage.

THE COURT:  And that's part of the challenge and always kind of a challenge with these particular facts.

MR. LAWRENCE:  If I --

THE COURT:  Hold that thought.  I know you want to respond.  It's been a little over two hours and so I -- it's a good time for us to take a break.  So we're going to take about a 15 minute break and we're going to come back.  We'll continue -- we'll continue at that time.

(Recess taken from 12:13 p.m. to 12:30 p.m.)

THE COURT:  Before we continue with this hearing, I did have a question for plaintiffs.

Specifically, we've been talking about data broadly and FDA and what they knew, and when I reflected on the argument this morning and -- and the briefing, there is some confusion in my mind in terms of what is needed or what was known in terms of approval for breakthrough therapy versus approval generally.  And this kind of goes back to a question I had earlier -- I didn't articulate it, at least in my mind -- that it was pretty surprising that it didn't get approved when the MD Anderson results showed 23 percent.

So what was needed for approval for breakthrough

2:21-cv-01612-CDS-BNW

therapy?

MR. STEIN:  So your Honor, breakthrough therapy is different from FDA approval.

THE COURT:  Right.

MR. STEIN:  Breakthrough therapy -- you don't get approved if you get a good number at breakthrough therapy.  You just get fast tracked -- you still have to -- you still have to do your ZENITH20 trial.

THE COURT:  Okay.

MR. STEIN:  So it's not like you're -- you hit a certain number on breakthrough physical therapy and you're approved, you did so good.

THE COURT:  Right.

MR. STEIN:  You still have to do the multi-center trial.  It's just a smaller subset that you can put forth and be, like, this is a promising application for approval and so you should fast track consideration of our full -- of our complete trial, the ZENITH20 trial.

THE COURT:  But they didn't get fast tracked?

MR. STEIN:  They didn't get fast tracked, right.

THE COURT:  Right.  So what was needed to get fast tracked?

MR. STEIN:  We -- we know it's an ORR.  It's always ORR, right?  It's just efficacy.  That's what they're looking at at every stage.  And we know it's over 43 percent.

2:21-cv-01612-CDS-BNW

We don't have the exact value pled because the exact value isn't known publicly. They know it internally. We would need document production. You know, we're not mind-readers and, you know, we're not here to clear an insurmountable hurdle.

THE COURT: Right.

MR. STEIN: We do know the other two values. We know it's higher than 43 and we know it's higher than 30, obviously, because it's always higher than the FDA approval.

THE COURT: Okay. So two -- two things. One, here, in court today, for the first time, you kind of argue the either/or. Either they knew it and they misled the investors in terms of what was needed or they didn't know and then, therefore, the representation that they did was misleading or false. That wasn't really argued in the briefing. And I don't see that pled in the complaint.

MR. STEIN: Your Honor, it is pled in the complaint. We used those same statements as our scienter evidence. So we kept them as false statement -- when we're paring everything down, we decided to keep them in in the lead-up to the trial given the format of the hearing. They really are more scienter statements. They're the defendant's admitting over and over again that they know what the requirements are, they know what the statistics are.

And our complaint alleges that there's not much to

2:21-cv-01612-CDS-BNW

know.  That when you're talking about statistics, what is there to know other than the statistics to meet -- the statistics of existing therapies, the statistics that your clinical trials need to hit.  And this is -- of course, they know.  We think it's also common sense.  You don't just blindly go into an FDA trial not knowing what the standard is.

THE COURT:  Nor do you try and develop a drug if there isn't an attempt to fill a need, right?  If that need is met, why would you fill a drug?

MR. STEIN:  Right.  You need to know the landscape --

THE COURT:  Right.

MR. STEIN:  -- before you invest millions of dollars into producing a drug.

THE COURT:  But to me -- I mean, I'm sure everyone did their research on what my background is.  I was a criminal person.  The way I look at complaints is the same way I look at search warrants, right?  I was looking for probable cause. This is a different standard.  But often, sometimes, I would review search warrants and I would say this person knows the story but they're not conveying that story to me.  It's sometimes similar in complaints.  And I think that's where I'm getting stalled out here.

I understand the argument.  It was much clearer to me in court today, which is often why I like to have oral arguments because you all know the issues and you frame them

for me better, but it's not conveyed as clearly in the complaint.

