# Exhibit E

Statements Alleged to be Fraudulent

*Edwards v. McDermott Int'l, Inc.*, No. 4:18-cv-04330
(S.D. Tex. Nov. 23, 2021), ECF 222-1

**Appendix A: Statements Alleged to Be Fraudulent[1]**

| SC ¶ | Date | Source | Challenged Statement | Reasons Not Actionable |
|---|---|---|---|---|
| 8 | 9/20/19 | Press Release | "McDermott International, Inc. (NYSE: MDR) today announced it *recently received unsolicited approaches to acquire all or part of Lummus Technology*, McDermott's industry-leading technology business, with valuation exceeding $2.5 billion. *Based on the receipt of these approaches, McDermott is exploring strategic alternatives to unlock the value of Lummus Technology while maintaining the strategic rationale of engineering, procurement and construction (EPC) pull-through*." | • No False Statement of Fact |
| 8 | 9/20/19 | Press Release | "Separately, McDermott's previously announced processes to sell the remaining portion of its pipe fabrication business and its industrial storage tank business are ongoing." | • No False Statement of Fact |
| 8 | 9/20/19 | Press Release | "'Lummus is an excellent business, with incredibly impressive employees, that has earned a reputation for expertise, innovation, and reliability in the refining and petrochemical industries,' said David Dickson, President and Chief Executive Officer of McDermott. '*The process of exploring strategic alternatives is part of our ongoing efforts intended to improve McDermott's capital structure, and we plan to use the proceeds from any transaction involving Lummus Technology to strengthen our balance sheet. While Lummus is an important business within McDermott, we have decided to undertake a process to fully realize its strategic and financial value.*'" | • No False Statement of Fact<br>• Puffery<br>• Forward-Looking Statement |

---

[1] Bolding and italics are as they appear in the Supplement to the CCAC.  This chart adds surrounding context to the excerpted Challenged Statements.

| SC ¶ | Date | Source | Challenged Statement | Reasons Not Actionable |
|---|---|---|---|---|
| 10(a) | 10/21/19 | Press Release | "McDermott International, Inc. (NYSE: MDR) (collectively with its subsidiaries, the Company") today announced it has entered into an agreement ("Agreement") with certain of its secured lenders ("the Lenders") under which the Company will have access to up to $1.7 billion of additional financing, including letter of credit capacity. Under the terms of the Agreement, McDermott will have immediate access to $650 million of financing comprised of $550 million under a term loan facility and $100 million under a letter of credit facility, before reduction for related transaction fees and expenses." | • No False Statement of Fact |
| 10(a) | 10/21/19 | Press Release | "*[McDermott] expects to utilize the amounts available under the Agreement to finance working capital and support the issuance of required performance guarantees on new projects*." | • No False Statement of Fact<br><br>• Forward-Looking Statement<br><br>• Opinion |
| 10(a) | 10/21/19 | Press Release | "*McDermott continues to pursue the previously announced strategic alternatives process for Lummus Technology and the sale process for the remaining portion of the pipe fabrication business*. McDermott has decided to terminate its previously announced sale process for its industrial storage tank business." | • No False Statement of Fact |
| 10(a) | 10/21/19 | Press Release | "New facility underscores strong lender support for McDermott" | • No False Statement of Fact<br><br>• Puffery |

| SC ¶ | Date | Source | Challenged Statement | Reasons Not Actionable |
|---|---|---|---|---|
| 10(a) | 10/21/19 | Press Release | "'***This new credit agreement is a continued signal from our lenders that they support McDermott, our underlying business, growth strategy and ability to achieve a long-term balance sheet solution***,' said David Dickson, President and Chief Executive Officer of McDermott. '***The Agreement provides near-term liquidity for the Company to manage working capital and provide performance guarantees on expected new awards.*** We remain focused on serving our customers' needs, supporting our dedicated employees, and maintaining our valued relationships with our subcontractors, suppliers, and other business counterparties, all as part of our efforts to enhance our position as a premier, fully integrated provider of technology, engineering, and construction solutions to the energy industry.'" | • No False Statement of Fact<br>• Puffery<br>• Forward-Looking Statement |
| 10(b) | 10/21/19 | 8-K | "On October 21, 2019, McDermott, as a guarantor, entered into a new superpriority senior secured credit agreement (the "Superpriority Credit Agreement") with MTA, MTUS and MTBV, as co-borrowers (collectively, the "Borrowers"), a syndicate of lenders and letter of credit issuers, Barclays Bank PLC, as administrative agent for the New Term Facility (as defined below), and Crédit Agricole Corporate and Investment Bank, as administrative agent for the New LC Facility (as defined below). ***Proceeds of the loans under the New Term Facility are to be used for general corporate purposes*** and to pay fees and expenses in connection with the Superpriority Credit Agreement and related transactions." | • No False Statement of Fact<br>• Forward-Looking Statement |

