# Exhibit G

Alleged Omissions and Misleading Statements and Why
They Are Not Actionable

*Mahoney v. Found. Med., Inc.*, No. 1:17-cv-11394-LTS
(D. Mass. Feb. 20, 2018), ECF 28-1

**EXHIBIT 2[1]**

**ALLEGED OMISSIONS AND MISLEADING STATEMENTS AND WHY THEY ARE NOT ACTIONABLE**

| AC ¶ | Alleged Omission[2] | Why Omission Is Not Actionable[3] |
|---|---|---|
| 81; 105 | Defendants failed to disclose that Foundation's tests were not commercially successful, as: (a) the existence of "competitive noise" from other genomic tests on the market was negatively impacting the Company's clinical test volumes; (b) doctors opted for "gold standard" and hotspot tests that were less expensive and covered by both Medicare and private payors; (c) although Foundation's tests provided detailed information about various gene mutations they were not accompanied by available or recommended treatment options and, as a result, had little to no clinical utility; and (d) neither FoundationOne nor FoundationOne Heme qualified for or would actually receive, the broad Medicare coverage | No Duty To Disclose: <br>• Plaintiff has not alleged any particularized facts to support the allegation that "Foundation's tests were not commercially successful." *City of Bristol Pension Fund v. Vertex Pharm. Inc.*, 12 F. Supp. 3d 225, 238 (D. Mass. 2014) ("*Bristol*") (challenged statements not actionable because of "distinct lack of information as to *how* they were misleading"). <br>• Plaintiff has not alleged any particularized facts indicating that FMI's detailed clinical testing data and revenues were inaccurate. <br>• Defendants reported accurate data and facts and therefore do not have a duty to disparage FMI's position in the market. *Guerra v. Teradyne, Inc.*, 2004 WL 1467065, at *10 (D. Mass. Jan. 16, 2004) ("*Guerra*"). <br><br>Allegedly Omitted Information Disclosed: <br>• Defendants repeatedly disclosed that FMI faced competition from other genomic tests. Br.at 5, 10; *In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 155 (D. Mass. 2009) ("*Marblehead*") (dismissing Section 10(b) claim where omission of information alleged to have rendered its statements misleading was disclosed). <br>• Defendants repeatedly disclosed that physicians were accustomed to using other genomic tests and that it was challenging to change their behavior in order to get them to use the Tests. Br. at 1, 5. |

---

[1] Defendants incorporate by reference the arguments set forth in the Memorandum of Law in Support of Defendants' Motion to Dismiss the Class Action Complaint ("Br."). "Test" or "Tests" as used herein refers to the defined term in the Br.

[2] Throughout the AC, Plaintiff identifies alleged misstatements and then alleges that those alleged misstatements are allegedly false and materially misleading due in part to the omissions identified in this column.

[3] In addition to the reasons set forth in this Exhibit, the alleged omissions identified herein fail to state a claim for securities fraud for the independent reason that Plaintiff has failed to allege facts that support a strong inference of scienter, and non-fraudulent inferences are far more cogent and compelling. *See* Br. at Section I.

| AC ¶ | Alleged Omission[2] | Why Omission Is Not Actionable[3] |
|---|---|---|
| | and reimbursement the Company led the market to believe it would.<br><br>Defendants, however, failed to disclose that Foundation's tests were not commercially successful due to several factors, including, the existence of "competitive noise" from other tests, which negatively impacted testing volumes, doctors selecting traditional gold standard and hotspot tests that were less expensive and covered by Medicare and private payors, and the lack of clinical utility of FoundationOne and FoundationOne Heme, which was a prerequisite to obtaining Medicare coverage and reimbursement. | • Defendants disclosed the steps that FMI was taking throughout the Class Period to demonstrate the clinical utility of the Tests.  Br. at 5.<br>• Defendants disclosed that the Tests did not have Medicare reimbursement and that FMI was trying to obtain Medicare reimbursement.  Br. at 7-9. |
| 83; 90 | Defendants continued to conceal the true extent to which competitive noise was negatively impacting the Company's clinical test volumes[.]<br><br>Defendants continued to conceal the true effects of competition from other molecular diagnostic tests[.] | No Duty To Disclose:  Plaintiff has not alleged any particularized facts indicating that FMI's detailed clinical testing data and revenues were inaccurate.  Defendants reported accurate data and facts and therefore do not have a duty to disparage FMI's position in the market.  *Guerra*, 2004 WL 1467065, at *10.<br><br>Allegedly Omitted Information Disclosed:  Defendants repeatedly disclosed that FMI faced competition from other genomic tests.  Br. at 5, 10 ; *Marblehead*, 639 F. Supp. 2d at 155. |
| 109; 129(h); 149(h); 167(h); 188(h); 206(i); | Defendants' failure to disclose the Company's true operational practices, results, and prospects and the actual impact being experienced due to community-based oncologists' rejection of FoundationOne and | No Actionable Omission of Item 303 Information:<br>• Plaintiff has not alleged any particularized facts showing that any trends or uncertainties existed beyond FMI's detailed disclosures of uncertainties and risks related to market traction and Medicare reimbursement.  Br. at 14-15 ; *see* 17 C.F.R. § 229.303.<br>• Plaintiff has not alleged any particularized facts showing that Defendants actually knew |

| AC ¶ | Alleged Omission[2] | Why Omission Is Not Actionable[3] |
|---|---|---|
| 227(i); 244(i); | FoundationOne Heme, competition from academic medical centers and other molecular diagnostic tests, an increasing refusal to order tests absent reimbursement, and the inability to achieve Medicare reimbursement for anything more than one of the tests' six clinical indications constitutes a violation of Item 303 and renders Defendants' Class Period SEC filings materially false and misleading.<br><br>[T]he Company's [SEC filing] was materially false and misleading because it failed to disclose (in violation of Item 303) materially adverse trends and conditions to investors[.] | about any undisclosed uncertainties or trends or their alleged material impact on FMI. Br. at 15; *see* 17 C.F.R. § 229.303. |
| 129(a); 149(a); 167(a); 188(a); 206(a); 227(a); 244(a) | FoundationOne and FoundationOne Heme did not have commercial demand[.] | No Duty To Disclose:  *See* reasons for ¶¶ 81, 105 *supra*.<br><br>Allegedly Omitted Information Disclosed:  *See* reasons for ¶¶ 81, 105 *supra*. |
| 129(b); 149(b); 167(b); 188(b); 206(b); 227(b); | FoundationOne and FoundationOne Heme lacked the clinical utility for community-based oncologists that existed with category one (the "gold standard") and/or category two ("hotspot") tests, which were a | No Duty To Disclose:<br>• Plaintiff has not alleged any particularized facts to support that allegation that the Tests lacked the clinical utility of competing tests.  *Bristol*, 12 F. Supp. 3d at 238.<br>• Plaintiff has not alleged any particularized facts indicating that Defendant's disclosures about the clinical utility of the Tests were inaccurate.<br>• Defendants reported accurate information concerning clinical utility and therefore do not |

| AC ¶ | Alleged Omission[2] | Why Omission Is Not Actionable[3] |
|---|---|---|
| 244(b). | fraction of the cost and readily reimbursable by non-governmental third party payors and Medicare[.] | have a duty to disparage FMI's products.  *Guerra*, 2004 WL 1467065, at *10.<br><br>Allegedly Omitted Information Disclosed:<br>• Defendants disclosed the steps that FMI was taking throughout the Class Period to demonstrate the clinical utility of the Tests.  Br. at 5; *Marblehead*, 639 F. Supp. 2d at 155.<br>• Defendants disclosed that FMI had not yet obtained Medicare reimbursement and the steps that FMI was taking throughout the Class Period to obtain reimbursement from Medicare and other third party payors by demonstrating clinical utility.  Br. at 7-9. |
| 129(c); 149(c); 167(c); 188(c); 206(c); 227(c); 244(c) | FoundationOne and FoundationOne Heme did not have validated clinical utility thereby providing community-based oncologists with less valuable and informative information for the treatment of their patients[.] | No Duty To Disclose:  *See* reasons for ¶¶ 129(b), 149(b), 167(b), 188(b), 206(b), 227(b), 244(b) *supra*.<br><br>Allegedly Omitted Information Disclosed:  *See* reasons for ¶¶ 129(b), 149(b), 167(b), 188(b), 206(b), 227(b), 244(b) *supra*. |
| 129(d); 149(d); 167(d); 188(d); 206(d); 227(d); 244(d) | Defendants were artificially boosting the Company's clinical test volumes to create the appearance of widespread adoption, market penetration, and growth by providing community-based oncologists, or their patients, with various undisclosed incentives, discounts, or inducements[.] | No Duty To Disclose:<br>• Plaintiff has not alleged any particularized facts to support that allegation that FMI's clinical test volumes were "boost[ed]."  *Bristol*, 12 F. Supp. 3d at 238.<br>• Plaintiff has not alleged any particularized facts indicating that FMI's detailed clinical testing data and revenues were inaccurate.<br>• Defendants reported accurate data and facts and therefore do not have a duty to disparage FMI's position in the market.  *Guerra*, 2004 WL 1467065, at *10.<br><br>Allegedly Omitted Information Disclosed:  Defendants disclosed FMI's sales, marketing and billing practices for the Tests.  Br. at 9-10; *Marblehead*, 639 F. Supp. at 155. |
| 129(e); 149(e); 167(e); 188(e); 206(e); | Defendants were overstating the average revenue per clinical test that, in reality, was approximately $1,400-$1,500 per test, substantially below the reported $3,400-$3,600[.] | Allegedly Omitted Information Disclosed:  Defendants disclosed average revenue per clinical Test and the method of calculation, including that average revenue per clinical test only included revenue that met FMI's revenue recognition criteria, and the reasoning behind its method.  Br. at 9-10; *Marblehead*, 639 F. Supp. at 155. |

| AC ¶ | Alleged Omission[2] | Why Omission Is Not Actionable[3] |
|---|---|---|
| 227(e); 244(e); *see also* 54 | Defendants were overstating the average revenue per clinical test that, in reality, was approximately $1,413 per test, substantially below the reported $3,400.<br><br>Defendants were overstating the average revenue per clinical test that, in reality, was approximately $1,401 per test, substantially below the reported $3,400. | |
| 129(f); 149(f); 167(f); 188(f); 206(f); 227(f); 244(f) | Defendants could not obtain 'broad' Medicare reimbursement approval for each of the six clinical indications for which FoundationOne and FoundationOne Heme were designed absent validated clinical utility, which did not exist. The most the Company could hope to achieve, if at all, was Medicare reimbursement approval for one of the six clinical indications pertaining to non-small cell lung cancer at a market price commensurate with that of competing hotspot tests, which would has indicated to investors the limited commercial viability of FoundationOne and FoundationOne Heme[.] | <u>No Duty To Disclose</u>:<br>• Plaintiff has not alleged any particularized facts to support the allegation that FMI "could not obtain 'broad' Medicare reimbursement." *Bristol*, 12 F. Supp. 3d at 238.<br>• Plaintiff has not alleged any particularized facts indicating that FMI's detailed disclosures regarding its efforts to obtain Medicare reimbursement were inaccurate.<br>• Where Defendants reported accurate information concerning the status of obtaining Medicare reimbursement, Defendants do not have a duty to disparage their efforts to obtain Medicare coverage. *Guerra*, 2004 WL 1467065, at *10.<br><br><u>Allegedly Omitted Information Disclosed</u>: Defendants disclosed that FMI had not yet obtained Medicare reimbursement and the steps that FMI was taking throughout the Class Period towards obtaining Medicare reimbursement, and repeatedly warned investors that it may never secure Medicare reimbursement. Br. at 6-7; *Marblehead*, 639 F. Supp. 2d at 155. |
| 129(g); 149(g); | Defendants gave investors the false impression of the widespread | <u>No Duty To Disclose</u>:<br>• FMI disclosed detailed data about its Tests, including the precise number of Tests |