And so there's -- there's the issue in terms of the data. I understand we don't know specifically what they knew. That makes sense to me. It also makes sense to me that either they knew it or they didn't. Like, it can't be both. So there's that.

That, to me is related to -- what I had if you were to see my personal notes in preparing for this hearing is timeline, timeline, timeline. You set forth a timeline, but it's not as clear to me as it could be. And so I'm spending time going back and forth, which defendant knew this when, and that then becomes an issue for scienter. If I'm saying that wrong, I apologize.

MR. STEIN: You nailed it.

THE COURT: You know, to specifically tying each defendant to scienter for purposes of pleading under the PSLRA.

And so I just don't think I need anymore argument when I sat back and processed what I've heard and what I've read today in preparing for this hearing. So I'm going to make some findings here on the record, and if you need clarity, you let me know. Bare with me as I am not going to issue a written order. The findings of fact and conclusions of law will be served by way of the transcript of this hearing.

So as the parties know, under Rule 8, plaintiff is

required to plead a short and plain statement of the claims showing the pleader is entitled to relief and dismissal is proper if the complaint lacks a cognizable legal theory or there are sufficient facts alleged under that theory.

However, here, because this is a securities case, things are a little bit different. There is the Rule 9 addition, if you will, which always and has always required that fraud be pled with particularity. In order for it to meet the Rule 9(b) standard, there has to be sufficient allegations constituting fraud so the defendant can prepare an adequate answer based on those allegations.

It's been stated over and over again, not only in the Ninth, but in the Supreme Court that particularity requires the who, the what, the where, the when, and the how. And then that was codified by Congress in 1995.

When it comes to securities litigation, there are three ways to establish falsity: One, a statement isn't actually believed; two, there's no reasonable basis for the belief; or three, the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy. And a plaintiff must plead specific facts to show how the statements at issue were false.

To be actionable, a statement must be false at the time it was made. And so as addressed here in Court, hindsight isn't enough to render a statement untrue.

2:21-cv-01612-CDS-BNW

In resolving a motion to dismiss, I only consider the well-pleaded allegations in the complaint. And I think during times during this morning's hearing, arguments have started to bleed into facts, which would be inappropriate. And so as I stated, we're going to stay within the motion to dismiss standard and that is how I'm resolving this motion today. Otherwise, I would convert this into one for motion for summary judgment. I'm not prepared to do that nor do I think it's appropriate given the information before the Court.

As I referenced before I began my oral pronouncement, I see a couple different issues.

The timeline, to me, whilst set forth, isn't wholly clear to the Court about who knew what when and that draw is connected directly to the fraud allegations. And then, of course, because that is related to scienter, it's related to that. And so they go together.

And so for that reason, I am granting the motion to dismiss, but I'm granting that motion to dismiss without prejudice and without -- and with leave to amend because I don't believe it would be futile to allow for amendment. I think that there are inferences that could be drawn, but hopefully, based on some of the questions I've asked during this hearing, you can kind of understand my concern when -- or what my concerns are in terms of inferences and if I'm allowed to do that and where in the complaint is that pled. And so I'm

going to allow you to amend the complaint.

Unlike other cases where I would make specific findings about allegations -- "I don't find this allegation to be false and misleading," or "I do find this statement falls under the safe harbor" -- I'm not going to do that here.  I'm going to just kind of generically grant this motion to dismiss, which is unlike how I would normally resolve these types of cases.

And the reason for that is the reason why I'm allowing amendment in that there is sufficient information before the Court demonstrating that amendment is appropriate.  But based on the arguments raised, it's just not clear to me for each identified statement whether or not I should classify them under the, I'll call them, exemption categories.

Do I think it's possible that some of the statements fall into corporate optimism or the safe harbor provisions?  I do.  But I'm not willing and I'm not ready to make that specific finding here in court today.  It's a little different than I would normally allow for.

So that is my decision, but I certainly want to have the parties -- any questions the parties might have answered.

This is defendant's motion.  Do you have questions?

MR. LAWRENCE:  No, your Honor.

THE COURT:  All right.  Plaintiffs?

MR. STEIN:  I think I understand your order, your

———2:21-cv-01612-CDS-BNW———

Honor.

THE COURT:  Yeah, I mean, I'll be honest.  In terms of pleading, you know, this is the false statement, this is how we knew it, this is who knew it, this is when they knew it.

MR. STEIN:  We can do that, your Honor.