3

| SC ¶ | Date | Source | Challenged Statement | Reasons Not Actionable |
|---|---|---|---|---|
| 10(b) | 10/21/19 | 8-K | As a result of the uncertainty described above and our ongoing minimum liquidity requirements, *we proactively engaged legal and financial advisors to evaluate our financial position and to address our liquidity concerns. As a result of this evaluation, we determined to enter into the Credit Agreement Amendment and LC Agreement Amendment, as well as the Superpriority Credit Agreement*, each as described in this report, *which we believe will address our liquidity concerns in the near term and allow us to continue to evaluate all potential long-term solutions to our liquidity needs.* However, we can provide no assurance that we will meet all the conditions and other requirements to receiving the access to the additional capital from Tranches B through D under the Superpriority Credit Agreement, and our inability to obtain this capital or execute an alternative solution to our liquidity needs could have a material adverse effect on our securityholders. | • No False Statement of Fact<br><br>• Forward-Looking Statement<br><br>• Opinion |
| 11(a) | 11/4/19 | Press Release | *"Continuing collaborative effort with lenders and noteholders to achieve a long-term balance sheet solution"* | • No False Statement of Fact<br><br>• Puffery<br><br>• Forward-Looking Statement<br><br>• Opinion |
| 11(a) | 11/4/19 | Press Release | "*We continue to pursue the previously announced strategic alternative process for our Lummus Technology business and the sale process for the remaining portion of our pipe fabrication business.* As previously announced, we decided to terminate the sale process for our industrial storage tank business." | • No False Statement of Fact |

| SC ¶ | Date | Source | Challenged Statement | Reasons Not Actionable |
|---|---|---|---|---|
| 11(a) | 11/4/19 | Press Release | "We elected to enter into the 30-day grace period with respect to a November 1, 2019 interest payment on our 10.625% senior notes due in 2024 in order to *continue collaborative discussions with our lenders and noteholders to find a long-term balance sheet solution*." | • No False Statement of Fact<br>• Puffery<br>• Forward-Looking Statement<br>• Opinion |
| 11(a) | 11/4/19 | Press Release | "David Dickson, President and Chief Executive Officer of McDermott, said: 'We experienced continued strong backlog, with several significant customer project awards, including the Ichthys Phase 2a Gas Field Development Project in Australia, which we developed in conjunction with our integrated subsea-solutions partner, Baker Hughes, as well as a large LNG tank project on the U.S. Gulf Coast. We also achieved solid operating results in our MENA, Asia Pacific (APAC), Europe, Africa, Russia and Caspian (EARC) and Technology segments. At the same time, our capital structure continues to be pressured by certain legacy CB&I projects. *Our recently announced $1.7 billion financing agreement with our lenders signals their confidence in our underlying business. We continue working with them to achieve a long-term balance sheet solution as we remain focused on delivering value for our customers, employees, subcontractors, and suppliers.*'" | • No False Statement of Fact<br>• Puffery<br>• Forward-Looking Statement<br>• Opinion |
| 11(b) | 11/4/19 | 10-Q | "We *retained legal and financial advisors to help us evaluate strategic and capital structure alternatives*." | • No False Statement of Fact |
| 11(b) | 11/4/19 | 10-Q | "We *announced the commencement of a process to explore strategic alternatives for our Technology segment*." | • No False Statement of Fact |

| SC ¶ | Date | Source | Challenged Statement | Reasons Not Actionable |
|------|------|--------|----------------------|------------------------|
| 11(b) | 11/4/19 | 10-Q | "Although we believe that *these actions provide an opportunity for us to address our liquidity needs for the next 12 months and will allow us to continue to evaluate potential solutions to our liquidity needs*, as described in Note 12, Debt, the conditions to accessing the full funding and letter of credit availability under the Superpriority Credit Agreement have not been fully satisfied as of the date of this report, and we are in the early stages of seeking to obtain certain approvals from third parties that will be necessary to satisfy these conditions. In addition, the lenders may, in their sole discretion, decline to fund any applicable tranche under the Superpriority Credit Agreement, even if all conditions precedent to funding an applicable tranche have been met. As a result, we are unable to conclude that the satisfaction of those conditions is probable, as defined under applicable accounting standards. Accordingly, because we can provide no assurance that we will meet all the conditions to access the additional capital under the Superpriority Credit Agreement or that the lenders will lend the additional capital, and our inability to obtain this capital or execute an alternative solution to our liquidity needs could have a material adverse effect on our security holders, there is a substantial doubt regarding our ability to continue as a going concern. We believe that our satisfaction of these conditions, including receipt of all necessary approvals and successful negotiation." | • No False Statement of Fact<br><br>• Forward-Looking Statement<br><br>• Opinion |