| AC ¶ | Alleged Omission[2] | Why Omission Is Not Actionable[3] |
|---|---|---|
| 167(g); 188(g); 206(g); 227(g); 244(g) | adoption of FoundationOne and FoundationOne Heme by ceasing to report the actual number of ordering community-based physicians – maintaining throughout 2014 that it was simply 'more than 2,100' – and, in 2015, continuing to lead the market to believe that there was an increasing number of 'thousands' of community-based oncologists ordering the tests[.]  Defendants gave investors the false impression of the widespread adoption of FoundationOne and FoundationOne Heme by ceasing to report the actual number of ordering community-based physicians and reporting only that 'thousands' of community-based oncologists were ordering the tests[.] | reported to physicians during each period, and the percentage of the Tests reported to community-based physicians.  Br. at 9-10.<br><br>• The incremental information Plaintiff seeks is immaterial.  Merely revealing one fact about a product does not require disclosure of "all others that, too, would be interesting, market-wise." *Hill v. Gozani*, 638 F.3d 40, 57 (1st Cir. 2011). |
| 129(i); 149(i); 167(i); 188(i); 206(j); 227(j); 244(j) | [T]he SOX certifications executed by the Defendants included the misleading representation that the [SEC filing] did not contain untrue statements or material omissions, when in reality, Defendants knew but failed to disclose, or recklessly disregarded, that the Company's reported success and future prospects were predicated on artificially inflated clinical test volumes, growth, and associated revenue and a | <u>No Duty To Disclose</u>:  *See* reasons for ¶¶ 129(d), 149(d), 167(d), 188(d), 206(d), 227(d), 244(d) *supra*.<br><br><u>Allegedly Omitted Information Disclosed</u>:  *See* reasons for ¶¶ 129(d), 149(d), 167(d), 188(d), 206(d), 227(d), 244(d) *supra*. |

| AC ¶ | Alleged Omission[2] | Why Omission Is Not Actionable[3] |
|---|---|---|
| | false impression of the adoption of FoundationOne and FoundationOne Heme by an increasing number of community-based oncologists. | |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| **Fourth Quarter 2013 Financial Results** | | | |
| 110; *see also* 44 | Q4 2013 Press Release (February 25, 2014) | "Clinical adoption of FoundationOne steadily increased during 2013 and accelerated through the fourth quarter demonstrating the value of the molecular information we are delivering to oncologists and pathologists . . . We are also encouraged by the initial uptake of FoundationOne Heme . . . . The response from hematologists and oncologists indicates this product will be important in providing comprehensive genomic profiling for patients with hematologic malignancies, sarcomas and pediatric cancers." | • Not False/Misleading: Plaintiff has not challenged Defendants' accurate clinical Test data for 2013, nor has he challenged that this data reflected an increase in clinical Test volumes in 2013. *City of Bristol Pension Fund v. Vertex Pharm. Inc.*, 12 F. Supp. 3d 225, 238 (D. Mass. 2014) ("*Bristol*") (challenged statements not actionable because of "distinct lack of information as to how they were misleading"); *In re Biogen Sec. Litig.*, 193 F. Supp. 3d 5, 46 (D. Mass. 2016) ("*Biogen*") (noting that "absent from [plaintiff's] allegations are any *specific* facts" about Biogen's sales and concluding "vague (and largely conclusory) allegations" are insufficient) (emphasis in original). |

---

[4] This column lists the allegedly misleading statements identified in the Amended Complaint ("AC"). Quotation marks in this column indicate quotations from FMI's underlying disclosures that are quoted in the AC. Language in this column that is not identified by quotation marks is from the AC.

[5] For the Court's convenience, this column summarizes the reasons, as set forth in Defendants' Brief, why each alleged misstatement or portion of a statement is not actionable—*i.e.*, because (1) the statement is not adequately alleged to be false or misleading ("Not False/Misleading"); (2) the statement is forward-looking and therefore immunized by the PSLRA's safe harbor ("Forward-Looking"); (3) the statement is an immaterial, general expression of puffery or corporate optimism ("Inactionable Puffery"); and/or (4) the statement is an inactionable statement of opinion or belief ("Inactionable Opinion"). In addition to the reasons set forth in this Exhibit, the alleged misstatements identified herein fail to state a claim for securities fraud for the independent reason that Plaintiff has failed to allege facts that support a strong inference of scienter, and non-fraudulent inferences are far more cogent and compelling. *See* Br. at Section I.

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| | | | • Forward-Looking:  Br. Section II.B. <br> • Inactionable Puffery:  Br. Section II.C. |
| 111 | Q4 2013 Press Release (February 25, 2014) | FMI "expects to report between 22,000 and 25,000 clinical tests in 2014, driven by FoundationOne and FoundationOne Heme," and "anticipates 2014 revenue will be in the range of $52 to $58 million." | • Not False/Misleading:  Plaintiff has not alleged any particularized facts that Defendants did not have a reasonable basis for their forward-looking predictions of revenue and clinical Test volumes. *Bristol*, 12 F. Supp. 3d at 238. <br> • Forward-Looking:  Br. Section II.B. |
| 112 | Q4 2013 Earnings Call (February 25, 2014) | "We believe that [the] single test philosophy and comprehensive information based approach is enabling a paradigm shift in the treatment of virtually all types of solid and liquid tumors." | • Not False/Misleading:  Plaintiff has not alleged any particularized facts indicating that the "single test philosophy and comprehensive information based approach" was not enabling a "paradigm shift" at the time the statement was made, or that this opinion was objectively false or not subjectively believed when made. *Corban v. Sarepta Therapeutics, Inc.*, 2015 WL 1505693, at *6 (D. Mass. Mar. 31, 2015), *aff'd*, 868 F.3d 31 (1st Cir. 2017). <br> • Inactionable Opinion:  Br. Section II.D. |
| 112 | Q4 2013 Earnings Call (February 25, 2014) | "Our fourth quarter was very strong in terms of the commercial ramp with tests and revenue again growing at accelerated rates as compared to prior periods." | • Not False/Misleading:  Plaintiff has not alleged any particularized facts indicating that FMI's detailed clinical Test data and revenues were false when disclosed, or that FMI's clinical Test data and revenues did not grow in Q4 2013 as compared to prior periods. *Bristol*, 12 F. Supp. 3d at 238. <br> • Inactionable Puffery:  Br. Section II.C. |
| 113; *see also* 43, 44 | Q4 2013 Earnings Call (February 25, 2014) | "[O]ur commercial mix continues to demonstrate uptake in community practices as well in the academic medical centers as those categories grew in tandem, with community groups slightly outpacing the academic centers . . . 55% of our reported tests came from community-based practices in the fourth quarter."  Defendant Pellini | • Not False/Misleading:  Plaintiff has not alleged any particularized facts indicating that FMI's detailed clinical Test data and revenues were false or misleading when disclosed.  Plaintiff has not alleged any particularized facts indicating that physicians did not see value in FMI's approach, or that this did not |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| | | emphasized that the "fundamental driver" of this growth was "the value that ordering physicians see in our approach." | drive growth. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. |
| 114 | Q4 2013 Earnings Call (February 25, 2014) | "[W]e are now submitting claims . . . [and] we made the decision to begin submitting these claims primarily because the volume of our Medicare claims has grown substantially given our commercial growth . . . We expect that this will be a process that plays out over time." | • <u>Not False/Misleading</u>:  Plaintiff has not alleged any facts that FMI was not submitting claims to Medicare or that the number of FMI's Medicare claims had grown at the time these statements were made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br><br>• <u>Forward-Looking</u>:  Br. Section II.B. |
| 115; *see also* 68 | Q4 2013 Earnings Call (February 25, 2014) | "We submitted these claims using a miscellaneous code, non-stacked code, as we had originally done with the non-governmental commercial payers. In addition, because current coding -- the current coding landscape does not contain codes specific enough for tests that are as comprehensive and precise as FoundationOne and FoundationOne Heme, we have submitted an application on the McKesson diagnostics exchange to establish unique [z-code] identifiers for these two assays. In its current form, this system will map z-code identifiers to FoundationOne and FoundationOne Heme. The z-code identifiers has already been adopted by Palmetto as part of the MolDX program that determines coverage in payment for Medicare in 17 states. While Massachusetts is not yet one of those states, the MolDX program is expected by many to be adopted broadly by other Medicare administrative contractors and by US commercial payers. While it is possible that other CPT coding options may become available for generic NGS type tests, it would be unusual that a CPT code would be released initially that adequately represents either FoundationOne or FoundationOne Heme. Therefore, proactively, it seems z-codes will further | • <u>Not False/Misleading</u>:  Plaintiff has not alleged any facts indicating that the statements describing FMI's approach to codes were false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br><br>• <u>Inactionable Opinion</u>:  Br. Section II.D. |

Case 1:17-cv-11394-LTS   Document 28-1   Filed 02/20/18   Page 29 of 629

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| | | distinguish these tests and allow us to move more quickly towards value-based payment.  As we previously noted, we are approaching reimbursement across a broad platform of activities, and we continue to be as transparent as possible as we move forward." | |
| 116 | Q4 2013 Earnings Call (February 25, 2014) | "[T]he Company is in a strong financial position [and w]e're pleased with our growth, and we do believe the business has compelling leverage as we gain momentum." | • Inactionable Puffery:  Br. Section II.C.<br>• Inactionable Opinion:  Br. Section II.D |
| 117 | Q4 2013 Earnings Call (February 25, 2014) | Defendant Kafka discussed the Company's operations and outlined FMI's "priority initiatives" in 4Q13: "Supporting the volume ramp in the commercial business and growing our sales force, continuing to extend our work supporting pharma clinical trials and launching FoundationOne Heme." | • Not False/Misleading:  Plaintiff has not alleged any facts indicating that the initiatives identified were not "priority initiatives" for FMI in Q4 2013, or any other facts indicating that the statements were false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. |
| 118 | Q4 2013 Earnings Call (February 25, 2014) | Defendant Kafka expressed the Company's contentment with "the mix of our business," and reported that "[g]rowth is being bolstered by the addition . . . of sales professionals in new territories across the United States," which totaled 26 as of December 31, 2013 and which the Company expected to "grow to approximately 45 to 50" by the end of the 2014 calendar year. | • Not False/Misleading:  Plaintiff has not challenged that FMI added sales representatives across the United States in 2013.  Plaintiff has not alleged any facts indicating that, at the time this  statement was made, FMI did not expect to grow its sales force to 45 to 50 employees.  *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• Forward-Looking:  Br. Section II.B.<br>• Inactionable Puffery:  Br. Section II.C. |
| 119 | Q4 2013 Earnings Call (February 25, 2014) | During the question and answer portion of the call, Defendants were asked for additional details about Medicare reimbursement, including the use of McKesson Z-Codes and Foundation's strategy for obtaining coverage. In response, Defendant Pellini claimed that the Company wanted to "maintain as much transparency as possible" | • Not False/Misleading:  Plaintiff has not alleged any particularized facts indicating that FMI did not "want to maintain as much transparency as possible" as to Medicare reimbursement.  *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.  To the contrary, Plaintiff's own allegations show that FMI disclosed |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
|  |  | about the reimbursement process. | the steps it was taking towards obtaining Medicare reimbursement in detail. *See* AC ¶¶ 68; 115. Moreover, Plaintiff selectively quotes and mischaracterizes this statement, which states in full: "As we previously noted, we are approaching reimbursement across a broad platform of activities, and we will continue to be as transparent as possible as we move forward." |
| 120 | Q4 2013 Earnings Call (February 25, 2014) | "We have been pleased with the execution on the tests, we have been pleased with the demand for FoundationOne and frankly, even the early demand FoundationOne Heme since its recent launch. . . . [W]e feel confident in the yearly guidance that we have provided." | • Not False/Misleading:  Plaintiff has not alleged any particularized facts indicating that FMI's detailed data regarding clinical Test volumes was false or misleading, or that the statements of opinion concerning demand and guidance were objectively false or not subjectively believed when made. *Corban*, 2015 WL 1505693, at *6.  Moreover, Plaintiff omitted the following cautionary statement in its quote:  "yet the day -- the year is still young and we're still learning " <br> • Inactionable Puffery:  Br. Section II.C. <br> • Inactionable Opinion:  Br. Section II.D. |
| 121 | Q4 2013 Earnings Call (February 25, 2014) | "[W]e did not provide an update on the specific number of oncologists that has ordered the test . . . [B]oth oncologists in the academic medical centers, as well as in the community settings continue to grow in number . . . [W]e certainly like the progress [and] the evolving ratio between community-based oncologists and academic-based oncologists." | • Not False/Misleading:  Plaintiff has not alleged any facts indicating that the number of ordering oncologists did not "continue to grow" at the time this statement was made.  Plaintiff has not alleged any particularized facts indicating that the detailed clinical Test data that FMI disclosed each quarter, which included the precise number of clinical Tests ordered and the percentage of those Tests that were reported to community-based physicians, was false or misleading. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. <br> • Inactionable Puffery:  Br. Section II.C. |