I'm struggling with -- if there's a -- if there's a finding from the Court about the sufficiency of defendants coming out and saying we know what the requirements are and we know the statistics that are expected, whether or not that's in it -- if that's insufficient or if that's your finding, that would be helpful to know.

To us, that seems pretty straightforward and pretty clearcut when defendants are telling you right early in the class period in May and in August that they know what's required.  It's -- it seems like a pretty clearcut admission from defendants.

And I understand the issue with the timeline and we're happy to re-write the complaint in a way that's understanding -- more understandable and to -- to your Honor's preferences.  But I guess I just wanted to put that on the record.

THE COURT:  Well, I want to make sure that -- it's not just my preference, right?  It's that exacting standard of the who, the how, the what exactly is met.

And I think that sometimes your -- not sometimes -- in some of the arguments here this morning, you're drawing

inferences that aren't clear from the complaint it itself.  And so it isn't, for me, a preference so much as making sure that standard is met because if not, it's makes it that much more difficult for me to evaluate these cases, right?  Kind of, it's the whole filling in the story as you know it and it makes sense to you to make it make sense to me and then, certainly, to make sure that I am compliant with that very stringent pleading standard set forth by Congress.

So I want to make sure I understand your question correctly.  It's your concern that arguing in the alterative, either they knew or they didn't, isn't enough?  I'm sorry.  I want to make sure I understand what your question is.

MR. STEIN:  My question is just about -- I just want to be clear that you're not -- you haven't made a determination today about whether or not it's enough to -- to establish defendant's knowledge.  And we can make it clear timeline-wise, but the statement from defendants themselves saying that we know the requirements and we know the statistics --

THE COURT:  Whoa.  Whoa.  You want to know whether or not I am making a determination that that alone is sufficient or insufficient?

MR. STEIN:  Correct.

THE COURT:  I'm not prepared to make that determination here today.  And that goes back to my timeline, timeline, timeline, because I think that is relevant and,

perhaps, some inferences that were argued here today could make that determination go one way or the other.

MR. STEIN:  Understood.

THE COURT:  I have one more question, because I didn't go really into scienter.  One second here.

While I think about that, let me also say this.  There were some requests for judicial notice.  I'm going to deny that as moot because I'm going to allow you to amend the complaint. It kind of moots that request.  I'll leave that be and then I can address any future requests going forward.

I'll make this observation that some of the documents that were requested as -- to be judicially noticed were referenced in the complaint and then there was objections to those documents being judicially noticed, I think, as being overbroad, the request being overbroad.  But it wasn't clear from the response which ones, if any, you weren't objecting to.

And so going forward, if there's going to be a request for judicial notice, I would ask that you all meet and confer as to what there is or is not objections to for the purposes of judicial notice.  And then if there's specific objections to make sure that that is brought to the Court's attention so I can address those accordingly.

I did have -- initially, I was going to ask some questions about the -- the SOX certifications, if you will, when it comes to scienter, but I don't think I need to ask them

2:21-cv-01612-CDS-BNW

because I'm allowing you to amend the complaint.  That might resolve itself.  So I'm going to let that lie.

All right.  Anything else or any other questions?

MR. STEIN:  I'm not sure if it's okay with defense counsel or not, but would it be okay with your Honor if we meet and confer with them and submit a proposed briefing schedule for the amended complaint?

THE COURT:  That's no problem with me.

MR. LAWRENCE:  That's my -- same question was timing.

THE COURT:  All right.  Wonderful.  Then go ahead and submit that and I'll get that -- I have no doubt I won't have any issue with it.  If I do, you'll know.  But otherwise, we'll get that docketed and then we can proceed accordingly.  All right?

Thank you all very much.  Really interesting argument and I appreciate the preparation.  And I'll reiterate my appreciation on the meet and confer.

I know some of you all traveled here so safe travels with the weird weather we're having in Vegas.  Or, perhaps, you're going to stay and enjoy the game.  Either way, be safe.  Take care.

(The proceedings concluded at 12:50 p.m.)

* * *

2:21-cv-01612-CDS-BNW

--o0o--

COURT REPORTER'S CERTIFICATE


I, SAMANTHA N. MCNETT, Official Court Reporter, United States District Court, District of Nevada, Las Vegas, Nevada certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


Date:  March 27, 2024


                              /s/ Samantha N. McNett
                              Samantha McNett, RMR, CRR, CCR