6

| SC ¶ | Date | Source | Challenged Statement | Reasons Not Actionable |
|---|---|---|---|---|
| 12 | 12/2/19 | Press Release | "The Company *expects to utilize the amounts available under Tranche B to continue financing working capital and support the issuance of required performance guarantees on new projects*. McDermott also announced that it has entered into a forbearance agreement with holders of over 35% of McDermott's 10.625% senior notes due 2024 (the "2024 Notes"). Under the terms of the forbearance agreement, the applicable holders of the 2024 Notes have agreed to forbear from exercising any rights related to the interest payment due on November 1, 2019, subject to certain conditions. The forbearance period extends through January 15, 2020 and may be extended further by a majority of the holders party to the forbearance agreement. McDermott is in discussions with additional holders of the 2024 Notes and anticipates that additional holders may execute the forbearance agreement in the coming days. The *Tranche B funding is expected to allow McDermott to continue collaborative discussions regarding a long-term balance sheet solution.* In connection with the Tranche B funding, the required lenders have agreed to amendments to the Agreement that would waive certain conditions and modify cross-default provisions in order to facilitate the Tranche B funding. *McDermott continues to pursue the previously announced strategic alternatives process for Lummus Technology.*" | • No False Statement of Fact<br><br>• Forward-Looking Statement<br><br>• Opinion |
| 13 | 12/13/19 | 8-K | "As required by the NYSE, McDermott is notifying the NYSE of its intent to cure the deficiency and return to compliance with the NYSE's continued listing requirements." | • No False Statement of Fact |
| 14 | 1/15/20 | 8-K | "The Credit Agreement Amendment…amends the Letter of Credit Agreement to *allow ordinary course auto-renewals of credit despite any acceleration, bankruptcy, or other event of default*." | • No False Statement of Fact |

| SC ¶ | Date | Source | Challenged Statement | Reasons Not Actionable |
|---|---|---|---|---|
| 14 | 1/15/20 | 8-K | "At 11:59 p.m. (New York City time) on January 15, 2020, the forbearance deadline under the Forbearance Agreement, dated December 1, 2019, by and among McDermott, MTA, MTUS, certain subsidiaries of McDermott and an ad hoc group (the "Ad Hoc Group") of holders of approximately 35% of MTA's and MTUS' 10.625% Senior Notes due 2024 (the "Senior Notes") will expire. As a result, the Ad Hoc Group will no longer be obligated to forbear from the exercise of certain rights and remedies they have under the indenture governing the Senior Notes as a result of McDermott's failure to make an interest payment of approximately $69 million, which was due on November 1, 2019. ***Despite the expiration of the forbearance deadline, McDermott continues to engage in constructive conversations with holders of the Senior Notes.***" | • No False Statement of Fact<br><br>• Puffery<br><br>• Opinion |

**Appendix B: Statements Paraphrased in the Supplemental Complaint[1]**

| SC ¶ | Ex. # | Date | Source | SC's Paraphrasing | Actual Statement |
|---|---|---|---|---|---|
| 7 | 17 | 9/20/19 | Press Release | Defendants…falsely reassure[ed] analysts and investors that McDermott continued to be stable and that the Lummus technology business could be sold to generate sufficient capital to correct liquidity issues and avoid bankruptcy…. | McDermott International, Inc. (NYSE: MDR) today announced it recently received unsolicited approaches to acquire all or part of Lummus Technology, McDermott's industry-leading technology business, with valuation exceeding $2.5 billion.  Based on the receipt of these approaches, McDermott is exploring strategic alternatives to unlock the value of Lummus Technology while maintaining the strategic rationale of engineering, procurement and construction (EPC) pull-through._____"Lummus is an excellent business, with incredibly impressive employees, that has earned a reputation for expertise, innovation, and reliability in the refining and petrochemical industries," said David Dickson, President and Chief Executive Officer of McDermott. "The process of exploring strategic alternatives is part of our ongoing efforts intended to improve McDermott's capital structure, and we plan to use the proceeds from any transaction involving Lummus Technology to strengthen our balance sheet. While Lummus is an important business within McDermott, we have decided to undertake a process to fully realize its strategic and financial value." |