11

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| 122; *see also* 57 | Q4 2013 Earnings Call (February 25, 2014) | "One of the reasons why we elected not to continue to just state that there's a – state the number of overall physicians ordering the tests is because we want to – we aim to continue to refine the metrics that we will give the investor community. And I think over the course of this year, we anticipate providing additional information that really helps you think about our commercial ramp. And so we don't want to provide numbers for the sake of it, we want to provide numbers that really give you the appropriate insight into the growth of our business.  We are seeing growth in both categories. We are seeing new customers each week, and as I said, both in the academic and as well as in the community setting. But one of the things that we have always measured is the percentage of the tests that are, in fact, from repeat customers." | • Not False/Misleading:  *See* reasons for ¶ 121 *supra*.<br>• Forward-Looking:  Br. Section II.B. |
| 123 | Q4 2013 Earnings Call (February 25, 2014) | "We are seeing growth in both categories [with] new customers each week . . . in the academic and as well as in the community setting . . . [O]ne of the things that we have always measured is the percentage of the tests that are, in fact, from repeat customers . . . that's the way that you build a business." | • Not False/Misleading:  Plaintiff has not alleged any particularized facts indicating that FMI was not "seeing growth" from both academic-based physician and community-based physicians in 2013, or that FMI did not measure the percentage of Tests reported to repeat customers.  *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• Inactionable Puffery: Br. Section II.C. |
| 124 | Q4 2013 Earnings Call (February 25, 2014) | "[W]e just really don't see any comprehensive approach that is competing with us in the market…[w]e have seen other tests that are entering the market, but they are not FoundationOne-like [o]ther tests that are much more narrow in breadth, they don't have the same accuracy, they don't have the same completeness." | • Not False/Misleading: Plaintiff has not alleged any facts indicating that any competing tests that were similar to FMI's Tests had entered the market, or any other facts indicating that these statements were false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• Inactionable Puffery:  Br. Section II.C.<br>• Inactionable Opinion:  Br. Section II.D. |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| 126 | 2013 10-K (March 7, 2014) | "Palmetto GBA, a Medicare administrative contractor that currently plays a leading role in discussions about coverage determinations for complex molecular tests, has established the Molecular Diagnostic Services program, or MolDX. MolDX is currently used to help determine coverage and payment for Medicare in 17 states. ZCodes has been adopted by Palmetto as part of MolDX. While Massachusetts is not one of those states, MolDX is expected by many to be adopted broadly by other Medicare administrative contractors and US commercial payors, including potentially, National Government Services, our Medicare administrative contractor in Massachusetts." | • Not False/Misleading: Plaintiff has not alleged any facts indicating that these statements concerning Palmetto, MolDX, or ZCodes were false when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• Forward-Looking: Br. Section II.B. |
| 127; *see also* 57 | 2013 10-K (March 7, 2014) | "We believe we have built the only molecular information platform that comprehensively assesses cancer tissue simultaneously for all four classes of genomic alterations across all cancer-related genes with the sensitivity and specificity required for routine medical practice. . . . We have experienced rapid adoption of FoundationOne. More than 2,100 physicians from large academic centers and community-based practices across more than 25 countries has ordered FoundationOne since its formal commercial launch in June 2012. We believe this rapid adoption of FoundationOne, which has been accomplished with a nascent sales team, demonstrates the demand for and utility of a single, comprehensive product that helps oncologists effectively implement the promise of precision medicine. | • Not False/Misleading: Plaintiff has not alleged any particularized facts that FMI's disclosed data regarding its Tests, including the number of physicians who have ordered FoundationOne since 2012, was false or misleading when disclosed. Plaintiff does not allege any facts indicating that the statements expressing FMI's opinions as to other commercially available molecular diagnostic tests were objectively false or not subjectively believed when made. *Corban*, 2015 WL 1505693, at *6.<br>• Inactionable Puffery: Br. Section II.C.<br>• Inactionable Opinion: Br. Section II.D. |
| 127; *see also* 57 | 2013 10-K (March 7, 2014) | "Based on our actual experience with patient cases since its launch, we believe FoundationOne's ability to identify actionable genomic alterations far exceeds that of other commercially available molecular diagnostic tests. We | • Not False/Misleading: Plaintiff has not alleged any facts indicating that these statements were false or misleading when made. Plaintiff does not allege any facts indicating that the statements expressing |

Case 1:17-cv-11394-LTS   Document 28-1   Filed 02/20/18   Page 32 of 629

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| | | define an actionable alteration as an identified genomic alteration in an analyzed cancer cell associated with an FDA-approved targeted therapy in the tumor type, an FDA-approved targeted therapy in another tumor type or an open clinical trial for which the alteration confers eligibility. Our comparative quantitative analysis demonstrated that running four commercially available tests that also utilize next-generation sequencing, or NGS, plus two relevant and commonly-used hotspot tests together would collectively identify only a maximum of 31% of the actionable genomic alterations that can be identified by FoundationOne." | opinions as to other commercially available molecular diagnostic tests were objectively false or not subjectively believed when made. *Corban*, 2015 WL 1505693, at *6.<br>• Inactionable Opinion: Br. Section II.D. |
| | | **First Quarter 2014 Financial Results** | |
| 130; *see also* 45 | Q1 2014 Press Release (May 7, 2014) | The press release reported 4,702 clinical tests and $7.1 million in revenue from clinical testing in the first quarter. | • Not False/Misleading: Plaintiff has not challenged FMI's Q1 2014 reported revenue or that it represented 25% quarter-over-quarter growth. Nor has Plaintiff alleged any particularized facts indicating that disclosed clinical Test volume or revenue was false or misleading. |
| 130; *see also* 45 | Q1 2014 Press Release (May 7, 2014) | "The first quarter was a strong start to 2014 for Foundation, as we drove 25 percent quarter over quarter growth in the number of clinical tests reported to physicians, and in particular, saw early success with the adoption of our second clinical product, FoundationOne Heme." | • Not False/Misleading: *See* reason for ¶ 130 *supra.*<br>• Inactionable Puffery: Br. Section II.C. |
| 130; *see also* 45 | Q1 2014 Press Release (May 7, 2014) | "To meet the increasing demand in the clinical and pharmaceutical business areas, we are continuing to invest in our commercial and business development infrastructure and expanding our experienced sales force." | • Not False/Misleading: Plaintiff has not alleged any facts indicating that FMI was not investing in its commercial and business development infrastructure or expanding its sales force, or any other facts indicating that this statement was false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. |

14

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| 130; *see also* 45 | Q1 2014 Press Release (May 7, 2014) | The press release also confirmed the Company's FY14 guidance of between 22,000-25,000 reported clinical tests and between $52 to $58 million in revenue. | • Not False/Misleading:  Plaintiff has not alleged any particularized facts that Defendants did not have a reasonable basis for their forward-looking predictions of future revenues and clinical Tests for FY14 at the time these predictions were made. *Bristol*, 12 F. Supp. 3d at 238.<br>• Forward-Looking:  Br. Section II.B. |
| 131; *see also* 51 | Q1 2014 Earnings Call (May 7, 2014) | "Foundation Medicine's commercial momentum continued through the first quarter resulting in strong sales and volume increases and a range of positive operational success. The team executed well against our goals and our financial results speak to that fact. Externally, we continue to feel encouraged by the sustained enthusiasm around our products in the oncology community as evidenced by continued growth in tests reported, overall revenue, and continued expansion into academic and community practices.<br><br>We again expanded our commercial infrastructure with the addition of talented and experienced sales professionals who continue to rapidly gain meaningful traction with oncologists and pathologists." | • Not False/Misleading:  *See* reasons for ¶ 130 *supra*.<br>• Inactionable Puffery:  Br. Section II.C. |
| 132; *see also* 69 | Q1 2014 Earnings Call (May 7, 2014) | "The average reimbursement for clinical tests that was recognized in revenue during the first quarter was approximately $3,400, which is consistent with our experience in the prior quarter." | • Not False/Misleading:  Plaintiff has not alleged any particularized facts that FMI's disclosed average reimbursement rate was false or misleading, nor could he given FMI's detailed disclosures about the calculation of that rate. *See* Br. at 9-10; *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. |
| 132; *see* | Q1 2014 Earnings Call (May 7, | Defendant Ryan told investors that Foundation was "headed in the right direction with our overall approach to reimbursement" and had "received unique Z-Code | • Not False/Misleading:  Plaintiff has not alleged any facts that FMI did not receive "unique Z-Code identifiers from the McKesson DEX" for its Tests. |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| *also* 69 | 2014) | identifiers from the McKesson DEX for both FoundationOne and FoundationOne Heme," which was "another step towards adequately differentiating our assets and providing greater transparency and reimbursement in billing practices." | Moreover, Plaintiff omitted Ryan's cautionary statement concerning reimbursement: "We continue to believe this is a process that will play out over time." <br>• Inactionable Puffery: Br. Section II.C. <br>• Inactionable Opinion: Br. Section II.D. The full statement, from which Plaintiff selectively quoted, is: "***We do think*** we're headed in the right direction with our overall approach to reimbursement." |
| 133 | Q1 2014 Earnings Call (May 7, 2014) | Defendant Ryan commented that "we continue to be encouraged by our test volume and revenue growth and we believe the Company is well positioned to leverage its current investments as volumes continue to expand." | • Not False/Misleading: Plaintiff has not alleged any particularized facts indicating that FMI's disclosed revenue and clinical Test data was false or misleading, and has failed to allege the statements of opinion were objectively false or not subjectively believed when made. *Corban*, 2015 WL 1505693, at *6. <br>• Inactionable Puffery: Br. Section II.C. <br>• Inactionable Opinion: Br. Section II.D. |
| 134 | Q1 2014 Earnings Call (May 7, 2014) | In discussing FoundationOne Heme, Defendant Kafka stated, "These efforts all speak to Foundation Medicine's commitment to maintaining our leading position through our commercial expansion as well as our commitment to innovation." | • Not False/Misleading: Plaintiff has mischaracterized this statement, as it pertained not only to FoundationOne Heme, but also the Company's "efforts" toward "establishing a new lab that meets FDA Quality System Regulation", "introduce[ing] an updated version of FoundationOne", and "internaliz[ing] our medical reporting capabilities[.]" Plaintiff has not alleged any facts indicating that these statements were false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. <br>• Inactionable Puffery: Br. Section II.C. |

16

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| 135 | Q1 2014 Earnings Call (May 7, 2014) | "I would like to reiterate, as I discussed on our last earnings call, that we do not yet see any validated comprehensive approach that is competing with us in the market today." He continued, "There has been a good deal of discussion among investors and others in the oncology community about the commercial environment in cancer diagnostics, and it can be confusing." | • Not False/Misleading: Plaintiff has not alleged any facts indicating that FMI was aware of any other "validated comprehensive approach" competing with FMI in the market when this statement was made, or any other facts indicating that this statement was false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• Inactionable Puffery: Br. Section II.C. |
| 135 | Q1 2014 Earnings Call (May 7, 2014) | "Collectively we believe this category [of comprehensive genomic profile that represents FMI's segment of molecular tests] represents an important approach in identifying potentially important treatment options for patients with many types of cancer" and "[w]e are convinced that we have gained early and growing traction in the marketplace due to our unique approach of testing all the known, relevant cancer genes for all classes of alterations in DNA in a way that makes it easy for the oncologist or pathologist to utilize this information in everyday patient care." | • Not False/Misleading: Plaintiff has not alleged any particularized facts indicating that these statements concerning its Tests were false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• Inactionable Puffery: Br. Section II.C.<br>• Inactionable Opinion: Br. Section II.D. |
| 136 | Q1 2014 Earnings Call (May 7, 2014) | "[W]e are continuing to work with really all of the national payors as well as some of the regional payors, continuing to educate, working with them on the clinical validity as well as utility data that continues to come out and we feel good about the direction we are headed in." | • Not False/Misleading: Plaintiff has not alleged any facts indicating FMI was not "working with" payors at the time this statement was made, or any other facts indicating that this statement was false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• Inactionable Puffery: Br. Section II.C. |
| 137 | Q1 2014 Earnings Call (May 7, 2014) | "Even though FoundationOne and FoundationOne Heme are Foundation Medicine tests and we are working for coverage decisions, this approach is something that is supported by a significant number of academic medical centers in particular whether they are bringing up their own | • Not False/Misleading: Plaintiff has not alleged any facts indicating that academic medical centers were not supporting FMI's efforts to obtain reimbursement, or any other facts indicating that the statements were false or misleading when made. |