---

[1] Bolding and italics are as they appear in the Supplement to the CCAC.

| SC ¶ | Ex. # | Date | Source | SC's Paraphrasing | Actual Statement |
|---|---|---|---|---|---|
| 10(b) | 13 | 10/21/19 | 8-K<br><br>Press Release | The 10/21/2019 Form 8-K mischaracterized these funding terms as permitting McDermott to devise long-term liquidity solutions while securing best value for Lummus through a non-bankruptcy sale, while concealing their true purpose as bridge financing to fund operations into a prepackaged bankruptcy…. | **8-K**: On October 21, 2019, McDermott, as a guarantor, entered into a new superpriority senior secured credit agreement (the "Superpriority Credit Agreement") with MTA, MTUS and MTBV, as co-borrowers (collectively, the "Borrowers"), a syndicate of lenders and letter of credit issuers, Barclays Bank PLC, as administrative agent for the New Term Facility (as defined below), and Crédit Agricole Corporate and Investment Bank, as administrative agent for the New LC Facility (as defined below). Proceeds of the loans under the New Term Facility are to be used for general corporate purposes and to pay fees and expenses in connection with the Superpriority Credit Agreement and related transactions.<br><br>…<br><br>**Press Release**: The Company expects to utilize the amounts available under the Agreement to finance working capital and support the issuance of required performance guarantees on new projects.<br><br>"This new credit agreement is a continued signal from our lenders that they support McDermott, our underlying business, growth strategy and ability to achieve a long-term balance sheet solution," said David Dickson, President and Chief Executive Officer of McDermott. "The |

2

| SC ¶ | Ex. # | Date | Source | SC's Paraphrasing | Actual Statement |
|---|---|---|---|---|---|
| | | | | | Agreement provides near-term liquidity for the Company to manage working capital and provide performance guarantees on expected new awards. We remain focused on serving our customers' needs, supporting our dedicated employees and maintaining our valued relationships with our subcontractors, suppliers and other business counterparties, all as part of our efforts to enhance our position as a premier, fully integrated provider of technology, engineering and construction solutions to the energy industry." |
| 11(a) | 18 | 11/4/19 | 8-K | In November 2019, Defendants made further materially false and misleading public statements, as set forth below, regarding McDermott's purported ability to find long-term capital structure and liquidity solutions outside of bankruptcy, given the $1.7 billion in new financing obtained the month prior. Defendants' statements intentionally continued the misimpression that this financing would stave off McDermott's potential bankruptcy by enhancing its liquidity, rather than serving only to permit a prepackaged bankruptcy to be | **McDermott Reports Third Quarter 2019 Results**<br><br>Backlog remains strong at $20.1 billion, and revenue opportunity pipeline remains robust at $89.1 billion<br><br>Net loss for Q3 2019 driven by asset impairments and project charges<br><br>Continuing collaborative effort with lenders and noteholders to achieve a long-term balance sheet solution<br><br>HOUSTON – November 4, 2019 — McDermott International, Inc. (NYSE: MDR) today reported revenues of $2.1 billion, a net loss of $1.9 billion, or $(10.37) per diluted share, and an operating loss of $1.7 billion for the third quarter of 2019. The net loss was due primarily to non-cash |

| SC ¶ | Ex. # | Date | Source | SC's Paraphrasing | Actual Statement |
|---|---|---|---|---|---|
| | | | | filed.<br><br>…<br><br>McDermott issued a press release ("11/4/2019 Press Release")… reassuring analysts and investors that the newly obtained funding, $650 million of which had been accessed, was permitting McDermott to work with lenders on long-term, non-bankruptcy solutions to its capital structure and liquidity problems, stating that McDermott was *"[c]ontinuing collaborative effort with lenders and noteholders to achieve a long-term balance sheet solution"* and "[w]e elected to enter into the 30-day grace period with respect to a November 1, 2019 interest payment on our 10.625% senior notes due in 2024 in order to continue collaborative discussions with our lenders and noteholders to find a long-term balance sheet solution." The 11/4/4019 Press Release added, | accounting charges of $1.5 billion related to impairments of goodwill and intangible assets and $256 million of changes in project gross profit on specified projects identified in a covenant of our new Superpriority Credit Agreement.<br><br>Operationally, four of our five operating segments reported solid performance during the third quarter, led by the Middle East and North Africa (MENA), which reported operating income of $69 million and an operating margin of 13.3%, both sharply improved from the second quarter of 2019. Additionally, we reported backlog of $20.1 billion, new awards of $1.7 billion and a revenue opportunity pipeline of a near-record $89.1 billion for the third quarter of 2019.<br><br>David Dickson, President and Chief Executive Officer of McDermott, said: "We experienced continued strong backlog, with several significant customer project awards, including the Ichthys Phase 2a Gas Field Development Project in Australia, which we developed in conjunction with our integrated subsea-solutions partner, Baker Hughes, as well as a large LNG tank project on the U.S. Gulf Coast. We also achieved solid operating results in our MENA, Asia Pacific (APAC), Europe, Africa, Russia and Caspian (EARC) and Technology segments. At the same time, our capital structure continues to be |