Case 1:17-cv-11394-LTS    Document 28-1    Filed 02/20/18    Page 37 of 629

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| | | tests in a handful of cases or whether they are simply working through Foundation Medicine. Collectively we can make an even stronger argument to the payors as we generate the data and I think have a voice to ultimately obtain those coverage policy decisions. So we are not in this alone and I think that is another important piece to realize." | *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• Inactionable Puffery:  Br. Section II.C. |
| 138 | Q1 2014 Earnings Call (May 7, 2014) | "[W]e have been really pleased with execution and the demand for our tests.  Our total volumes grew 25% over Q4 and that is robust growth.  In the bigger picture, volumes grew more than threefold over Q1 of last year . . . . [W]e saw growth in both the academic medical centers as well as community oncologist areas which is all -- which is very positive." | • Not False/Misleading:  Plaintiff has failed to allege any particularized facts indicating that FMI's disclosed revenue and clinical Test data was false or misleading, that volumes did not grow 25% over Q4, or that FMI did not see growth in both academic and community-based physicians.  *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• Inactionable Puffery:  Br. Section II.C. |
| 139 | Q1 2014 Earnings Call (May 7, 2014) | Defendant Pellini provided an update on what sales representatives were hearing in the field regarding Foundation's tests, stating, "It is again, very consistent, though it's not only in the academic medical center arena, but also with some of the larger laboratories." He continued, "[t]hey tend to be bringing up the targeted panels" and "[t]hat is one of the reasons we carved out these different categories of testing" Defendant Pellini stated, "[w]e are seeing are a number of laboratories bringing up targeted panels."  Defendant Pellini commented that "there might be 10% or 15%" overlap in categories two and three, but that "we do see that as being very differentiated from Foundation Medicine's marketplace." | • Not False/Misleading:  Plaintiff has not alleged any facts indicating that academic medical centers and laboratories were not "bringing up targeted panels" to FMI sales representatives, or any other fact indicating that these statements were false or misleading when made.  *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. |
| 141 | Q1 2014 Earnings Call | In responding to a question on the average reimbursement rate for FoundationOne Heme, Defendant Ryan explained, | • Not False/Misleading:  Ryan expressly stated that FMI did not have "enough experience in full to be |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| | (May 7, 2014) | "[w]e don't has enough experience in full to be able to answer," but provided that "[t]he average revenue per test that was recorded in revenue that I mentioned was $3,400 which was consistent with Q4." | able to answer" and Plaintiff has not alleged any facts indicating that these statements was false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. Plaintiff has not alleged any particularized facts indicating that FMI's disclosed average reimbursement rate was false or misleading, nor could he given FMI's detailed disclosures about the calculation of that rate. *See also* reasons for ¶ 132 *supra*; Br. at 9-10. |
| 142; *see also* 49 | Q1 2014 Earnings Call (May 7, 2014) | "Out of the gates we saw the majority of the adoption -- of the early adoption was from the major academic medical centers, the key opinion leaders, they still represent a really important customer base for us . . . As the testing became a little bit more well known, it started to leak out into the community, often in a regional way around some of the leading academic medical centers where you has the initial uptake in testing." | • Not False/Misleading: Plaintiff has not alleged any facts indicating that early adoption of FMI's Tests was not from academic centers or that the Tests did not then "started to leak out into the community," or any other facts indicating that these statements were false or misleading when made. Nor could he given the detailed clinical Test data that FMI disclosed each quarter, including the total number of Tests ordered and the percentage of Tests reported to community-based physicians. Br. at 9-10.<br>• Inactionable Opinion: Br. Section II.D. |
| 143 | Q1 2014 Earnings Call (May 7, 2014) | "Now as we build the sales force they continue to reach out into the community. They are giving additional cover to the communities doing a lot of the education. And as you know, the second half of last year is where we first saw the transition from the majority of tests coming from academic centers to the majority of tests coming from the community practices." | • Not False/Misleading: *See* reasons for ¶ 142 *supra*. |
| 144 | Q1 2014 Earnings Call (May 7, 2014) | Defendant Pellini further reported that "54% . . . [of the] tests [performed] were from community practices versus 46% from academic medical centers" – results that were consistent with prior quarters. He attributed the percentage | • Not False/Misleading: Plaintiff does not allege any facts indicating that any of the detailed clinical Test data that FMI disclosed, including the percentage of Tests reported to community-based physicians, was |

Case 1:17-cv-11394-LTS   Document 28-1   Filed 02/20/18   Page 38 of 629

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| | | of community physicians to the "early impact of the sales team." | false or misleading. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 2016 193 F. Supp. 3d at 46.<br>• Inactionable Opinion: Br. Section II.D. The full statement, from which Plaintiff selectively quoted, is: "***I think***, again, what we're seeing is the early impact of the sales team, ***in our opinion***." |
| 145 | Q1 2014 Earnings Call (May 7, 2014) | "The most, I think, important competitive dynamic relates to education. What we described in the one past, again, one of the reasons we had the early and significant uptake in the academic medical centers is that I think intuitively many of the key opinion leaders had a sense this was an important tool. We made that relatively easy for them.  The next phase was then to migrate this into the community setting and also to educate not only the payors but also work with the FDA as part of the education process. Those are ongoing activities. There are a couple of academic medical centers out there that are either working with Foundation Medicine or they has pioneered their own approaches. Frankly it is helpful to has those academic medical centers talking about their approach, talking about the relationship with Foundation Medicine and publishing data in parallel with Foundation Medicine. Again, I would say most important thing that we are -- one of the most important things that we are focused on in 2014 is educating the community, the oncology community on how to think about FoundationOne and FoundationOne Heme within the context of these key clinical indications." | • Not False/Misleading: Plaintiff has not alleged any facts indicating that FMI was not undertaking these educational efforts with academic medical centers and payors, or any other facts indicating that these statements were false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• Inactionable Opinion: Br. Section II.D. |
| 147 | Q1 2014 10-Q (May 13, 2014) | "We have experienced rapid adoption of FoundationOne. More than 2,100 physicians from large academic centers and community-based practices has ordered FoundationOne since its formal commercial launch in June 2012. We believe this rapid adoption of FoundationOne, | • Not False/Misleading: *See* reasons for ¶ 127.<br>• Inactionable Puffery: Br. Section II.C.<br>• Inactionable Opinion: Br. Section II.D. |