4

| SC ¶ | Ex. # | Date | Source | SC's Paraphrasing | Actual Statement |
|---|---|---|---|---|---|
| | | | | "*We continue to pursue the previously announced strategic alternative process for our Lummus Technology business and the sale process for the remaining portion of our pipe fabrication business*." It also quoted Defendant Dickson as stating, "[O]ur capital structure continues to be pressured by certain legacy CB&I projects. *Our recently announced $1.7 billion financing agreement with our lenders signals their confidence in our underlying business. We continue working with them to achieve a long-term balance sheet solution as we remain focused on delivering value for our customers, employees, subcontractors, and suppliers*." | pressured by certain legacy CB&I projects. Our recently announced $1.7 billion financing agreement with our lenders signals their confidence in our underlying business. We continue working with them to achieve a long-term balance sheet solution as we remain focused on delivering value for our customers, employees, subcontractors, and suppliers." **Capital Structure and Liquidity** As announced on October 21, 2019, we have obtained a $1.7 billion financing agreement from certain of our first-lien lenders, of which $650 million has been accessed. We elected to enter into the 30-day grace period with respect to a November 1, 2019 interest payment on our 10.625% senior notes due in 2024 in order to continue collaborative discussions with our lenders and noteholders to find a long-term balance sheet solution. |
| 11(b) | 7 | 11/4/19 | 10-Q | In November 2019, Defendants made further materially false and misleading public statements, as set forth below, regarding McDermott's purported ability to find long-term capital structure and liquidity solutions | As a result of the uncertainty described above and our ongoing minimum liquidity requirements, we have taken the actions described below. • We retained legal and financial advisors to help us evaluate strategic and capital structure alternatives. |

| SC ¶ | Ex. # | Date | Source | SC's Paraphrasing | Actual Statement |
|---|---|---|---|---|---|
| | | | | outside of bankruptcy, given the $1.7 billion in new financing obtained the month prior. Defendants' statements intentionally continued the misimpression that this financing would stave off McDermott's potential bankruptcy by enhancing its liquidity, rather than serving only to permit a prepackaged bankruptcy to be filed.<br><br>…<br><br>That day, McDermott also filed a Form 10-Q with the SEC for Q3 2019 ("Q3 2019 10-Q"), SOX certified by Dickson and Spence, describing steps purportedly undertaken to address McDermott's capital structure and liquidity problems, including, *inter alia, "retain[ing] legal and financial advisors to help us evaluate strategic and capital structure alternatives*;" entering into the Superpriority Credit Agreement, Credit Agreement, and Letter of | • On October 21, 2019, we entered into a superpriority senior secured credit facility (the "Superpriority Credit Agreement") which provides for borrowings and letters of credit in an aggregate principal amount of $1.7 billion, consisting of (1) a $1.3 billion term loan facility (the "New Term Facility") and (2) a $400 million letter of credit facility (the "New LC Facility"). Upon the closing of the Superpriority Credit Agreement, we were provided access to $650 million of capital ("Tranche A"), comprised of $550 million under the New Term Facility, before reduction for related fees and expenses, and $100 million under the New LC Facility. Subject to satisfaction of certain conditions specified in the Superpriority Credit Agreement, including, in each case, approval of the lenders (in their discretion), a second tranche of $350 million of capital (comprised of $250 million under the New Term Facility and $100 million under the New LC Facility) ("Tranche B") will be made available between November 30, 2019 and December 31, 2019, a third tranche of $150 million under the New Term Facility ("Tranche C") will be made available between December 30, 2019 and March 31, 2020 and a fourth tranche of $550 million of capital (comprised of $350 million under the New |