20

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| | | accomplished with a nascent sales team, demonstrates the demand for and utility of a single comprehensive product that helps oncologists effectively implement the promise of precision medicine." | |
| 150; *see also* 70 | Press Release (July 17, 2014) | " 'This approval [from the New York Department of Health for the Tests] marks a significant regulatory milestone for Foundation Medicine and serves as a confirmation of the high standard for validation established with FoundationOne and FoundationOne Heme,'  said Jeffrey Ross, M.D., medical director, Foundation Medicine. " 'The approval enables New York physicians to utilize our tests, which are designed to identify the molecular growth drivers of each individual's unique cancer, to select relevant targeted therapy options or clinical trials that may be appropriate for their patients.'<br><br>* * *<br><br>The state of New York is the only U.S. state that requires an independent regulatory review process, including technical and clinical validation, for laboratory developed tests. FoundationOne and FoundationOne Heme are the only fully informative genomic profiles to be approved by New York State for the detection of all classes of genomic alterations, including base pair substitutions, insertions and deletions, copy number alterations and gene rearrangements, within the full coding region of all genes known to be somatically altered in human cancers. The standard set by New York State represents one of the most rigorous levels of validation required for laboratory developed tests." | • Not False/Misleading:  Plaintiff has not alleged any facts indicating that the statements (made by an FMI employee who is not a Defendant) announcing the New York Department of Health's approval of the Tests or the standards applied by the New York Department of Health were false or misleading when made.  *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| Second Quarter 2014 Financial Results | | | |
| 151; *see also* 46, 61 | Q2 2014 Press Release (August 12, 2014) | "We continued to gain commercial momentum in the second quarter, with strong growth in clinical test volumes and in the revenue contribution from our pharmaceutical industry partnerships . . . It was especially encouraging to see a large number of new abstracts and publications coming from our partnerships and from independent research efforts. These data further validate our comprehensive approach to clinical testing and also represent a growing base of evidence supporting the clinical utility of our tests, a key factor in the reimbursement equation for payors." | • <u>Not False/Misleading</u>: Plaintiff has not challenged Defendants' accurate Q2 2014 financial results, nor has Plaintiff alleged any particularized facts indicating that the revenue or clinical Test data disclosed by the Company for Q2 2014 was false or misleading. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• <u>Inactionable Puffery</u>:  Br. Section II.C.<br>• <u>Inactionable Opinion</u>:  Br. Section II.D. |
| 151 | Q2 2014 Press Release (August 12, 2014) | The press release also confirmed prior FY14 guidance of 22,000-25,000 reported clinical tests and between $52-$58 million in revenue. | • <u>Not False/Misleading</u>:  *See* reasons for ¶¶ 111, 130.<br>• <u>Forward-Looking</u>:  Br. Section II.B. |
| 152 | Q2 2014 Earnings Call (August 12, 2014) | "[O]ur second quarter, it was a very strong one with positive momentum across virtually all commercial metrics." | • <u>Not False/Misleading</u>:  Plaintiff has not challenged Defendants' accurate Q2 2014 financial results, nor has Plaintiff alleged any particularized facts indicating that the revenue and clinical Test data disclosed by the Company for Q2 2014 was false or misleading. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• <u>Inactionable Puffery</u>: Br. Section II.C. |
| 153 | Q2 2014 Earnings Call (August 12, 2014) | In particular, Defendant Pellini reported an updated commercial mix between community physicians and academic centers, reporting that the number of tests being ordered by community physicians had jumped to 60% from 54% the prior quarter. | • <u>Not False/Misleading</u>:  Plaintiff does not allege any particularized facts indicating that any of the clinical Test data disclosed by FMI, including the percentage of Tests reported to community-based physicians, was false or misleading. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| 154 | Q2 2014 Earnings Call (August 12, 2014) | "We still has a very strong client base around -- within the academic medical centers around the United States. And I think the most positive thing is that we still see growth in both of those areas, both at the academic medical center setting as well as in the community practice, where the community practice is. But, as Jason mentioned in the earlier comments, we're learning about how the community oncologist will really ultimately incorporate this into their community -- into their daily practice." | • Not False/Misleading: *See* reasons for ¶ 153 *supra*.<br>• Inactionable Puffery:  Br. Section II.C. |
| 155 | Q2 2014 Earnings Call (August 12, 2014) | With respect to the reorder rate, Defendant Pellini extolled the positive rate of reorder, highlighting that "the majority of cases that we see each week are in fact coming from accounts and clients who has ordered the test before, so we like the trending on the reorder rate as well." In fact, he pointed out that the 60% of tests that were reported to community oncologists, were "driven largely by repeat ordering physicians." Defendant Pellini attributed the volume growth, at least in part, to the "growth of [the] sales team," and commented that "over time we will continue to see further growth into community practices around the United States." | • Not False/Misleading:  Plaintiff has not alleged any particularized facts indicating that the majority of orders that FMI saw each week were placed "from accounts and clients who [had] ordered the test before" or any other facts indicating that these statements were false or misleading when made**.** *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.  Plaintiff also omitted the following clarifying statement: "over time we will continue to see further growth into community practices around the United States.  ***But it's really not any one thing driving that growth***."<br>• Forward-Looking:  Br. Section II.B.<br>• Inactionable Opinion:  Br. Section II.D. |
| 156 | Q2 2014 Earnings Call (August 12, 2014) | "As the numbers indicate, our business remains robust, resulting in strong sales and volume growth in a range of positive operational successes." | • Not False/Misleading:  Plaintiff has not alleged any particularized facts indicating that the revenue or clinical Test data disclosed by the Company was false or misleading.  *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• Inactionable Puffery: Br. Section II.C. |
| 157 | Q2 2014 Earnings Call | "We had a strong second quarter in terms of our commercial acceleration and revenue growth." | • Not False/Misleading:  *See* reasons for ¶ 156 *supra*.<br>• Inactionable Puffery:  Br. Section II.C. |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| | (August 12, 2014) | | |
| 157 | Q2 2014 Earnings Call (August 12, 2014) | He also provided a status update on the Company's average reimbursement for clinical tests, which rose to $3,600 (an increase of about $200 per test from the first quarter), attributable to "the impact of the higher priced FoundationOne Heme test," as "there was no material change in the average reimbursement per FoundationOne test." | • Not False/Misleading:  *See* reasons for ¶ 132 *supra*; *see also* Br. at 9-10 . |
| 158; *see also* 71 | Q2 2014 Earnings Call (August 12, 2014) | "As a sign of steady progress, both Medicare and a number of regional and national commercial payors, we've moved beyond what we refer to as the educational phase and on to providing validation and clinical utility data as part of our ongoing dialogue. Of course, we're engaged in various phases of discussion at any given time, but we continue to make progress as payors become increasingly familiar with our tests, the value they're delivering to physicians and their patients, and the impact that they can has in overall cancer treatment. Nonetheless, despite this progress, we still can't predict the timing of any potential coverage decisions." | • Not False/Misleading:  Plaintiff has not alleged any facts indicating that FMI was not engaged in such discussions with and providing validation and clinical utility data to Medicare and other payors, or any other facts indicating that these statements were false or misleading when made, particularly in light of the cautionary statement that "despite this progress, we still can't predict the timing of any potential coverage decisions." *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 2016 193 F. Supp. 3d at 46.<br>• Inactionable Puffery:  Br. Section II.C.<br>• Inactionable Opinion:  Br. Section II.D. |
| 159 | Q2 2014 Earnings Call (August 12, 2014) | "[W]e continue to stay focused . . . on those six key clinical indications I think that is important to realize. That's where the studies are focused as we interact with it with a clinician. We're really focused on those six core clinical indications that we've been talking about for the past year and a half or so." | • Not False/Misleading:  Plaintiff has not alleged any facts indicating that FMI was not focused on the six clinical indications as disclosed, or any other facts indicating that the alleged statements were false or misleading when made.  *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. |
| 160; *see* | Q2 2014 Earnings Call (August 12, | "New York . . . is the only US state that requires an independent regulatory review process and represents one of the most rigorous  levels of both technical and clinical | • Not False/Misleading:  Plaintiff has not alleged any facts indicating that any state other than New York requires regulatory review or New York's |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| *also* 71 | 2014) | validation required for lab developed tests." | requirements, or any other facts indicating this statement was false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• <u>Inactionable Opinion</u>:  Br. Section II.D. |
| 160;<br>*see also* 71 | Q2 2014 Earnings Call (August 12, 2014) | Defendant Kafka signaled . . . not only that the "approval confirms the high standard of validation established by our assays," but also that the approval would have "a positive impact as we continue our reimbursement dialogue with payors." | • <u>Not False/Misleading</u>:  Plaintiff has not alleged any facts indicating that the New York approval did not confirm "the high standard of validation established by [FMI's] assays" or any other facts indicating that these statements were false or misleading when made.<br>• <u>Forward-Looking</u>:  Br. Section II.B.  The full statement, from which Plaintiff selectively quoted, is: "***we expect*** this approval to have a positive impact as we continue our reimbursement dialogue with payors."<br>• <u>Inactionable Puffery</u>:  Br. Section II.C.<br>• <u>Inactionable Opinion</u>:  Br. Section II.D. |
| 161 | Q2 2014 Earnings Call (August 12, 2014) | "[T]he New York State regulatory process is quite rigorous as was alluded to in Steve's [Kafka's] comments. [T]here are very detailed metrics around analytic validation components that were embodied in that document and we felt that was a very real and meaningful process and approval." | • <u>Not False/Misleading</u>:  Plaintiff has not alleged any facts indicating that the description of New York State's regulatory process or the materials submitted to New York for approval were false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• <u>Inactionable Puffery</u>:  Br. Section II.C.<br>• <u>Inactionable Opinion</u>:  Br. Section II.D. |
| 162 | Q2 2014 Earnings Call (August 12, 2014) | "I think the most important takeaway is that both the New York State approval coupled with the Nature Biotech analytic validation paper last fall should in fact help check the box or should in fact check the box for analytic validation . . . I think it's just another piece in the process | • <u>Not False/Misleading</u>:  Plaintiff has not alleged any facts indicating that these statements were false or misleading, and has failed to allege the statements of opinion were objectively false or not subjectively believed when made. *Corban*, 2015 WL 1505693, at |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| | | as we continue to build evidence that starts with analytic validation runs all the way to the clinic utility for the payors.  []I would just look at it in totality of the information that we are developing for and presenting to the payors." | *6; *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. <br> • <u>Inactionable Opinion</u>:  Br. Section II.D. |
| 163 | Q2 2014 Earnings Call (August 12, 2014) | "Foundation Medicine has established and is positioned to maintain our leadership position in comprehensive molecular testing for cancer patients. We do not yet see a comparable commercial offering in the marketplace." | • <u>Not False/Misleading</u>:  Plaintiff has not alleged any facts indicating that Defendants were aware of any "commercial offering" that was comparable to FMI's Tests, or any other facts indicating that these statements were false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. <br> • <u>Inactionable Puffery</u>:  Br. Section II.C. <br> • <u>Inactionable Opinion</u>:  Br. Section II.D. |
| 165 | Q2 2014 10-Q (August 13, 2014) | "We have experienced rapid adoption of FoundationOne. More than 2,100 physicians from large academic centers and community-based practices has ordered FoundationOne since its formal commercial launch in June 2012. We believe this rapid adoption of FoundationOne demonstrates the demand for and utility of a single comprehensive product that helps oncologists effectively implement the promise of precision medicine." | • <u>Not False/Misleading</u>:  *See* Reasons for ¶¶ 127, 147 *supra*. <br> • <u>Inactionable Puffery</u>:  Br. Section II.C. <br> • <u>Inactionable Opinion</u>:  Br. Section II.D. |
| | | **Third Quarter 2014 Financial Results** | |
| 170 | Q3 2014 Press Release (November 5, 2014) | The press release reported that the Company had conducted 6,428 clinical tests and reported $9.8 million in revenue from clinical testing in 3Q14. | • <u>Not False/Misleading</u>:  Plaintiff has not challenged Defendants' accurate Q3 2014 financial results, nor has Plaintiff alleged any particularized facts indicating that the Company's reported revenue or clinical Test volume were false or misleading. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| 171 | Q3 2014 Press Release (November 5, 2014) | "We continued to execute operationally and commercially in the third quarter, with further growth in revenue and clinical test volumes." | • Not False/Misleading:  *See* reasons for ¶ 170 *supra*.<br>• Inactionable Opinion:  Br. Section II.D. |
| 171 | Q3 2014 Press Release (November 5, 2014) | The press release also updated FY14 guidance, narrowing its expected reported clinical tests to within the upper end of the Company's initial guidance range of 22,000-25,000 and raising its revenue projection to be between $58 to $60 million, updated from the Company's previous 2014 guidance of $52 to $58 million. | • Not False/Misleading:  *See* reasons for ¶¶ 111, 130, 151.<br>• Forward-Looking:  Br. Section II.B. |
| 173; *see also* 72 | Q3 2014 Earnings Call (November 5, 2014) | "As for our third quarter, our commercial momentum continued across the organization, and we also reached an important milestone in our active and ongoing reimbursement efforts" with Priority Health becoming the first health plan to broadly cover FoundationOne and FoundationOne Heme. | • Not False/Misleading:  Plaintiff has not alleged any facts indicating that Priority Health did not agree to broadly cover the Tests, that FMI's reimbursement efforts were not "active and ongoing," or any other facts indicating that this statement was false or misleading when made.  *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• Inactionable Puffery:  Br. Section II.B. |
| 174 | Q3 2014 Earnings Call (November 5, 2014) | "[B]eginning in 2015, Google employees and their families who are navigating cancer treatment will has covered access to FoundationOne and FoundationOne Heme testing." | • Not False/Misleading:  Plaintiff has not alleged any facts indicating that Google employees would not have covered access to the Tests beginning in 2015, or any other facts indicating that this statement was false or misleading when made.  *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. |
| 175; *see also* 47 | Q3 2014 Earnings Call (November 5, 2014) | "As our results indicate our business remains robust, resulting in continued sales and test volume growth coupled with a number of positive operational successes. The team has continued to execute well against our goals and our financial results speak to that fact.  The commercial uptake for FoundationOne and FoundationOne Heme | • Not False/Misleading:  *See* reasons for ¶ 170 *supra*.<br>• Inactionable Puffery:  Br. Section II.C.<br>• Inactionable Opinion:  Br. Section II.D. |

27

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| | | remains strong, as does the clinical data supporting each test." | |
| 176; *see also* 47, 51 | Q3 2014 Earnings Call (November 5, 2014) | "[W]e ended the quarter with a US sales team of 47 account executives and sales managers, consistent with our plan and the prior quarter.  We continue to demonstrate robust integration into community practices, with 60% of test reported to physicians in the community, which is consistent with the prior quarter. Clinical tests reported to physicians in both the community setting and academic medical centers increased over the prior quarter.  We are in the early days of learning about ordering patterns in the community and we're actively investing in our commercial infrastructure to increase reordering trends among our physician clients." | • Not False/Misleading: Plaintiff has not alleged any facts indicating that FMI did not have 47 sales employees at the end of the second quarter, or that the Company was not "actively investing" in its commercial infrastructure at the time these statements were made.  *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.  *See also* reasons for ¶153 *supra*.<br>• Inactionable Puffery:  Br. Section II.C. |
| 177 | Q3 2014 Earnings Call (November 5, 2014) | "The average reimbursement for clinical tests recognized in revenue in Q3 was approximately $3,600, consistent with the prior quarters." | • Not False/Misleading:  *See* reasons for ¶¶ 132, 141, 157 *supra*. |
| 177 | Q3 2014 Earnings Call (November 5, 2014) | "We were encouraged by some of our reimbursement momentum headlined by the coverage decision by Priority Health for both FoundationOne and FoundationOne Heme. This was an important step forward in recognizing the value of comprehensive genomic profiling in oncology that also represents tangible evidence of the progress that we're continuing to make with certain payers." | • Not False/Misleading:  Plaintiff has not alleged any facts indicating that Priority Health did not issue a coverage decision for the Tests, or any other facts indicating that these statements were false or misleading when made.<br>• Inactionable Puffery:  Br. Section II.C.<br>• Inactionable Opinion:  Br. Section II.D. |
| 178 | Q3 2014 Earnings Call (November 5, 2014) | "[T]he third quarter was another very strong period for FMI with meaningful revenue growth, positive news from Priority Health and continued investments on the commercial, research and technology fronts." | • Not False/Misleading:  *See* reasons for ¶ 170 *supra*.<br>• Inactionable Puffery:  Br. Section II.C. |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| 178 | Q3 2014 Earnings Call (November 5, 2014) | "We believe those investments will drive future top line growth and yield significant leverage as we scale. But most importantly, we still fundamentally believe that we're at the very front edge of what is a tremendous market opportunity for comprehensive genomic profiling and molecular information in the field of oncology." | • Not False/Misleading: *See* reasons for ¶ 170 *supra*.<br>• Forward-Looking: Br. Section II.B.<br>• Inactionable Puffery: Br. Section II.C.<br>• Inactionable Opinion: Br. Section II.D. |
| 180 | Q3 2014 Earnings Call (November 5, 2014) | "[T]he overall fundamentals of our clinical business do remain strong. . . . And the way that we look at it is, we started off by gaining tremendous traction within the academic medical centers. That was our first market. We then made a deliberate commercial push into the community setting and that push has been quite successful based on the number of ordering oncologists and the percentage of tests that are ordered from this segment." | • Not False/Misleading: Plaintiff has not alleged any particularized facts indicating that the detailed clinical Test data disclosed by the Company is false or misleading, or any other facts indicating that these statements were false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• Inactionable Puffery: Br. Section II.C.<br>• Inactionable Opinion: Br. Section II.D. |
| 181 | Q3 2014 Earnings Call (November 5, 2014) | "With respect to the reorder rates, one of the things that we touched on in last quarter's call is that, we do see a difference in reorder rates between the oncologists in the academic medical center setting and the community oncologists. And I think the migration into the community is something that has really taken place over the course at least in earnest taken place over the course of the past year or so, and I think what we've recognized is, we have to focus more on the community docs, that's where our commercial team is now aligned. And again, that's the type of additional support, we are putting this additional support in place to really assist the barriers that those community oncologists sometimes face in clinical practice." | • Not False/Misleading: Plaintiff has not alleged any facts indicating that FMI had not "migrated" into the community-based physician market with respect to reordering, that it did not "align" its commercial team in that market, that it was not putting "additional support" in place to assist with that market, or any other facts indicating that these statements were false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. |
| 182 | Q3 2014 Earnings Call (November 5, | "[T]he average reimbursement per test that was recognized in revenue held steady at that $3,600." | • Not False/Misleading: *See* reasons for ¶¶ 132, 141, 157, 177 *supra*. |