| SC ¶ | Ex. # | Date | Source | SC's Paraphrasing | Actual Statement |
|---|---|---|---|---|---|
| | | | | Credit Agreement; appointing the Chief Transformation Officer; and "*announc[ing] the commencement of a process to explore strategic alternatives for our Technology segment*." The Q3 2019 10-Q stated that "*these actions provide an opportunity for us to address our liquidity needs for the next 12 months and will allow us to continue to evaluate potential solutions to our liquidity needs*." | Term Facility and $200 million under the New LC Facility) ("Tranche D") will be made available between January 31, 2020 and March 31, 2020. The New Term Facility and the New LC Facility are scheduled to mature on October 21, 2021.<br><br>• On October 21, 2019, we entered into the Credit Agreement Amendment and the LC Agreement Amendment (each as defined and described in Note 12, Debt), which, among other things, amended our leverage ratio, fixed charge coverage ratio and minimum liquidity covenant under the Credit Agreement for each fiscal quarter through December 31, 2021 and also modified certain affirmative covenants, negative covenants and events of default to, among other things, make changes to allow for the incurrence of indebtedness and pledge of assets under the Superpriority Credit Agreement.<br><br>• On October 21, 2019, we entered into a Consent and Waiver Agreement (as defined and described in Note 20, Redeemable Preferred Stock) with our preferred stockholders to enter into the Superpriority Credit Agreement, the Credit Agreement Amendment and the LC Agreement Amendment. |

7

| SC ¶ | Ex. # | Date | Source | SC's Paraphrasing | Actual Statement |
|---|---|---|---|---|---|
| | | | | | • Our applicable subsidiaries elected not to make the payment, when due, of approximately $69 million in interest due on their 10.625% senior notes due 2024 (the "2024 Notes") on November 1, 2019. As a result of the non-payment, a 30-day grace period following non-payment of the interest has commenced. During that grace period, we intend to continue discussions with representatives of holders of the 2024 Notes regarding the interest payment. The non-payment of the interest will not trigger an event of default under the Senior Notes Indenture unless the grace period expires without an agreed-upon resolution and the interest payment then remains unpaid. If such an event of default occurs, then the trustee under the Senior Notes Indenture or the holders of at least 25% in aggregate principal amount of the 2024 Notes may declare the principal of and accrued interest on the 2024 Notes to be immediately due and payable. In addition, such an event of default would result in cross defaults under the Superpriority Credit Agreement, the Credit Agreement and the Letter of Credit Agreement. The conditions precedent to funding of Tranche B include, among other things, the refinancing of at least 95% of the 2024 Notes with similar new |

8

| SC ¶ | Ex. # | Date | Source | SC's Paraphrasing | Actual Statement |
|------|-------|------|--------|-------------------|------------------|
|      |       |      |        |                   | senior notes which must have interest payable only by an increase in the principal amount, and which may be secured by a lien on the collateral securing obligations under the Superpriority Credit Agreement only on a basis junior to our obligations under the Superpriority Credit Agreement, the Credit Agreement and the Letter of Credit Agreement.<br><br>• We appointed a Chief Transformation Officer to report to McDermott's CEO and the Board of Directors of McDermott.<br><br>• We announced the commencement of a process to explore strategic alternatives for our Technology segment.<br><br>Although we believe that these actions provide an opportunity for us to address our liquidity needs for the next 12 months and will allow us to continue to evaluate potential solutions to our liquidity needs, as described in Note 12, Debt, the conditions to accessing the full funding and letter of credit availability under the Superpriority Credit Agreement have not been fully satisfied as of the date of this report, and we are in the early stages of seeking to obtain certain approvals from third parties that will be necessary to satisfy these conditions. In addition, the lenders may, in their sole discretion, decline to fund any applicable |

9

| SC ¶ | Ex. # | Date | Source | SC's Paraphrasing | Actual Statement |
|------|-------|------|--------|-------------------|------------------|
|      |       |      |        |                   | tranche under the Superpriority Credit Agreement, even if all conditions precedent to funding an applicable tranche have been met. As a result, we are unable to conclude that the satisfaction of those conditions is probable, as defined under applicable accounting standards. Accordingly, because we can provide no assurance that we will meet all the conditions to access the additional capital under the Superpriority Credit Agreement or that the lenders will lend the additional capital, and our inability to obtain this capital or execute an alternative solution to our liquidity needs could have a material adverse effect on our security holders, there is a substantial doubt regarding our ability to continue as a going concern. We believe that our satisfaction of these conditions, including receipt of all necessary approvals and successful negotiation. |