29

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| | 2014) | | |
| 183 | Q3 2014 Earnings Call (November 5, 2014) | "Over the course of the past year, we thought we saw a couple of companies that were perhaps moving in this direction, which is really this category 3 comprehensive genomic profiling.  To be frank, we just haven't seen them emerge in our space at this point in time. [F]rom a commercial standpoint, we continue to believe that we are the only company out there with a validated comprehensive genomic profile." | • Not False/Misleading:  Plaintiff has not alleged any facts indicating that these statements were false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.  Plaintiff does not allege any facts indicating that the statement expressing an opinion concerning the comprehensive genomic profiling space and competition in that space were objectively false or not subjectively believed when made.  *Corban*, 2015 WL 1505693, at *6.<br>• Inactionable Opinion:  Br. Section II.D. |
| 184 | Q3 2014 Earnings Call (November 5, 2014) | "[W]e're seeing the exact same thing that we've seen for the past year and a half, I think we have a clear sense of all the major academic medical centers, the large handful of them that are either have brought up or working to bring up a comprehensive genomic profile type test and I think even in the past several of days another major cancer center that we're aware of, said that they has their own test. And to be frank, that supports us. That supports us as we – in terms of as we have conversation with payers. But what most of the centers will be doing if they bring up any type of next-generation sequencing, if they bring it up, it will be panel-based testing that category 2. And as we've described multiple times in the past, we just don't see that as being competitive with what we're doing with comprehensive genomic profiling." | • Not False/Misleading:  *See* reasons for ¶ 183 *supra*.<br>• Inactionable Opinion:  Br. Section II.D. |
| | | **Fourth Quarter 2014 Financial Results** | |
| 189 | Press Release (January 12, 2015) | On January 12, 2015, Foundation issued a press release announcing preliminary 2014 financial results. The press release announced that Foundation achieved "Revenue of | • Not False/Misleading:  Plaintiff has not challenged Defendants' accurate Q4 2014 and FY 2014 financial results, nor has Plaintiff alleged any particularized |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| | | Approximately $61.1 Million and Report[ed] More than 24,500 Clinical Tests in 2014," exceeding its guidance. | facts indicating that the Company's reported revenue or clinical Test volume were false or misleading. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. |
| 190 | Press Release (January 12, 2015) | "The rapid revenue growth in 2014 was driven by progress across the three key pillars of our business, specifically, the continued adoption of comprehensive genomic profiling by oncologists in both the academic and community setting, an increase in demand from our pharmaceutical partners for clinical trial support, and expanded access to our molecular information platform . . . . Once again, the team at Foundation Medicine executed well on our business and delivered real value to our clients and their patients, as we exceeded our total revenue guidance for the year." | • Not False/Misleading:  *See* reasons for ¶ 189 *supra*.<br>• Inactionable Puffery:  Br. Section II.C. |
| 191; *see also* 80 | Q4 2014 Press Release (February 24, 2015) | Then on February 24, 2015, after the market closed, Foundation issued a press release announcing its financial results for 4Q14 and FY14. The press release reported that the Company had conducted 7,233 clinical tests and reported $10.3 million of clinical revenue in 4Q14. | • Not False/Misleading:  *See* reasons for ¶ 189 *supra*. |
| 191; *see also* 80 | Q4 2014 Press Release (February 24, 2015) | "Commercial execution and growth rates were strong across both our clinical and pharma customers in the fourth quarter, highlighting the broad adoption of our comprehensive genomic profiling approach." | • Not False/Misleading:  *See* reasons for ¶ 189 *supra*.<br>• Inactionable Puffery:  Br. Section II.C. |
| 191; *see also* 80 | Q4 2014 Press Release (February 24, 2015) | "The company expects to report between 43,000 and 47,000 clinical tests in 2015" and "anticipates 2015 revenue will be in the range of $105 - $115 million assuming completion of the Roche transaction in the second quarter of 2015." | • Not False/Misleading:  *See* reasons for ¶¶ 111, 130, 151, 171 *supra*.<br>• Forward-Looking:  Br. Section II.B. |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| 193 | Q4 2014 Earnings Call (February 24, 2015) | "[W]e drove significant gains in the community setting, while sustaining growth with our academic customers, ending the year with approximately 60% of our clinical volume coming from community-based physicians." | • Not False/Misleading: *See* reasons for ¶ 153 *supra*.<br>• Inactionable Puffery: Br. Section II.C. |
| 194; *see also* 75 | Q4 2014 Earnings Call (February 24, 2015) | "During the fourth quarter of 2014, we continued to make meaningful strides in the commercial front." | • Not False/Misleading: *See* reasons for ¶ 189 *supra*.<br>• Inactionable Puffery: Br. Section II.C. |
| 194; *see also* 75 | Q4 2014 Earnings Call (February 24, 2015) | "[W]e were encouraged by signs of forward progress on the reimbursement landscape, headlined by Palmetto's Draft Local Coverage Determination, published in January." He stated that the "draft LCD was a very important step forward, because it specifically relates to comprehensive genomic profiling in certain patients with non-small cell lung cancer" and "sets a standard for the rigorous analytic validation that's required with this type of testing." | • Not False/Misleading: Plaintiff has not alleged any facts indicating that Palmetto had not issued a draft LCD, that it related to "comprehensive genomic profiling in certain patients with non-small cell lung cancer," or any other facts indicating these statements were false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. Plaintiff does not allege any facts indicating that the statements expressing opinions about this LCD were objectively false or not subjectively believed when made. *Corban*, 2015 WL 1505693, at *6.<br>• Inactionable Puffery: Br. Section II.C.<br>• Inactionable Opinion: Br. Section II.D. |
| 195 | Q4 2014 Earnings Call (February 24, 2015) | "I think one of the keys here, . . . is looking at our investments during the year, and our operating expenses. The investments we're making are not just in the sales team. They're also across client services, across strategic marketing, market analytics, and differentiation programs, as well as our reimbursement team, and of course, internationally. So there are a lot of different elements where we're investing during the year for commercial growth." | • Not False/Misleading: Plaintiff has not alleged any facts indicating that FMI was not making the identified investments, or any other facts indicating that these statements were false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• Inactionable Opinion: Br. Section II.D. |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| 196 | Q4 2014 Earnings Call (February 24, 2015) | "What I can tell you is that we remain encouraged by the progress or the focus that we are seeing from one of the local Medicare administrative contractors, which is Palmetto. As Jason mentioned, they are seen as one of the thought leaders in this space. And they are, in essence, trying to rally the troops within the Medicare organization to focus more on molecular testing, and specifically, comprehensive genomics profiling . . . So while we cannot comment on specific timelines, we are sensing a bit of additional urgency in trying to -- from Palmetto, at least, we are sensing additional urgency in really trying to work through this process. But. . . , it is a process. And just because Palmetto takes a step forward, does not necessarily mean that our MAC or any other MACs will take a step forward." | • Not False/Misleading:  Plaintiff has not alleged any particularized facts concerning Palmetto indicating that these statements were false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.  Plaintiff does not allege any facts indicating that the statements expressing opinions about Palmetto were objectively false or not subjectively believed when made, particularly in light of the accompanying cautionary statements.  *Corban*, 2015 WL 1505693, at *6.<br>• Inactionable Opinion:  Br. Section II.D. |
| 197 | Q4 2014 Earnings Call (February 24, 2015) | When directly asked if investors should regard Medicare reimbursement "as a matter of when, or is it a matter of if," Defendant Pellini stated, "we have always believed that it is a matter of when, and we continue to believe it is a matter of when. . . . But we do believe it's a question of when. And we think the question of if -- we passed the question of if, some time ago." | • Not False/Misleading:  Plaintiff does not allege any facts indicating that Defendants did not have a reasonable basis for its forward-looking prediction about future Medicare reimbursement. *Bristol*, 12 F. Supp. 3d at 238.  Moreover, Plaintiff omits the accompanying cautionary language: "keep in mind, [reimbursement] can be different for each payer . . . There are some regional and national payers and some MACs that are better, closer to the front edge of that bell curve, and there will certainly be certain MACs and certain national payers and regional payers that fall in the middle, and some that fall in the back end."<br>• Forward-Looking:  Br. Section II.B.<br>• Inactionable Opinion:  Br. Section II.D. |
| 198 | Q4 2014 Earnings Call | "[O]ne of our initial really pushes, commercially, was to get out to as many as physicians and as many clients as we | • Not False/Misleading:  Plaintiff has not alleged any facts indicating that these statements concerning |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| | (February 24, 2015) | could.  [W]e feel great about that in terms of the thousands of oncologist who have ordered . . . [T]he main initiatives for 2015 isn't only to broaden that client base, but it is to go really deeper into that client base." | FMI's "initial pushes" and "main initiatives for 2015" were false or misleading when made.  *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• <u>Inactionable Puffery</u>:  Br. Section II.C. |
| 202 | Q4 2014 Earnings Call (February 24, 2015) | "[W]hen you wrap all those things up in a package . . . that's what keeps us separated and will continue to keep us separated from anyone else in the marketplace." | • <u>Not False/Misleading</u>:  *See* reasons for ¶ 202 *supra*.<br>• <u>Inactionable Puffery</u>:  Br. Section II.C. |
| 204; *see also* 57 | 2014 10-K (March 13, 2015) | "We believe we have built the only commercially available molecular information platform that comprehensively assesses cancer simultaneously for all four classes of genomic alterations (i.e., base pair substitutions, copy number alterations, short insertions and deletions, and gene rearrangements and fusions) across all cancer-related genes with the sensitivity and specificity required for routine medical practice. . . . FoundationOne and FoundationOne Heme deliver this complex molecular information in a concise report that matches detected molecular alterations with potentially relevant treatment options and clinical trials." | • <u>Not False/Misleading</u>:  *See* reasons for ¶ 127 *supra*.<br>• <u>Inactionable Puffery</u>:  Br. Section II.C.<br>• <u>Inactionable Opinion</u>:  Br. Section II.D. |
| 204; *see also* 57 | 2014 10-K (March 13, 2015) | "Our clinical products has been rapidly adopted in the marketplace, and several thousand physicians from large academic centers and community-based practices has ordered FoundationOne or FoundationOne Heme. We believe this rapid adoption, which has been accomplished in the early stages of our commercial growth, demonstrates the demand for and utility of a single, comprehensive solution that helps oncologists effectively implement the promise of precision medicine." | • <u>Not False/Misleading</u>:  *See* reasons for ¶¶ 127, 147, 165 *supra*.<br>• <u>Inactionable Puffery</u>:  Br. Section II.C.<br>• <u>Inactionable Opinion</u>:  Br. Section II.D. |
| 204; | 2014 10-K | "Based on our actual experience with patient cases since its | • <u>Not False/Misleading</u>:  *See* reasons for ¶ 127 *supra*. |

Case 1:17-cv-11394-LTS    Document 28-1    Filed 02/20/18    Page 53 of 629

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| *see also* 57 | (March 13, 2015) | launch, we believe FoundationOne's ability to identify clinically relevant genomic alterations exceeds that of other commercially available molecular diagnostic tests. We define a clinically relevant alteration as an identified genomic alteration in an analyzed cancer cell associated with an FDA-approved targeted therapy indicated for use in the tumor type, an FDA approved targeted therapy indicated for use in another tumor type, or an open clinical trial for which the alteration confers eligibility. Our comparative quantitative analysis demonstrated that running four commercially available tests that also utilize next-generation sequencing, or NGS, plus two relevant and commonly-used hotspot tests together would collectively identify only a maximum of 31% of the actionable genomic alterations that can be identified by FoundationOne." | • Inactionable Puffery:  Br. Section II.C.<br>• Inactionable Opinion:  Br. Section II.D. |
| 204; *see also* 57 | 2014 10-K (March 13, 2015) | "We believe FoundationOne and FoundationOne Heme are currently the only commercially available comprehensive molecular information products that provide a fully informative genomic profile in a concise and actionable format designed for use in the clinical setting." | • Not False/Misleading:  *See* reasons for ¶ 127 *supra*.<br>• Inactionable Puffery: Br. Section II.C.<br>• Inactionable Opinion:  Br. Section II.D. |
| **First Quarter 2015 Financial Results** | | | |
| 208 | Q1 2015 Press Release (May 11, 2015) | "For the quarter, the Company reported "total revenue of $19.3 million in the first quarter of 2015, compared to $11.5 million in the first quarter of 2014 and $18.7 million in the fourth quarter of 2014.  Revenue from clinical testing in the 2015 first quarter was $11.1 million, compared to $7.1 million in the first quarter of 2014 and $10.3 million in the fourth quarter of 2014.  The Company reported "7,854 clinical tests in the first quarter of 2015, a 67% increase from the same quarter last year and a 9% increase from last year's fourth quarter" which included "6,885 FoundationOne® tests and 969 FoundationOne® Heme | • Not False/Misleading:  Plaintiff has not challenged Defendants' accurate Q1 2015 financial results, nor has Plaintiff alleged any particularized facts indicating that the Company's reported revenue or clinical Test volume were false or misleading. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. |

Case 1:17-cv-11394-LTS   Document 28-1   Filed 02/20/18   Page 54 of 629

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| | | tests." | |
| 208 | Q1 2015 Press Release (May 11, 2015) | "We're continuing to build a transformational business for the long-term, and we believe we made significant progress in that direction during the first quarter." | • Not False/Misleading: *See* reasons for ¶ 208 *supra*.<br>• Inactionable Puffery: Br. Section II.C.<br>• Inactionable Opinion: Br. Section II.D. |
| 208 | Q1 2015 Press Release (May 11, 2015) | The press release also reiterated 2015 guidance of between 43,000 and 47,000 clinical tests and revenue in the range of $105-$115 million for fiscal year 2015 ("FY15"). | • Not False/Misleading: *See* reasons for ¶¶ 111, 130, 151, 171, 191 *supra*.<br>• Forward-Looking: Br. Section II.B. |
| 209 | Q1 2015 Earnings Call (May 11, 2015) | "[W]e had a solid first quarter, evidenced by growth across our overall business." | • Not False/Misleading: *See* reasons for ¶ 208 *supra*.<br>• Inactionable Puffery: Br. Section II.C. |
| 209 | Q1 2015 Earnings Call (May 11, 2015) | "While these growth rates are good for many in this industry, we expect to return to a growth rate that reflects our leadership position in molecular information." | • Not False/Misleading: *See* reasons for ¶ 208 *supra*.<br>• Forward-Looking: Br. Section II.B.<br>• Inactionable Puffery: Br. Section II.C. |
| 210 | Q1 2015 Earnings Call (May 11, 2015) | "[T]he launch of FoundationOne and subsequently FoundationOne Heme were met with unprecedented market adoption when measured against other molecular testing growth rates in the industry."<br><br>Defendant Pellini attributed the strong growth, in part, to Foundation "satisfying a high unmet need with quality products that are viewed by many as the gold standards for comprehensive genomic profiling." | • Not False/Misleading: Plaintiff has not alleged any facts indicating that the launches of the Tests were met with "unprecedented market adoption," that they did not "satisfy a high unmet need," or any other facts indicating that this statement was false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. *See also* reasons for ¶ 208 *supra*.<br>• Inactionable Puffery: Br. Section II.C.<br>• Inactionable Opinion: Br. Section II.D. Plaintiff omits the qualifying language which makes clear he is asserting an opinion: "***we believe*** this growth was |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| | | | partly achieved by satisfying a high unmet need…" |
| 211 | Q1 2015 Earnings Call (May 11, 2015) | "[W]hile tests will come and go, our approach remains unparalleled, both in the robustness of the validity of the science, and its completeness of information.  No other Company is offering a comparable end-to-end molecular information solution for oncology." | • Not False/Misleading:  Plaintiff has not alleged any facts indicating that any other company was offering a "comparable solution" to FMI's Tests, or any other facts indicating that this statement was false or misleading when made.  *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• Inactionable Puffery:  Br. Section II.C.<br>• Inactionable Opinion:  Br. Section II.D. |
| 212 | Q1 2015 Earnings Call (May 11, 2015) | "[T]he average reimbursement per clinical test that was recognized in revenue was $3,400 in the first quarter, a slight decrease from Q4.  Some level of volatility in this number is to be expected before we gain broader reimbursement coverage.  [W]e do not believe this quarterly variance has an impact on our current reimbursement discussions or on the long-term price or margin trajectory." | • Not False/Misleading:  *See* reasons for ¶¶ 132, 141, 157, 177, 182 *supra*.<br>• Inactionable Opinion:  Br. Section II.D. |
| 213; *see also* 84 | Q1 2015 Earnings Call (May 11, 2015) | "[W]e saw meaningful progress . . . with Palmetto's draft of local coverage determination published in January.  The draft LCD is an important step because it specifically relates to comprehensive genomic profiling, and because it sets a high standard for the rigorous analytic validation required for this type of approach." | • Not False/Misleading:  *See* reasons for ¶ 194 *supra*.<br>• Inactionable Puffery:  Br. Section II.C.<br>• Inactionable Opinion:  Br. Section II.D. |
| 214; *see also* 83 | Q1 2015 Earnings Call (May 11, 2015) | Defendant Daly confirmed growth in the market for genomic cancer testing was "driven by several key factors, including the shift from single gene to pan-cancer testing, the influx of new entrants into the space and increased marketing efforts on the part of national academic medical centers and national cancer treatment centers.  Coupled with programs like the President's Precision Medicine | • Not False/Misleading:  Plaintiff has not alleged any facts indicating that the factors and programs identified did not drive market growth, or any other facts indicating that these statements were false or misleading when made.  *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• Inactionable Opinion:  Br. Section II.D. |

37

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| | | Initiative, all has contributed to heightened patient and provider awareness and thus overall market growth." | |
| 214; *see also* 83 | Q1 2015 Earnings Call (May 11, 2015) | "[T]he flip side of this growth is market confusion . . . it's difficult for some oncologists and pathologists to differentiate today between the various tumor-profiling assays and to determine which test is most appropriate for a particular patient.  [T]his is not surprising." | • Not False/Misleading:  Plaintiff has not alleged any facts indicating that these statements concerning market confusion or tactics by competing companies were false or misleading when made.  *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. Plaintiff does not allege any facts indicating that the opinions as to market confusion were objectively false or not subjectively believed when made. *Corban*, 2015 WL 1505693, at \*6.  <br>• Inactionable Opinion:  Br. Section II.D. |
| 214; *see also* 83 | Q1 2015 Earnings Call (May 11, 2015) | "One need not look beyond the noise created in the market over the last few weeks. In one instance, we've seen confusing data. In other instances bold and misleading marketing statements from companies in the space claiming either to have comprehensive profiling tests or tests that offer more accurate results than those delivered by FoundationOne." | • Not False/Misleading:  *See* reasons for ¶ 214 *supra*.  <br>• Inactionable Opinion:  Br. Section II.D. |
| 214; *see also* 83 | Q1 2015 Earnings Call (May 11, 2015) | "In short, these tactics are employed by companies attempting to gain share of market by leveraging non-validated comparisons to Foundation Medicine's products that today remain the clinical gold standard. In some respects, this is one reason Foundation Medicine embraces proposed FDA oversight over LDTs, so the physicians can have confidence in the accuracy of the tests they order and patient care is protected." | • Not False/Misleading:  *See* reasons for ¶ 214 *supra*.  <br>• Inactionable Puffery:  Br. Section II.C.  <br>• Inactionable Opinion:  Br. Section II.D. |
| 214; *see* | Q1 2015 Earnings Call (May 11, | "Thus, we are at an important inflection point. Foundation Medicine's rigorous science and clinical validation has enabled our significant market penetration thus far. But | • Not False/Misleading:  *See* reasons for ¶ 214 *supra*.  <br>• Inactionable Puffery:  Br. Section II.C.  <br>• Inactionable Opinion:  Br. Section II.D. |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| *also* 83 | 2015) | with the increased volume of market noise, now is the time for us to focus on and invest in building a mature customer-centric commercial organization designed to lead for the next decade and beyond." | |
| 216 | Q1 2015 Earnings Call (May 11, 2015) | "We have been in this market the longest. We have the brand name. And I think that many look to us to provide the gold standard products, which we have been doing and we certainly take that to heart." | • Not False/Misleading:  Plaintiff has not alleged any facts indicating that FMI had not been in the market the longest, or any other facts indicating that this statement was false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• Inactionable Puffery:  Br. Section II.C.<br>• Inactionable Opinion:  Br. Section II.D. |
| 217 | Q1 2015 Earnings Call (May 11, 2015) | "We continue to see new doctors on a consistent basis quarter-over-quarter. We continue to see a slightly higher reorder rate at the academic medical centers versus the community centers.  That's something that we are working on, to be frank.  [T]hose reorder rates are really critical to the continued growth of our business, and a fair bit of our investment on the commercial side is heading that direction.  So directionally there really has not been any significant shift in either of those efforts in terms of new docs or a shift in the reorder rate. But those are things that we have to continue to focus on as an organization." | • Not False/Misleading:  Plaintiff has not alleged any facts indicating that FMI was not "seeing new doctors on a consistent basis," that the reorder rate was not "slightly higher" at medical centers, or any other fact indicating that these statements were false or misleading when made. *See also* reasons for ¶¶ 155, 181 *supra*.<br>• Inactionable Opinion:  Br. Section II.D. |
| 218 | Q1 2015 Earnings Call (May 11, 2015) | "[T]he reorder rate is clearly where the majority of our volume is coming from and the academic medical centers continue to dominate. But as we move more towards the community, in order to enhance that reorder rate, our commercial team is focusing on ensuring the actionability of the results that we provide." | • Not False/Misleading:  Plaintiff has not alleged any facts indicating that reorders did not constitute the "majority of [FMI's] volume," that the academic medical centers did not "continue[d] to dominate," that FMI's commercial team was not focused on ensuring the actionability of its Test results in order to enhance the reorder rate, or any other fact indicating that these statements were false or |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| | | | misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. *See also* reasons for ¶¶ 155, 181, 218 *supra*. |
| 219 | Q1 2015 Earnings Call (May 11, 2015) | With respect to FoundationOne Heme and the cause of a second quarter of declining numbers, Defendant Daly attributed the decline to "not yet reach[ing] the mainstream, as we have with FoundationOne." | • Not False/Misleading:  Plaintiff has not alleged any facts indicating that FoundationOne Heme had "reached the mainstream" or any other fact indicating that this statement was false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. |
| 220 | Q1 2015 Earnings Call (May 11, 2015) | "Directionally, we are exactly where we want to be. We see both the pharma and clinical areas growing nicely. Early on pharma led the way, and then we saw the clinical volume emerge. Now we have the emergence of our information business." | • Not False/Misleading:  Plaintiff has not alleged any particularized facts indicating that FMI's reported revenue or clinical Test volume were false or misleading, or any other facts indicating that these statements were false or misleading when made.<br>• Inactionable Puffery:  Br. Section II.C. |
| 221 | Q1 2015 Earnings Call (May 11, 2015) | "[T]he 43,000 to 47,000 tests [that the Company had projected for 2015] are all clinical market tests. None of those are pharma, either Roche or existing pharma partners. That's all in the clinical space." | • Not False/Misleading:  *See* reasons for ¶¶ 111, 130, 151, 171, 191, 208 *supra*<br>• Forward-Looking:  Br. Section II.B. |
| 222 | Q1 2015 10-Q (May 11, 2015) | "Our first clinical products, FoundationOne for solid tumors, and FoundationOne Heme for blood-based cancers, or hematologic malignancies, including leukemia, lymphoma, myeloma, and many sarcomas and pediatric cancers, are, to our knowledge, the only widely available comprehensive genomic profiles designed for use in the routine care of patients with cancer. To accelerate our commercial growth and enhance our competitive advantage, we are continuing to expand our sales force, grow our molecular information knowledgebase, called FoundationCORE, publish scientific and medical advances, | • Not False/Misleading:  Plaintiff has not alleged any facts indicating that the description of the Tests was false or misleading when made, or that FMI was not taking the identified steps. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. Plaintiff also has not alleged any facts indicating that the opinion regarding FMI's "first mover advantage" was objectively false or not subjectively believed when made. *Corban*, 2015 WL 1505693, at *6.<br>• Inactionable Opinion:  Br. Section II.D. |

Case 1:17-cv-11394-LTS   Document 28-1   Filed 02/20/18   Page 60 of 629

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| | | foster relationships throughout the oncology community, and develop new clinical and technology products. * * * Our products provide genomic information about each patient's individual cancer, enabling physicians to optimize treatments in clinical practice and biopharmaceutical companies to develop targeted oncology therapies more effectively. We believe we have a significant first mover advantage in providing comprehensive genomic profiling and molecular information products on a commercial scale." | |
| 223 | Q1 2015 10-Q (May 11, 2015) | The 1Q15 10-Q also repeated the revenue and clinical test volume numbers reported in the Company's press release, claiming that "[t]he increase was driven by our growing test volumes and expanding commercialization efforts." | • Not False/Misleading: *See* reasons for ¶¶ 208, 220 *supra*. |
| | | **Second Quarter 2015 Financial Results** | |
| 228; *see also* 8, 87 | Q2 2015 Press Release (July 29, 2015) | "Foundation Medicine delivered 16% quarter-over-quarter revenue growth demonstrating that our commercial team continues to leverage a portfolio of differentiated products for both our clinical and biopharmaceutical clients and partners." | • Not False/Misleading: Plaintiff has not challenged Defendants' accurate Q2 2015 financial results, nor has Plaintiff alleged any particularized facts indicating that the Company's reported revenue or clinical Test volume were false or misleading. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• Inactionable Opinion: Br. Section II.D. |
| 228; *see also* 8, 87 | Q2 2015 Press Release (July 29, 2015) | "[C]linical volume growth was affected by slower than anticipated progress towards obtaining a local coverage determination from our regional Medicare Administrative Contractor (MAC) and by some competitive noise in the market . . . we are adjusting guidance for clinical volume and annual revenues." | • Not False/Misleading: *See* reasons for ¶ 228 *supra*. Plaintiff has alleged no facts indicating that FMI's Q2 2015 results were not affected by the factors identified herein, or any other facts indicating that these statements were false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. |

41

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| 228; *see also* 8, 87 | Q2 2015 Press Release (July 29, 2015) | "We remain focused on building and investing in this business to deliver growth and value creation by integrating our molecular information products into routine patient care." | • Not False/Misleading: *See* reasons for ¶ 228 *supra*.<br>• Inactionable Puffery: Br. Section II.C. |
| 229 | Q2 2015 Press Release (July 29, 2015) | The press release reported updated FY15 guidance for 2015, lowering revenue guidance to a range of $85 to $95 million, instead of $105-$115 million, and FY15 clinical test volume in the range of 35,000-38,000, instead of 43,000-47,000. | • Not False/Misleading: *See* reasons for ¶¶ 111, 130, 151, 171, 191, 208, 221 *supra*.<br>• Forward-Looking: Br. Section II.B. |
| 230; *see also* 88 | Q2 2015 Earnings Call (July 29, 2015) | "To begin our business continued with steady growth in the second quarter, with a 16% increase in total revenue over Q1." | • Not False/Misleading: *See* reasons for ¶ 228 *supra*. |
| 230; *see also* 88 | Q2 2015 Earnings Call (July 29, 2015) | With respect to the clinical side of Foundation's business, Defendant Pellini attributed volume growth to "physicians continued support, adoption and integration of our gold standard comprehensive genomic profiling approach to cancer." | • Not False/Misleading: *See* reasons for ¶ 228 *supra*.<br>• Inactionable Puffery: Br. Section II.C. |
| 230; *see also* 88 | Q2 2015 Earnings Call (July 29, 2015) | "Our 2015 annual guidance for clinical volume testing was developed based on certain assumptions, including having a local coverage determination, or LCD, for a portion of Medicare cases in place, starting in the first half of 2015." | • Not False/Misleading: Plaintiff has not alleged any facts indicating that FMI did not base its 2015 annual guidance for clinical Test volume on the factor identified, or any other facts indicating that this statement was false or misleading when made. Plaintiff has not alleged any particularized facts that Defendants did not have a reasonable basis for their forward-looking predictions of 2015 revenue and clinical Test volumes. *Bristol*, 12 F. Supp. 3d at 238; *see also* reasons for ¶¶ 111, 130, 151, 171, 191, 221, 229 *supra*. |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| | | | |
| 230; *see also* 88 | Q2 2015 Earnings Call (July 29, 2015) | Defendant Pellini also disclosed that, as a result of "slower than expected progress with Medicare and certain national commercial payers," Foundation did not see "the commonly observed carryover effect from a coverage decision that we would typically expect to see in the field." | • <u>Not False/Misleading</u>: Plaintiff has not alleged any facts indicating that progress with Medicare and certain national payers was not "slower than expected" or that the referenced "carryover effect" was not typical or expected, or any other facts indicating that these statements were false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46. |
| 231; *see also* 88 | Q2 2015 Earnings Call (July 29, 2015) | "As guided by Medicare at the local and national levels, we worked closely with Palmetto GBA, even though they are not the specific Medicare Administrative Contractor, or MAC for our region. While there was no direct precedent for this approach, Palmetto was the only MAC with expertise in assessing cutting edge molecular testing, and it was strongly suggested that other MACs, including ours, National Government Services, or NGS, would look to Palmetto for guidance on this important area. The first part of the effort took shape. Palmetto's LCD for comprehensive genomic profiling in a subset of patients with non-small cell lung cancer became final as of July 6th. We expect Palmetto to establish in Q3 a reasonable payment approach that reflects the clear need to maintain very high standards for analytic validation of comprehensive genomic profiling. We anticipated NGS to be more proactive based on the Palmetto decision, but we now realize this next phase is going to take more time to play out." | • <u>Not False/Misleading</u>: Plaintiff has not alleged any facts indicating that the statements concerning Palmetto were false or misleading when made, or that FMI did not "anticipate NGS to be more proactive" as disclosed, particularly given the disclosure that "there was no direct precedent for [FMI's] approach." *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• <u>Forward-Looking</u>: Br. Section II.B. |
| 231; *see* | Q2 2015 Earnings Call (July 29, | "The payer process in the US is complex, and a lack of clarity at the local MAC level does nothing to simplify the route to coverage. We are being much more proactive at the | • <u>Not False/Misleading</u>: *See* reasons for ¶ 231 *supra*.<br>• <u>Forward-Looking</u>: Br. Section II.B.<br>• <u>Inactionable Opinion</u>: Br. Section II.D. |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| *also* 88 | 2015) | state and federal levels to bring awareness to this process. And we are working to not only ensure coverage for patients, but to implement change to the system. While we continue to push on all fronts we are no longer assuming any Medicare payment for the rest of 2015. That said, we do expect additional progress at the regional level, and Jason will provide additional commentary. Given what I has just stated, we are updating our outlook for clinical testing volume to 35,000 to 38,000 clinical cases, and revising 2015 full year revenue guidance to a range of $85 million to $95 million." | |
| 231; *see also* 88 | Q2 2015 Earnings Call (July 29, 2015) | "Given what I have just stated, we are updating our outlook for clinical testing volume to 35,000 to 38,000 clinical cases, and revising 2015 full year revenue guidance to a range of $85 million to $95 million." | • Not False/Misleading:  *See* reasons for ¶¶ 111, 130, 151, 171, 191, 221, 229 *supra*.<br>• Forward-Looking:  Br. Section II.B. |
| 232; *see also* 90 | Q2 2015 Earnings Call (July 29, 2015) | With respect to competition, Defendant Pellini admitted that Foundation was continuing to "build stronger messaging around the need for comprehensive testing in the appropriate clinical indication" and that the Company was "making progress on that front." | • Not False/Misleading:  Plaintiff has not alleged any facts indicating that FMI was not building "stronger messaging" or any other facts indicating that this statement was false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• Inactionable Puffery:  Br. Section II.C. |
| 233; *see also* 89 | Q2 2015 Earnings Call (July 29, 2015) | "The average reimbursement per clinical test recognized in revenue was approximately $3,400, consistent with the first quarter." | • Not False/Misleading:  *See* reasons for ¶¶ 132, 141, 157, 177, 182, 212 *supra*. |
| 233; *see also* 89 | Q2 2015 Earnings Call (July 29, 2015) | "We had planned as Mike mentioned for a portion of our Medicare cases to be paid starting in the first half of the year, and the lack of an LCD in our region began to impact the growth curve of clinical revenue and testing volume." | • Not False/Misleading:  *See* reasons for ¶ 231 *supra*. |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| 233; *see also* 89 | Q2 2015 Earnings Call (July 29, 2015) | "Our adjusted annual guidance for clinical test volume is 35,000 to 38,000 reported tests, and $85 million to $95 million in annual revenue." The changes to guidance were "driven by a shift in our assumptions around the timing of Medicare payments, the associated affect that an LCD can has on non-Medicare volumes, and some of that competitive noise of the marketplace related to hot spot based testing." | • <u>Not False/Misleading</u>: *See* reasons for ¶¶ 111, 130, 151, 171, 191, 221, 229, 231 *supra*. |
| 234 | Q2 2015 Earnings Call (July 29, 2015) | "What we saw in Q2 is very consistent with what we saw in Q1, and frankly Q4 of last year . . . . That is about 60% of our clinical volume continues to come from the community, whereas about 40% of our volume comes from the academic medical centers. . . .both [are] growing . . . growing in a consistent fashion." | • <u>Not False/Misleading</u>: *See* reasons for ¶¶ 153, 176, 193 *supra*. |
| 234 | Q2 2015 Earnings Call (July 29, 2015) | He also commented on reorder rates stating, "the reorder rate and the number of test order in any given month by a single practitioner in the community is not as high as we see in the academic medical centers" and "[o]verall we saw nice volume growth of 13% from Q2 over Q1, and we saw that growth in both the academic and the community settings." | • <u>Not False/Misleading</u>: *See* reasons for ¶¶ 111, 130, 151, 171, 191, 221, 229, 231 *supra*; *see also* reasons for ¶¶ 155, 181, 218.<br>• <u>Inactionable Puffery</u>: Br. Section II.C. |
| 235 | Q2 2015 Earnings Call (July 29, 2015) | "[T]here are a number of companies that have emerged with some hot spot type test, claiming in some cases to offer a comprehensive assay," Foundation was "maintaining [its] leadership position" in the market "as we go forward." | • <u>Not False/Misleading</u>: Plaintiff has not alleged any facts indicating that other companies had emerged and claimed to offer a "comprehensive assay" or any other fact indicating that these statements were false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.<br>• <u>Inactionable Puffery</u>: Br. Section II.C.<br>• <u>Inactionable Opinion</u>: Br. Section II.D. Plaintiff has omitted the following language from his quote: "***we*** |

45

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| | | | *feel like we do believe* we are maintaining our leadership position as we go forward." |
| 236 | Q2 2015 Earnings Call (July 29, 2015) | "We use everything that we know about today to put into that guidance . So that is probably how I would address that question. The Medicare cases we had expected or planned to get paid this year is part of the adjustment to revenue, and the other part as Mike had mentioned, is this spillover effect, as you well understand. These LCDs by a MAC, or if it is at the national level can has a spillover effect to the commercial payer marketplace as well. I think it is a combination of the direct Medicare revenue, as well as some of the other volume impact, if that answers your question." | • Not False/Misleading: *See* reasons for ¶ 231 *supra*. |
| 237 | Q2 2015 Earnings Call (July 29, 2015) | "Medicare coverage has an impact, both on those cases that we had planned for payment during the year" and "is one substantive piece of the change in the revenue guidance. The other substantial piece relates to overall volume, so there is that carryover effect . . . . That a positive LCD would have, more broadly in a physician's office around other testing that is not just Medicare volume."<br><br>"It really is a combination of those two things. . . . [T]here is sort of in the background some of this competitive noise too." | • Not False/Misleading: *See* reasons for ¶ 231 *supra*. |
| 238 | Q2 2015 Earnings Call (July 29, 2015) | In discussing the impact from "competitive noise" and specifically, liquid biopsies, Defendant Pellini admitted that "it does create a little bit of noise" but claimed it was only "in the short-term." | • Not False/Misleading  Plaintiff has not alleged any facts indicating that these statements concerning liquid biopsies were false or misleading when made. *Bristol*, 12 F. Supp. 3d at 238; *Biogen*, 193 F. Supp. 3d at 46.  Moreover, Plaintiff has mischaracterized these statements by quoting from the full statement: "…those will all become pieces of the long-term solution that we bring to the marketplace. And so I |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| | | | think it does create, and I said on the call last time around, I [sic] does create a little bit a little bit of noise in the short term. We have to work through this. We have to continue to educate the market…But long term, all these pieces simply become a portfolio of what Foundation Medicine brings to the marketplace." |
| 241 | Q2 2015 10-Q (August 7, 2015) | "Our first clinical products, FoundationOne for solid tumors, and FoundationOne Heme for blood-based cancers, or hematologic malignancies, including leukemia, lymphoma, myeloma, and many sarcomas and pediatric cancers, are, to our knowledge, the only widely available comprehensive genomic profiles designed for use in the routine care of patients with cancer. To accelerate our commercial growth and enhance our competitive advantage, we are continuing to expand our sales force, grow our molecular information knowledgebase, called FoundationCORE, publish scientific and medical advances, foster relationships throughout the oncology community, and develop new clinical and technology products. * * * Our products provide genomic information about each patient's individual cancer, enabling physicians to optimize treatments in clinical practice and biopharmaceutical companies to develop targeted oncology therapies more effectively. We believe we have a significant first mover advantage in providing comprehensive genomic profiling and molecular information products on a commercial scale." | • Not False/Misleading: *See* reasons for ¶ 222 *supra*.<br>• Inactionable Puffery: Br. Section II.B. |
| 242 | Q2 2015 10-Q (August 7, 2015) | The 2Q15 10-Q also repeated the revenue and clinical test volume numbers reported in the Company's press release, claiming that "[t]he increase was driven by our growing | • Not False/Misleading: *See* reasons for ¶¶ 222, 223, 228 *supra*. |

| AC ¶ | Source | Alleged Misleading Statement[4] | Why Statement Is Not Actionable[5] |
|---|---|---|---|
| | | test volumes and expand[ed] commercialization efforts." | |

48